## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

RECEIVED

| | | |
|---|---|---|
| ANGELA DENISE NAILS, | * | 2007 JAN 29  A 11: 14 |
| | * | |
| PLAINTIFF, | * | 1:06-CV-00737. WKW |
| | * | DEBRA P. HACKETT, CLK |
| vs. | * | U.S. DISTRICT COURT |
| | * | MIDDLE DISTRICT ALA |
| DOTHAN RESCUE MISSION, | * | |
| | * | |
| DEFENDANT. | * | |

### MOTION FOR SUMMARY JUDGMENT

THE DEFENDANT, Dothan Rescue Mission, moves this Court to enter a full, final and appealable summary judgment in its favor and against the Plaintiff as to all counts of the Complaint, pursuant to Rule 56 Fed. R.  In support of these requests, the Defendant states:

1.   No genuine issues of material fact exists.

2.   The Defendant is entitled to a judgment and to affirmative rulings and orders from this Court as a matter of law.

3.   There is no just reason for delay.

4.   The Defendant submits its Brief in Support of its Motion for Summary Judgment in support of this motion.

5.   The Defendant submits the following evidentiary materials, in addition to the pleadings of record in this case, in support of this motion:

(a)   The Affidavit of Brad Hardy.

(b)   The Affidavit of Anna Culbreth.

(c)   The Affidavit of Angela Palmer.

(d)   The Deposition of Angela Denise Nails.

(e)   Defendant's Exhibits 7, 12, 13, 15, 18,
      and 21.

WHEREFORE, the Defendant moves the Court to enter a full, final and appealable summary judgment in its favor and against the Plaintiff as to all counts of the Complaint or, alternatively, as to such counts of the Complaint as the evidence entitles it.

HARDWICK, HAUSE, SEGREST & WALDING

BY: _____
     Kevin Walding (WAL036)
     ASB 8121-I-69J

BY: _____
     Patrick B. Moody (MOO110)
     ASB 0902-T-73M
     Post Office Box 1469
     Dothan, Alabama 36302
     (334) 794-4144
     (334) 671-9330 (FAX)
ATTORNEYS FOR DEFENDANT

## **CERTIFICATE OF SERVICE**

I hereby certify that, this date, I have served a copy of this document on the following attorney (s) of record by placing a copy in the United States Mail in a properly addressed envelope with prepaid postage.

Angela Denise Nails
342 South Saint Andrews Street
Apartment 808
Dothan, Alabama 36301

This the 26th day of January, 2007.

Of Counsel

# Evidentiary Materials
## In Support of
## Summary Judgment

A.    The Affidavit of Brad Hardy.

B.    The Affidavit of Anna Culbreth.

C.    The Affidavit of Angela Palmer.

D.    The Deposition of Angela Denise Nails.

E.    Defendant's Exhibits 7, 12, 13, 15, 18, and 21.

# AFFIDAVIT
# OF
# BRAD HARDY

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

ANGELA DENISE NAILS,          *
                              *
        PLAINTIFF,            *        1:06-CV-00737.WKW
                              *
vs.                           *
                              *
DOTHAN RESCUE MISSION,        *
                              *
        DEFENDANT.            *


## AFFIDAVIT OF BRAD HARDY

STATE OF ALABAMA     )
                     )
HOUSTON COUNTY       )

Before me, the undersigned authority, personally appeared BRAD HARDY, who, being duly sworn, deposes and says as follows:

My name is Brad Hardy. I am over 19 years of age and am a resident of the State of Alabama, residing in Dothan, Houston County, Alabama. I have personal knowledge of the facts stated below.

I am employed as the Executive Director of The Dothan Rescue Mission. The Dothan Rescue Mission is a privately funded religious organization assisting the less fortunate citizens of Dothan and the surrounding areas. The Mission provides housing assistance, meals, and financial assistance to less fortunate citizens. As part of our program, guests at the Mission are required to attend religious services every night.

Guests at the Mission are required to follow rules and procedures designed to protect their safety and to accomplish the purposes, goals, and religious aims of the Mission. If a guest refuses to follow these rules and procedures they are asked to leave the Mission.

Part of my job as Executive Director is reviewing the files of people who apply for assistance from the Mission. In January of 2005, I reviewed the Mission's file on Nails when she applied for assistance. I also interviewed Nails to determine her financial needs. Her file showed that she had broken rules at the Mission in the past, and that the previous Director had barred her from the Mission. Nails indicated to me that she had shelter, but she wanted to stay at the Mission to save rent money. After learning these facts, I denied Nails any financial assistance or shelter.

I did provide Nails with meal vouchers for the cafeteria on quite a few occasions. These vouchers were revoked, however, after I learned that Nails was speaking negatively of the Mission while she was using our cafeteria.

As Executive Director of the Rescue Mission I am the custodian of records for the Rescue Mission. The documents marked as Defendant's Exhibits 1 through 20 are true and correct copies of official records of the Mission, all of which are kept in the ordinary course of business for the Mission.

The work of the Dothan Rescue Mission is solely supported by private donations from churches, individuals, and businesses. The Mission does not receive any federal, state or local government funds of any kind. The Mission is considered a religious organization under section 501(c)(3) of the tax code.

The Dothan Rescue Mission is not a branch or department of the City of Dothan. The only contact the Mission has with the City of Dothan is through a program called Project Care.

Project Care is a program that allows Dothan utility customers to donate their private funds to help less fortunate citizens with their utility bills. This program is completely voluntary. No Dothan utility customer is required to donate funds and no tax dollars are used for this fund.

The utility department for the City of Dothan simply forwards the privately donated funds to the Rescue Mission. The Mission then disburses these funds to applicants who

have demonstrated a financial need with their electric
bills.  The Mission does not receive any support from City
funds, that is, from taxpayer funds.  The funds from Project
Care are private funds that come from utility customers who
choose to donate.

The facts stated above are true and correct.

_____
BRAD HARDY


Sworn to and subscribed before me on this the *14th* day
of December, 2006.

(S E A L)                    _____
                             NOTARY PUBLIC

                             MY COMMISSION EXPIRES:
                             _5/09/2010_____

Page 3 of 3

# AFFIDAVIT
# OF
# ANNA CULBRETH

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ANGELA DENISE NAILS, | * | |
| | * | |
| PLAINTIFF, | * | 1:06-CV-00737.WKW |
| | * | |
| vs. | * | |
| | * | |
| DOTHAN RESCUE MISSION, | * | |
| | * | |
| DEFENDANT. | * | |

### AFFIDAVIT OF ANNA CULBRETH

**STATE OF WASHINGTON** )
)
**KING COUNTY** )

Before me, the undersigned authority, personally appeared ANNA CULBRETH, who, being duly sworn, deposes and says as follows:

My name is Anna Culbreth. I am over 19 years of age and am a resident of the State of Washington, residing in Redmond, King County Washington. I have personal knowledge of the facts stated below.

I was employed as the Assistant Executive Director of the Dothan Rescue Mission until 2004. The Dothan Rescue Mission is a privately funded religious organization assisting the less fortunate citizens of Dothan and the surrounding areas.  The Mission provides housing assistance, meals, and financial assistance to less fortunate citizens. As part of the Mission's program, guests are required to attend religious services every night.

Guests at the Mission are required to follow rules and procedures designed to protect their safety and to accomplish the purposes of the Mission.  If a guest refuses to follow these rules and procedures, they are asked to leave the Mission.

I remember working with Angela Denise Nails on numerous occasions. Nails refused to follow many of the rules at the Mission. She seemed to have trouble following our program and wanted to do things her own way.

Nails called my husband, Harry Culbreth, and I at home quite a few times complaining about the Mission, and the requirements of the Mission's program.

Because of the phone calls and the discussions with the women's lodge manager concerning Nails's conduct and her refusal to follow the rules, we decided to ask her to never come to the Mission again.

On several occasions after we barred Nails, the Mission provided her with meal cards and other assistance, but we did refuse to allow her to reside in the Mission.

The facts stated above are true and correct.

ANNA CULBRETH

Sworn to and subscribed before me on this the 18th day of December, 2006.

(SEAL)

Notary Public
The State Of Washington
L. DIACONU
My Commission Expires APR 19, 2009

NOTARY PUBLIC

MY COMMISSION EXPIRES:
April 19, 2009

# AFFIDAVIT
# OF
# ANGELA PALMER

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

ANGELA DENISE NAILS,   *
            *
   PLAINTIFF,    *   1:06-CV-00737.WKW
            *
vs.          *
            *
DOTHAN RESCUE MISSION,  *
            *
   DEFENDANT.    *

## AFFIDAVIT OF ANGELA PALMER

STATE OF ALABAMA  )
          )
HOUSTON COUNTY   )

Before me, the undersigned authority, personally appeared ANGELA PALMER, who, being duly sworn, deposes and says as follows:

My name is Angela Palmer. I am over 19 years of age and am a resident of the State of Alabama, residing in Dothan, Houston County, Alabama. I have personal knowledge of the facts stated below.

I am employed by the City of Dothan as the City Finance Director. Project Care is a program whereby Dothan Utility customers may choose to donate funds to help less fortunate citizens with their utility bills. The money donated by the citizens is in addition to the amount they owe Dothan Utilities. Dothan Utilities simply gathers the donated money and passes it along to The Dothan Rescue Mission. No matching funds from the City of Dothan are given to the Mission. The City does not donate any money from any source of revenue to Project Care.

All money given to The Dothan Rescue Mission through Project Care is by private donations from Dothan utility customers. The Dothan Rescue Mission has complete control over how the donated funds are disbursed. Basically the

utility office turns over any donated money, and then The Rescue Mission determines the criteria for applicants and who is eligible to receive these funds.  The Rescue Mission is in charge of distributing these funds.  The City of Dothan nor Dothan utilities is involved in any way with the distributing of these funds.

The Dothan Rescue Mission is not an entity or office of the City of Dothan.  The City has no control over nor involvement with any aspect of The Dothan Rescue Mission.

The facts stated above are true and correct.

_Angela Palmer_
_____
ANGELA PALMER

Sworn to and subscribed before me on this the 21 day of December , 2006 .

_Tracie Williams_
_____
NOTARY PUBLIC



MY COMMISSION EXPIRES:
July 1, 2008

# DEPOSITION
# OF
# ANGELA DENISE NAILS

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           MIDDLE DISTRICT OF ALABAMA
 3               SOUTHERN DIVISION
 4   ANGELA DENISE NAILS,      )
 5        PLAINTIFF,           )
 6   VS.                       )   1:06-CV-00737-WKW
 7   DOTHAN RESCUE MISSION,    )
 8        DEFENDANT.           )
 9        The deposition of ANGELA DENISE NAILS,
10   taken by the Defendant, pursuant to the Federal
11   Rules of Civil Procedure, before Linda G. Petty,
12   Court Reporter, and Notary Public, State at
13   Large, at the law offices of Hardwick, Hause,
14   Segrest & Walding, Dothan, Alabama, on the 6th
15   day of December, 2006, at 1:00 P.M., CST,
16   pursuant to notice.
17
18                  * * * * *
19
20   APPEARANCES:
21   FOR THE PLAINTIFF:    FOR THE DEFENDANT:
22   PRO SE               MR. KEVIN WALDING
                          MR. PATRICK MOODY
23   ALSO PRESENT:        Attorneys at Law
                          Dothan, Alabama
24   MR. BRAD HARDY
25
```

**Page 2**

```
 1          ANGELA DENISE NAILS
 2   having been first duly sworn, testified as
 3   follows, to-wit:
 4
 5          EXAMINATION
 6
 7   BY MR. WALDING:
 8     Q  Tell me your full name, please.
 9     A  Angela Denise Nails.
10     Q  Ms. Nails, I'm Kevin Walding, and this
11   is my associate, Patrick Moody.  We're attorneys
12   representing the Dothan Rescue Mission in the
13   lawsuit that you have filed against the Dothan
14   Rescue Mission.  Do you understand that?
15     A  Yes, I understand.
16     Q  I'm here today to take your
17   deposition.  Have you given a deposition before?
18     A  I don't believe so.
19     Q  Okay.  Well, just that you and I are
20   communicating well, I want you to understand how
21   the process works.  Okay?
22        Basically, a deposition is a chance for me,
23   as the lawyer for the person or entity that you
24   have sued, to ask you questions about your
25   lawsuit and about you.  And how the process
```

**Page 3**

```
 1   works is that I ask a question, and then, you
 2   respond to the question.  Okay?  Do you
 3   understand that?
 4     A  Yes, I understand that.
 5     Q  And this lady here is the court
 6   reporter, and her job is to take down both my
 7   question, and then, your response.
 8     A  Uh-huh.
 9     Q  Do you understand that?
10     A  Yes, I understand that.
11     Q  Okay.  It's important, while we're
12   doing this process, that, if you don't
13   understand one of my questions, that you tell me
14   that.  Okay?
15     A  (Witness nodding head in affirmative.)
16     Q  And we --
17     A  I'll tell you that.
18     Q  Good.  It's also important for you to
19   answer the question in a verbal way, out loud.
20     A  Okay.
21     Q  As opposed to shaking your head up and
22   down or sideways.
23     A  Okay.
24     Q  And that way, we have a clear
25   indication, on the record, with this lady, as to
```

**Page 4**

```
 1   what your response to the question is.  Okay?
 2     A  Okay.
 3     Q  You understand that?
 4     A  Uh-huh.
 5     Q  All right.
 6     A  Okay.
 7     Q  So, will you agree that, if you don't
 8   understand one of my questions, you'll tell me
 9   that?
10     A  I will tell you that I do not
11   understand the question.
12     Q  Good.  And will you agree, as best you
13   can, to answer my questions out loud, verbally,
14   as opposed to shaking your head up and down or
15   sideways?
16     A  Yes.  I agree to answer verbal -- the
17   questions verbally.
18     Q  Good.  Good.  You understand the basic
19   process that we're going to be following?
20     A  Yes.  I do understand the basic
21   process we're following, yes, I do.
22     Q  Good.  Are you taking any drugs or
23   medications or chemical substances of any kind
24   today that might impair your ability to listen
25   to my question, and then, respond to it?
```

Page 5

1   A  No.  I'm not taking any type of drugs
2  or chemical that would imbalance me from
3  answering any question today.
4   Q  Okay.  Are you suffering from any sort
5  of medical conditions or mental conditions or
6  emotional conditions that might affect your
7  ability to listen to my question, and then,
8  answer it?
9   A  No, I am not.
10   Q  Okay.  Are you having any personal
11  problems or concerns today that might affect you
12  being able to listen to my question and answer
13  that question truthfully?
14   A  No, I do not.
15   Q  Where do you live, Ms. Nails?
16   A  I live at 342 Saint Andrews Street,
17  Apartment Number 808, in Dothan, Alabama.
18  36301 is the ZIP code.
19   Q  And how long have you lived at that
20  address?
21   A  One year and one day.
22   Q  So, you're saying you moved there a
23  year and a day ago?
24   A  Yes.
25   Q  Where did you live before you went to

Page 6

1  live there on Saint Andrews Street?
2   A  At -- let me think about it.  103 East
3  Lafayette Street, Apartment Number 1, in Dothan,
4  Alabama.  36301 is the ZIP code.
5   Q  And how long did you live there at 103
6  East -- I call it Lafayette Street -- okay? --
7  here in Dothan?
8   A  Four months.
9   Q  Let's go back to where you live
10  presently.  Do you live with anyone there on
11  Saint Andrews Street?
12   A  I live alone.
13   Q  Are you married?
14   A  No.  I'm single.
15   Q  What about when you lived there on
16  East Lafayette Street, for that approximately
17  four months?  Did you live with anyone else
18  there?
19   A  No, I did not.
20   Q  So, you lived alone?
21   A  Yes, I did.
22   Q  Why is it that you moved from this
23  apartment on East Lafayette Street to the
24  apartment on Saint Andrews?
25   A  Because there was a tenant that lived

Page 7

1  behind me that was not on the lease, and she was
2  selling or buying drugs and doing some other
3  illegal activities.  So, I moved.
4   Q  Okay.  Better neighborhood?
5   A  No.  It -- it's right in back of the
6  house or the house apartment that I was living
7  in.  I live in the Vaughn Towers.
8   Q  Right.
9   A  It's right behind where I was.
10   Q  You were moving to get away from a
11  neighbor of yours who was doing illegal --
12   A  A nontenant.
13   Q  Oh.
14   A  Nontenant.
15   Q  Didn't even live there?
16   A  Wasn't even on the lease.
17   Q  Okay.  Where did you live before you
18  lived at 103 East Lafayette Street?
19   A  I don't remember.  I'm sorry.  I don't
20  remember.
21   Q  Do you believe you lived here in
22  Dothan, Alabama, or --
23   A  Yeah.  I've been here in Dothan for --
24  I think I left in January of 2003, and I came
25  back in June of 2003.  So, yes.  I've been here

Page 8

1  since June of 2003, in Dothan, Alabama.
2   Q  So, you know for certain, as we sit
3  here this afternoon, that you've lived in Dothan
4  since at least June of 2003?
5   A  Yes.
6   Q  You just can't tell me exactly where
7  you lived?
8   A  No, I can't.
9   Q  You said something about you left at
10  an earlier time?
11   A  Yes, I did.
12   Q  When was it that you left?
13   A  January of 2003.
14   Q  And where was it that you went to?
15  Did you move to another city?  Is that what
16  you --
17   A  It was a state.  A different state.
18  I left in -- well, I really don't remember,
19  because I've been going to college.  And then,
20  I have daughters that live in Alabama.
21  Aliceville, Alabama.
22   So, it could have been either I was in
23  Alabama, Aliceville, Alabama, or I left and went
24  out of state and moved there.  But, I believe I
25  was in Aliceville, Alabama.

Multi-Page

## Page 9

1    Q   Where would you have gone if you had
2  moved out of state?  Any particular state?
3    A   Probably Florida, if I had to assume
4  that that was the case.
5    Q   And why do you say "probably Florida"?
6    A   I have ties there.  My grandmother
7  lived there.  I used to live there for quite a
8  while.
9    Q   Where does she live in Florida?
10   A   Okaloosa County.  Fort Walton Beach.
11 But, she's passed, now.  But, my grandfather
12 just lives there alone.
13   Q   Any other state that you might have
14 moved to?
15   A   In the last how many years?
16   Q   Well, I was trying to go back about 10
17 or 15.  But, you're not able to get me past June
18 or January of 2003?
19   A   Well, 1996, I moved to Fort Walton
20 Beach, Florida.
21   Q   Okay?
22   A   And then, I stayed there for four
23 years.  In 2000 -- '96, '97, '98, '99 -- I went
24 to Flint, Michigan until 2001.
25   Q   And then, you think you may have lived

## Page 10

1  either in Aliceville, Alabama, or at Fort Walton
2  Beach, Florida, during this period of time
3  between 2001 and 2003?
4    A   In 2001, I went back to Fort Walton
5  Beach and left there in 2003.  In 2003 -- 2002.
6  It must have been the end of 2002, because I
7  came to Dothan in 2003, in January, and left in
8  June.  And from there, I must have went to
9  Aliceville, Alabama, to stay with my children
10 for six months.
11   Q   With your daughter?
12   A   I have two daughters, yes.
13   Q   They both live in Aliceville, Alabama?
14   A   Yes.
15   Q   Have you lived in Texas before?
16   A   I lived in El Paso, Texas.
17   Q   When was it you lived there,
18 approximately?
19   A   It was the time span between Michigan,
20 Flint, Michigan, and 2001.  Some time in 2001.
21   Q   Did you attend school out there?
22   A   Howard Payne University, yes.
23   Q   I'm sorry?
24   A   Howard Payne University, yes.
25   Q   I think I asked you if you were

## Page 11

1  married, and you told me that you're single?
2    A   I'm divorced.
3    Q   Who were you married to?
4    A   Lester McCaa.  M-c-C-a-a.  Small c,
5  big C, double a.
6    Q   You're going way too fast for me.  I'm
7  sorry.
8    A   M, small c, big C, double a.
9    Q   Double a.  Okay.  And where does
10 Lester McCaa live, now?
11   A   He lives in Aliceville, Alabama.
12   Q   Does he have any relatives that live
13 here in the Wiregrass area?
14   A   No, he doesn't.
15   Q   Let me be a little more specific on
16 that question.  When I say the Wiregrass area,
17 I'm concerned with Houston County.  That's here
18 where Dothan is.  Henry County, up where
19 Abbeville and Headland are.  Dale County, which
20 is Ozark, also, Midland City, Ariton.  Those
21 would be at least three towns in Dale County.
22 Geneva County, and, of course, you have Hartford
23 and Slocomb and Geneva over there.  And Coffee
24 County.  And Coffee is Enterprise, and also,
25 Elba.

## Page 12

1    Your ex-husband, Mr. McCaa, did he have any
2  relative or does he have any relatives that live
3  in those counties?
4    A   No.  No, he does not.
5    Q   You understand, now, when I'm talking
6  about the Wiregrass area, I'm talking about
7  those counties?
8    A   I understand.  He -- they lived in
9  Pickens County.  The county is Pickens.
10   Q   You told me that you have two
11 daughters?
12   A   Two daughters.
13   Q   Any other children?
14   A   No.
15   Q   Tell me your daughters' names?
16   A   Tasha.  Alisha.  A-l-i-s-h-a.  The
17 same last name as my ex-husband.
18   Q   McCaa?
19   A   Uh-huh.
20   Q   How old is Tasha?
21   A   Twenty-three.
22   Q   And how old is Alisha?
23   A   Twenty-two.
24   Q   And is Tasha married?
25   A   Both of them are single.  Never been

Page 13

1  married.
2  Q  And both live in Aliceville, Alabama?
3  A  Yes.
4  Q  Do you have any relatives that live in
5  the Wiregrass area?  Now, I'm again going back
6  to those counties, Houston, Henry, Dale, Geneva
7  and Coffee County.  Those five counties are the
8  counties I'm talking about, when I say the
9  Wiregrass.  Do you have any relatives that live
10  in those five counties?
11  A  No, I don't.
12  Q  Do you have any living relatives?
13  A  Yes, I do.
14  Q  And where do they live?
15  A  My mother lives in Maryland.
16  Q  I'm sorry?  Maryland?
17  A  Maryland.
18  Q  And I'm a little hard of hearing, Ms.
19  Nails, and I apologize to you for that.  But,
20  you know, it's just like being a little
21  overweight.  I can't help that, either.  All
22  right?  So, sometimes, I may ask you to repeat.
23  Okay?
24  A  That's fine.  I don't mind repeating
25  something.

Page 14

1  Q  Your mom lives in Maryland?
2  A  My daddy is deceased.  The rest of my
3  family is in Detroit, Michigan, and Columbus,
4  Ohio.
5  Q  I think you said something about your
6  grandfather still lived down in Fort Walton?
7  A  Uh-huh.  Yes.  In Fort Walton Beach.
8  He's 80-something years old.
9  Q  Do you have any close friends that
10  live in the Wiregrass area?  And, again, by the
11  Wiregrass area, I'm talking about Houston
12  County, Henry County, Dale County, Geneva County
13  and Coffee County.  Any close friends that live
14  in the Wiregrass area?
15  A  No.  No, I do not have any close
16  friends that live in the Wiregrass areas.
17  Q  You don't have any close friends, Ms.
18  Nails?
19  A  I don't have any friends.
20  Q  No friends at all?
21  A  No friends at all.
22  Q  Well, why is that?
23  A  I'm just not from this area.  So, I
24  just haven't met a lot of people.  I've had a
25  lot of different things to do, and I do them

Page 15

1  alone.  Mostly, like going to eat.  I go out to
2  eat alone, or I stay in my apartment.  I'm an
3  old lady.  I'm 40 -- I'll be 46, January the
4  8th.
5  Q  Well, I take exception to you calling
6  yourself old.  Okay?  You certainly aren't.
7  Okay?
8  A  Okay.
9  Q  Forty-six is not old.  But, if you
10  consider it so, that's okay with me.
11  So, you can't name any close friends of
12  yours that live in the Wiregrass area?
13  A  I don't have any, to give you any
14  names.
15  Q  What about neighbors of yours?  Do you
16  know any of your neighbors?
17  A  I know a few, but I don't know them --
18  I mean, where I'm living at, now, I know them by
19  face and talk to them.  But --
20  Q  You couldn't tell me their names?
21  A  I couldn't tell you their names.
22  Q  And I know these questions may sound a
23  little crazy.  Let me explain to you why I'm
24  asking the questions.  Because, in this case, I
25  believe that there is a jury demand, which

Page 16

1  means, at some point in the case, we might have
2  to strike a jury.  Obviously, we would not want,
3  on our jury panel, people that you are close
4  friends with or that you're relatives with.
5  So, part of the process of this lawsuit,
6  you know, is for me to understand who those
7  people might be and that we could eliminate those
8  people.  Okay?  Do you understand that?
9  A  Yes, I do.
10  Q  So, my questions may be a little
11  crazy, but not really, when you understand what
12  I'm trying to do.
13  You can't tell me the names of your
14  neighbors?  Correct?
15  A  Well, the names of -- I live in an
16  apartment.  It's eight floors, and you have two
17  sides of apartments, with about ten apartments
18  on each side.
19  Now, I live on the end apartment.  So, I
20  really have no neighbors, because the balcony is
21  next to there.  The one person that lives on the
22  side of me, is a male.  Now, I could tell you
23  his name, if you want to know his name, but we
24  don't associate, we don't go anywhere together,
25  or we don't do things together or we hardly ever

Page 17

1 speak.
2    Particularly, what I was talking about was,
3 a couple of females that live in the building
4 who, when we see each other coming and going or
5 if we need some assistance, we will help each
6 other, but it's not something that we do
7 anything together or anything like that. So,
8 them telling me their names and me remembering
9 them, I probably wouldn't. But, if I saw them
10 by sight, then, I would know.
11    Q  I understand. So, if you saw them,
12 you'd know who they were? You just can't tell
13 me their names?
14    A  Yes, sir. That's correct.
15    Q  All right. Fair enough. Fair enough.
16 Are you a member of a church?
17    A  No, I'm not.
18    Q  Are you a member of any sort of social
19 groups?
20    A  No. No members of any social groups.
21    Q  Are you a member of any civic
22 organizations?
23    A  No. I'm not a member of any civic
24 organizations.
25    Q  Do you have any hobbies?

Page 18

1    A  I like to read. I like going to --
2 doing athletic things, like, swimming, the
3 sauna. I like shopping.
4    Q  All right. Well, in doing the hobbies
5 that you have, do you interact with certain
6 people that live in this area?
7    A  There's people there, yes.
8    Q  Well, can you tell me any names?
9    A  No, I can't.
10    Q  So, when you read, do you go to the
11 public library to get books or do you purchase
12 books from book stores?
13    A  I read from a Bible, basically.
14 Magazines that come in the mailbox. Newspapers.
15 Things like that. On occasion, there may be a
16 book or something that may catch my interest,
17 and I may read from that. But, it's very
18 seldom.
19    Q  So, then, you wouldn't frequent, say,
20 the Houston-Love Memorial Library?
21    A  No. I have a library card, but, no, I
22 do not --
23    Q  And you wouldn't frequent
24 Books-A-Million, for example?
25    A  No.

Page 19

1    Q  What about the hobby of swimming?
2 Where do you swim?
3    A  At the Wiregrass Recreation Center.
4    Q  And are there people that you interact
5 with regularly there at the Wiregrass Rec
6 Center?
7    A  No. No.
8    Q  Is that the only place you go to swim?
9    A  Yes, it is.
10    Q  You said sauna. Where do you use a
11 sauna?
12    A  At the Wiregrass.
13    Q  Any place else?
14    A  Occasionally, I go to Gold's Gym.
15    Q  What about shopping? Where do you
16 like to go shopping?
17    A  Wal-Mart.
18    Q  Okay. Fair enough. The northside one
19 or the southside one?
20    A  I go to the southside one.
21    Q  Any other hobbies that you have, other
22 than the four you've identified for me?
23    A  There are a lot of things I like to
24 do, but, no. No, there's nowhere else.
25    Q  And I'm really interested in things

Page 20

1 you actually do with some regularity?
2    A  Uh-huh.
3    Q  Okay?
4    A  Yes.
5    Q  All right. I'd like you, if you
6 would, ma'am, to tell me about your education.
7 Start with high school. Where did you go to
8 high school?
9    A  Leavenworth High School, in
10 Leavenworth, Kansas.
11    Q  And you took a diploma from there?
12    A  Yes, sir.
13    Q  When was that?
14    A  I graduated in 1980.
15    Q  Tell me about any further education
16 you had after graduating from high school?
17    A  I went into the military, United
18 States Army. I stayed there for a year and a
19 half. I got an honorable discharge.
20    After that, I started working for the
21 government. I stayed with them about four years
22 and -- almost five years. I was there about
23 four years, nine months.
24    And from there, I left and went to Florida,
25 and I started attending Okaloosa-Walton

Page 21

1 Community College. I think that was in 1997.
2 And I stayed in school, the way they count
3 semesters, it would be seven years, but I think
4 it's really six. Six years, if you count year
5 by year, because I stopped going in 2003.
6     And then, I started back up again this
7 year, and I'm going to start back up again at
8 Ozark Community College. I'm working on my
9 bachelor's degree.
10    Q  Any other universities or colleges
11 that you've attended?
12    A  I attended Okaloosa-Walton Community
13 College. I've attended Mott Community College.
14    Q  I'm sorry? Mott?
15    A  M-o-t-t. Howard Payne University.
16 Wallace Community College. Troy University.
17    Q  Okay. How about Stillman College?
18    A  Stillman College.
19    Q  I'd like to kind of get all of these
20 in a time frame. But, let me go back and
21 revisit some of what you just told me. You
22 graduated from high school in Leavenworth,
23 Kansas, in 1980?
24    A  1980.
25    Q  And like most people, you know

Page 22

1 definitely when you graduated from high school.
2 It was definitely 1980?
3    A  Yes.
4    Q  You went into the military for about a
5 year, a year and a half?
6    A  No. A year and a half.
7    Q  A year and a half exactly?
8    A  I went in April the 1st of '81, and I
9 left in August of -- April, May, June, July,
10 August. Well, a year and four months. That
11 would be a year and four months. August of '82.
12    Q  And what branch of the military did
13 you go into?
14    A  Army.
15    Q  And where were you stationed?
16    A  Fort Jackson, South Carolina, and
17 Aberdeen Proving Ground, Maryland.
18    Q  What did you do in the Army?
19    A  76 Yankee supply clerk.
20    Q  And why did you choose to be
21 discharged from the Army?
22    A  They had an EDP program, that they
23 were overextended in the service. They had too
24 many military people, and I was one of the
25 people that came in last.

Page 23

1     So, what they were offering was your school
2 money, honorable discharge, and that you could
3 go into the reserves. And I was under that
4 program.
5    Q  I see. It was a program where they
6 were encouraging people to leave?
7    A  They were asking them to leave.
8    Q  And in exchange for taking an
9 honorable discharge, you got these benefits?
10 For example, school money?
11    A  Well, that's money that you already
12 had put into. You were just getting everything
13 back. Everything that you accepted, you were
14 getting it back in return, because when you
15 join, you get the life -- life benefit. You
16 know, the insurance, if you still wanted to take
17 that, they would give you that. Usually, if
18 you're not in the military, you don't get that.
19 But, they were giving you that.
20     And then, they were giving you your school
21 tuition, that you put in, they'd give you that
22 back. Like, if I put $5,000.00 in toward
23 school, they would double it. Well, they would
24 give me my part of my $5,000.00 back.
25    Q  Okay. Now, let's see. My notes are a

Page 24

1 little fuzzy here. I think you told me that you
2 then went to work for the government in some
3 way?
4    A  Yes.
5    Q  Is that right?
6    A  Uh-huh.
7    Q  What did you do for the government?
8    A  I was a supply clerk for
9 nonappropriated funds.
10    Q  Help me out there. What does that
11 mean?
12    A  You have appropriated fund department,
13 which is more of high-paying scale. And then,
14 you have a nonappropriated fund department,
15 which is lower-paying scale.
16    Q  Okay?
17    A  That's all I really know about it.
18    Q  Where did you work?
19    A  I was, like, in a supervisor's
20 position for nonappropriated funds. I was over
21 all the systems for the Air Force and the Army,
22 for the Herbert Field, at Fort Stewart, Georgia,
23 and -- whatever that other place is. It's been
24 20-something years almost since that.
25     I was doing all the inventory for things

Page 25

1 that you see in this room, everything that you
2 see in this room, except for the people. I was
3 doing inventory. It was my responsibility to
4 keep up with every piece of property on both
5 installations.
6     Q And I think you told me you did that
7 job. That would be like civil service? Is that
8 what we're talking about?
9     A That's what it was.
10     Q And you did that job for four years,
11 maybe five years?
12     A Well, four years, nine months. It was
13 so close to -- five years.
14     Q And then, if I understood you
15 correctly, you started going to school in
16 Florida, down at Okaloosa-Walton Community
17 College? Is that right?
18     A Yes. I left Georgia and went to Fort
19 Walton. Okaloosa. Okaloosa, which is Fort
20 Walton Beach, and started going to school at
21 Okaloosa-Walton Community College.
22     Q And why did you leave the position in
23 Georgia?
24     A Because everyone that was in that
25 position, was relieved from their jobs.

Page 26

1     Q They were fired?
2     A Yes. They fired, yes.
3     Q Well, did you take a job of some
4 kind in -- I assume Fort Walton is where
5 Okaloosa-Walton Community College is? Is that
6 right? Is it in Fort Walton?
7     A Well --
8     Q In that area?
9     A I took a job, but --
10     Q Well, let's go back to my question,
11 the first one. Where is Okaloosa-Walton
12 Community College?
13     A It's in Fort Walton Beach, Florida.
14     Q Good. Did you take a job when you
15 moved to Fort Walton Beach, Florida?
16     A I took a housekeeping position.
17     Q And was that with a company of some
18 sort?
19     A Well, yes. Condominium companies. I
20 mean, it wasn't one particular one that I stayed
21 with. I moved around to different companies.
22     Q But, you cleaned houses and apartments
23 and condos?
24     A No. Just condos.
25     Q Just condos? All right. How long did

Page 27

1 you do that?
2     A And then, I started working for
3 another lady for three years. I did start
4 cleaning houses.
5     Q We're kind of blending what I want to
6 know about. I was really asking about your
7 education, and we've gotten over into your work
8 experience, which is fine, because, also, I want
9 to know about your work experience, and that's
10 good.
11     So, while you're going to Okaloosa-Walton
12 Community College, you're also working for this
13 condo company, cleaning condos, and maybe for
14 this lady, doing cleaning? Is that accurate?
15     A Yes. Well, I started out working for
16 myself, just going in and just working a job.
17     And then, she had an ad in the paper for
18 the next summer or the next season, and I began
19 working for her company, Bella Cleaning Company,
20 and I began working for her for three years.
21     Q And who is this lady you're referring
22 to?
23     A Bella. I don't -- Bella.
24     Q That was her name?
25     A That was her name, and that was her

Page 28

1 company name.
2     Q Is that her first name or last name?
3     A That was her first name.
4     Q Then, if I understood you correctly,
5 you said that you attended the community college
6 for six or seven years, depending on how you
7 counted the credits or whatever, and stopped in
8 2003?
9     A Yes.
10     Q And were you working either with Bella
11 or in some other capacity, cleaning, during all
12 this time frame?
13     A Huh-uh. I was in -- in the time frame
14 I was living in Florida, yes, I was working,
15 cleaning, yes, I was.
16     Q Do you recall working in any other
17 jobs during that time frame? Roughly '97 to
18 2003?
19     A I worked for some temporary services.
20 I worked for labor services, day labor services.
21 That's about all I can really remember.
22     Q Let's see. As far as your education,
23 where did you go after you stopped going to
24 Okaloosa-Walton Community College some time in
25 2003, if anywhere?

Page 25 - Page 28

Page 29

1    A  I think -- I don't know if it was -- I
2  think it was 2004, I had started going to
3  Wallace, but I'm not sure what -- what year it
4  was, if it was 2004.  But I started going to
5  Wallace.  I know that I picked back up again in
6  2006, going back to Wallace.
7    Q  Are you attending Wallace, now?
8    A  No, I'm not.
9    Q  Roughly, when was it that you went to
10  Mott Community College?  Am I saying that right?
11    A  I think that's 2000 -- I think it was
12  2000, 2001.
13    Q  Where is it located?
14    A  Flint, Michigan.
15    Q  When did you attend Howard Payne
16  College or University Community College?
17    A  It must have been about the same time.
18  About 2001.
19    Q  Where is that institution located?
20    A  In El Paso, Texas.
21    Q  So, it sounds to me like, Ms. Nails,
22  that you didn't stay in the Fort Walton Beach
23  area this entire time from '97 to 2003.  You
24  also moved to Flint, Michigan, and El Paso,
25  Texas?

Page 30

1    A  That's right.
2    Q  And then, you named Wallace Community
3  College, and you believed you attended there,
4  starting in 2004?  Correct?
5    A  I think that's when I first started
6  the first class.
7    Q  You mentioned Troy University.  When
8  did you attend Troy?
9    A  I attended Troy, the first time, in
10  Fort Walton Beach, Florida, and I don't know --
11  I don't know what year that was.  I'm sorry.
12  But, it was first in Fort Walton Beach, Florida.
13    I don't think I ever attended here.  I did
14  try to get admitted, but I never attended here.
15    Q  They have a branch down in Fort Walton
16  Beach?
17    A  Uh-huh.
18    Q  What about Stillman College?  When did
19  you attend there?
20    A  It must have been about 2002.
21    Q  I'm sorry, again, ma'am.
22    A  2002.  It must have been about 2002.
23    Q  And I'm sorry.  Where is Stillman
24  College located?
25    A  Tuscaloosa.

Page 31

1    Q  I thought it was in Alabama.  I just
2  didn't know exactly where.
3    And so, did you live in Tuscaloosa or the
4  Tuscaloosa area at the time?
5    A  I lived in the dorm.
6    Q  Any other education, since high
7  school, that you can tell me about?  Or have we
8  talked about everything?
9    A  One other school, Baker Community
10  College.  I must have went over -- I was up
11  there in Flint.  It was in between those years,
12  2000 and 2001.
13    Q  Now, I understand from your answers to
14  some of the written discovery, that you're about
15  25 hours away from having your bachelor's
16  degree?
17    A  Uh-huh.
18    Q  Is that correct?
19    A  Uh-huh.
20    Q  And your bachelor's degree would be in
21  what discipline or area?
22    A  Business manager.
23    Q  And I'm sorry.  I'm a little scattered
24  sometimes.  Did I ask you where you worked?
25    A  I don't work.  I'm disabled.

Page 32

1    Q  When was the last time that you were
2  gainfully employed?
3    A  What's this month?  This is December.
4  Of 2006?
5    A  I think it was September of 2006.
6    Q  September of this year?
7    A  Uh-huh.
8    Q  And where did you work?
9    A  Kelly Services.
10    Q  Is that here in Dothan, Alabama?
11    A  Uh-huh.  Dothan, Alabama, yes.
12    Q  And that's a temporary employment
13  agency of some kind?
14    A  It's temporary employment, yes.
15    Q  Did they assign you to specific
16  places?
17    A  Just one.  Tri-State, in Marianna,
18  Florida.
19    Q  What is Tri-State, in Marianna,
20  Florida?
21    A  It's a auto part warehouse.
22    Q  And what did you do for them?
23    A  I was just there for two days -- a day
24  and a half.  Myself and a couple of other
25  individuals moved boxes from one shelving area

Page 33

1  to another shelving area.
2      Q  Did Kelly Services of Dothan assign
3  you to any other employers?
4      A  No, they did not.
5      Q  So, then, if I'm understanding you
6  correctly, you worked for a day and a half with
7  Tri-States, in Marianna, Florida, through Kelly
8  Services?  Correct?
9      A  That's right.
10     Q  Where did you work before that, going
11  to work with Kelly Services?  You said that was
12  in September of this year?
13     A  That's the only place I worked this
14  year.
15     Q  So, the only gainful employment you've
16  had during 2006 has been this day and a half,
17  working at Tri-States, down in Marianna,
18  Florida, through Kelly Services?
19     A  Yes.  Here in Dothan, Alabama, yes.
20  In Dothan, Alabama, yes.
21     Q  So, you've had gainful employment
22  during this year?
23     A  I was self-employed, yeah.  I was also
24  self-employed for a couple of months in Fort
25  Walton Beach, Florida, where I had my own

Page 34

1  cleaning business.
2      Q  How long were you self-employed in the
3  cleaning business in Fort Walton?
4      A  I started, I think it was in April,
5  until --
6      Q  April of this year, ma'am?
7      A  April or June.
8      Q  April, May, June?
9      A  Uh-huh.  2006.
10     Q  Were you gainfully employed before
11  having your own cleaning business in Fort
12  Walton Beach, Florida, in June, this year?
13     A  I can't think of anything else, this
14  year.
15     Q  What about in 2005?
16     A  I had my own cleaning business in
17  2005, and I was --
18     Q  Ma'am, I am sorry.  I don't mean
19  to --
20     A  I had my own cleaning business in
21  2005.
22     Q  Okay.  And where was that?
23     A  Fort Walton Beach, Florida.
24     Q  And I apologize to you, again, but I
25  do have a little problem hearing you.  So, when

Page 35

1  you rambled and were kind of mumbling, then, I
2  can't understand you.  And the whole purpose of
3  this is for you and I to communicate.  Okay?
4      A  (Witness nodding head in affirmative.)
5      Q  How long did you operate this cleaning
6  business in Fort Walton?
7      A  I think that was May through August.
8  May through August or September of 2005.
9      Q  Where did you work before that?
10     A  I don't think I worked at all in 2004.
11  If I did, I don't remember.
12     Q  How is it that you lived, ma'am?
13     A  I was awarded Social Security
14  disability with Medicare and Medicaid, back in
15  2003, in November.
16     Q  And why were you awarded Social
17  Security disability back in November of 2003?
18     A  Because my left foot has a stye that
19  comes and goes.  My back, in the lower part, has
20  chronic back pain.  And both my knees, right and
21  left, have knee pain.
22     Q  Did you use an attorney in order to
23  obtain Social Security disability?
24     A  (Witness nodding head in affirmative.)
25     Q  And, ma'am, if you'll answer, it --

Page 36

1      A  Yes.  Michael Brown.
2      Q  Mike Brown?  He's here in Dothan?
3  Correct?
4      A  Yes.
5      Q  Did you have a medical doctor or a
6  physician who said that you were physically
7  disabled and entitled to Social Security
8  disability?
9      A  Yes.
10     Q  And who was that?
11     A  Social Security doctor.
12     Q  Can you tell me his name?
13     A  I'm sorry.  It's been three years.
14  I'm sorry.  I don't have that information, now.
15     Q  This was not a physician of your own,
16  that you saw regularly, who diagnosed you as
17  such?
18     A  Huh-uh.  No.
19     Q  This was someone employed through the
20  government, through the Social Security
21  Administration?
22     A  Yes.  But, there were also doctors
23  that I did see, that they might have used.
24     Q  Some of their records or something?
25     A  Yes.

Page 37

1  Q  And who were those doctors?
2  A  I don't know their names.
3  Q  Were they here in Dothan?
4  A  No.  One was in Texas.  There was the
5  mental hygiene place, over here in Dothan.
6  Their records, as well.  They used theirs.
7  And then, they sent me to their own Social
8  Security physician.  Then, there was one in
9  Tuscaloosa.  That's the only ones I can
10  remember.
11  Q  And you can't tell me any of these
12  doctors' names?
13  A  No, I can't.
14  Q  You said that one of the problems you
15  had -- and I'll come back.  Well, let me finish.
16  Have we talked about your educational
17  background?  Have we covered --
18  A  I believe I told you everything I
19  know.
20  Q  Good.  Let's go back to your work
21  background.  You were awarded Social Security
22  disability in November of 2003.  Were you
23  employed, gainfully, in any way, before that
24  time?
25  A  I could have been.

Page 38

1  Q  You told me that you stopped working
2  for the government in -- let's see.  That would
3  have been roughly '84, '85?
4  A  '91.
5  Q  '91?  All right.  Then, you worked for
6  these cleaning services, off and on, roughly, to
7  2003?  Is that accurate?
8  A  2005.  2000 and about 6.
9  Q  All right.  You were working for these
10  cleaning services at a time that you also
11  received Social Security disability?
12  A  Yes.
13  Q  And, Ms. Nails, if you need to take a
14  break at any time, all you have to do is tell me
15  that.
16  A  Okay.
17  Q  If need to use the restroom or need
18  something to drink, we'll be glad to get you --
19  A  Okay.
20  Q  -- something.  Okay?  Have you and I
21  basically then talked about your work history?
22  You told me about the Army, you told about
23  working at the government civil service job,
24  working at cleaning services, and then, the one
25  temporary position with Kelly Services.

Page 39

1  Have we basically covered your work
2  history?
3  A  I think so.  That's all I can
4  remember.
5  Q  All right.  I want to show you a few
6  documents, and then, ask you some questions
7  about them.  Okay?  Let me show you what I have
8  marked as Defendant's Exhibit 1 and Defendant's
9  Exhibit 2.  Okay?
10  Do you recognize Defendant's Exhibit 1?
11  Let's concentrate on 1, first, please, ma'am?
12  A  I recognize this as my typing, and
13  this is my signature, yes.  Right here.  Right
14  there, yes.
15  Q  And, again, I apologize to you, and
16  you're embarrassing me just a little bit,
17  because I've asked you several times not to
18  speak without speaking loudly enough for me to
19  hear you.  Okay?
20  What is Defendant's Exhibit 1?  Is that
21  your complaint that you filed in this case?
22  A  Yes, it is.
23  Q  And I'm not trying to trick you, Ms.
24  Nails.  Please understand.  That's not what I'm
25  here about.  Okay?  What is Defendant's Exhibit

Page 40

1  2?
2  A  Amended complaint.
3  Q  That is also a pleading you filed in
4  this case?
5  A  Yes.
6  Q  Now, I want to make sure I understand.
7  Those two documents, they basically tell the
8  Dothan Rescue Mission, and me, as the lawyer for
9  the Dothan Rescue Mission, what your allegations
10  or complaints against the Dothan Rescue Mission
11  are.  Is that accurate?
12  A  Yes.
13  Q  As I read your complaint and your
14  amended complaint, and also some of your written
15  discovery information, there are basically two
16  incidents that happened?
17  A  Uh-huh.
18  Q  That you're basing your lawsuit on?
19  Is that accurate?
20  A  Well, in my lawsuit, it says that my
21  constitutional -- no?
22  Q  Yes, ma'am.  I'm asking if there are
23  two incidents?
24  A  There's more than two incidents.
25  Q  Look at Defendant's Exhibit 2 for me,

Page 41

1  ma'am.  Would you agree that the last page of
2  Defendant's Exhibit 2 says, "The date of alleged
3  violation, May 2003."  Correct?
4    A  Uh-huh.  Yes.  Correct.
5    Q  And then, it also says, "The date of
6  the alleged of violation, June 2005."  Correct?
7    A  Correct.
8    Q  So, I read your complaints to say
9  there are two incidents?
10    A  Okay.
11    Q  Would you agree with me, that this
12  lawsuit is about two incidents, one that
13  happened in May of 2003 and one that happened in
14  June of 2005?  Yes or no?
15    A  Yes.
16    Q  All right.  Let me show you what I
17  have marked as Defendant's Exhibit 6.  Those are
18  your responses to the requests for admissions.
19    Would you agree with me that you admit
20  we're talking about two incidents here, one in
21  May of 2003 and one in June of 2005.  That's
22  number one and number two.  You see that?
23    A  I see that, yes.
24    Q  All right.  Good.  I want to talk
25  about the incident that happened in May of 2003.

Page 42

1  Okay?  Tell me what it was that happened in May
2  of 2003, that caused you or has caused you to
3  sue the Dothan Rescue Mission?
4    A  I was a resident, and during the time
5  that I was a resident, they had an assistant --
6  I guess you would call her a housemother.
7    I was asked to leave the Dothan Rescue
8  Mission after three days of trial stay, and I
9  think Harry Culbreth and Lisa Smith had left
10  the decision for me to stay on up to the
11  housemother.
12    Well, when my three days was up, she had
13  told me that I would have to move.  And I asked
14  her why.  She said that she got the word from
15  Lisa, over at the main office.
16    And then, as I was leaving to go, she had
17  told me that it would be better off that I would
18  find another place to stay, because of -- it was
19  either my age or either my color, she told me,
20  as I was walking off.  And I was walking toward
21  the -- or going to the office, to ask why I was
22  asked to leave.
23    And I was told by Harry Culbreth that I was
24  not following the rules at the -- at the
25  mission.  And I'd asked him what particularly

Page 43

1  was it that was in the rules that I was not
2  following, and he just said the rules.
3    So, I had asked him, would I be able to
4  come back.  He just said, "At this time, I don't
5  know."  But, he said, "For right now, you cannot
6  stay on past the three days of trial."
7    Q  All right.  Tell me what happened in
8  June of 2005 that has caused you to sue the
9  Dothan Rescue Mission?
10    A  I had went back to the Dothan Rescue
11  Mission.  I had asked Lisa Smith if I could sign
12  in and if I could get meal tickets.  They give
13  it seven days at a time.  They give the meal
14  ticket for seven days at a time.
15    Q  So, you weren't trying to live as a
16  resident?
17    A  No.
18    Q  You wanted meal tickets?
19    A  Yes.
20    Q  Okay.  Go ahead?
21    A  And she had told me yes.  She gave me
22  a slip for seven days.  When that seven days had
23  ended, I had went back, and I had asked, again,
24  if I could sign in to get meal tickets.  Lisa
25  Smith said yes.

Page 44

1    I think it was in my second day or third
2  day of using that second meal ticket -- I call
3  him the lunchroom supervisor, because -- what's
4  this guy's name?  He's always in there.  He
5  makes sure everybody is in line and gets fed.
6    Q  You can't tell me his name?
7    A  I probably put it on here somewhere.
8  He's a black male.
9    Anyways, we were in line, standing outside
10  in line.  And as I got through to the door in
11  the inside, he turned me around and said, "I
12  need to talk with you."
13    And I told him, "Okay.  What's this about?"
14    He says, "I just got a call from Brad
15  Hardy, and he said that your meals is revoked
16  and that you can't come back on the property,
17  because if you do, that you're trespassing."
18    And I asked him, I said, "Well, what
19  happened?"  I said, "Did you say -- did you say
20  anything?  Did you give me bad reference, or
21  could you tell me why?"
22    He said, "I didn't say anything, because
23  you haven't done anything."  He said, "All I
24  know is that Brad called over here and told me
25  to stop you from eating in the lunch kitchen."

Page 45

1    Q   Did he say anything else?
2    A   That's all he told me.  And when he
3  said that, about the trespassing and no lunch
4  ticket, I just said, "Okay," and I left.
5    Q   Did you ever talk with Brad Hardy
6  about why your meal tickets were revoked?
7    A   I probably did, but at the time that I
8  spoke with him, is right after it happened, and
9  he was very hostile.  I'll say yes, I did talk
10  to him, and he was very hostile to me about the
11  situation.  He didn't have any explanation to me
12  as to why he was revoking my meal tickets.  He
13  didn't -- he didn't have anything to say.
14    Q   Okay.  Has anyone associated with the
15  Dothan Rescue Mission given you an explanation
16  why your meal tickets were revoked or suspended?
17    A   No.
18        MR. WALDING:  Let's take a little
19        break.
20        THE WITNESS:  Okay.
21        MR. WALDING:  Would you like something
22        to drink?
23        THE WITNESS:  How long is the break?
24        MR. WALDING:  We'll take as long as
25        you like.  I'd like about five

Page 46

1        minutes, at least.
2        THE WITNESS:  No.  I'll just step
3        outside for a few minutes.
4        MR. WALDING:  Okay.
5        THE WITNESS:  And maybe when I come
6        back, I can get a bottle of
7        water.
8        MR. WALDING:  Good.  You sure can.
9        (Short break in deposition.)
10    Q   All right.  We're back on after a
11  break, Ms. Nails.
12    Before we go any further, let me give you
13  the documents that are in between these.  We've
14  looked at Defendant's 1 and 2, and I brought out
15  Defendant's 6.  Let me show you Defendant's
16  Exhibit 3 and ask you on the record what that
17  is?
18    A   Disclosure deposition (sic).
19    Q   And was that the disclosures that you
20  were required to make to us under the rules in
21  this case?
22    A   Yes.
23    Q   As part of the disclosure process, you
24  were supposed to turn over any documents that
25  you have, that you say supports your allegation

Page 47

1  or your case?
2    A   Uh-huh.  Yes.
3    Q   Do you have any documents that you say
4  support your allegations in this case?
5    A   I don't have any documents.
6    Q   Let me show you Defendant's Exhibit 4.
7  Now, that is a set of requests for documents
8  that I sent you, and you did not produce any
9  documents to me in response to those requests
10  for documents.  Is that true?
11    A   I guess that would be true.
12    Q   Because you don't have any documents
13  that support or tend to support your allegations
14  in this case?  Right?
15    A   That is true.
16    Q   You don't have anything to give --
17    A   I don't have anything to give --
18    Q   You don't have any documents?
19    A   -- at all.
20    Q   Let's make sure we're clear on this.
21  You don't have any documents, paper, that
22  supports or tends to support your allegations in
23  this case?
24    A   I don't have any documents.  Now, I
25  could use the ones that you -- that you gave --

Page 48

1  you sent to me.  I could use those as part of
2  the attachment.
3    Q   But, I have those already, because I
4  sent them to you?  Right?
5    A   Correct.  You sent those documents.
6    Q   Do you have any videotapes or audio
7  tapes that might support or tend to support your
8  allegations in this case?
9    A   I don't have any video or audio tapes
10  that would support.
11    Q   Do you have any photographs or
12  drawings of any kind, that might support or tend
13  to support your allegations in this case?
14    A   I don't have any photographs or
15  drawings.
16    Q   So, then, if I'm understanding you
17  right, you don't have any documents or any
18  tangibles to give to me, but you might possibly
19  use some of the things that I produced to you?
20    A   And -- yes.
21    Q   Was that "yes"?
22    A   Yes.  That's yes.  And, also, as well,
23  I don't know if you're asking this right now,
24  but the people that worked inside the Dothan
25  Rescue Mission, I may use them for testimony.

Q All right. Good. Let me show you Defendant's Exhibit 5. That was a set of written questions that I sent to you and that you wrote in answers to. Is that accurate?
A Yes. Yes.
Q And those are sworn to under oath. Is that right?
A Yes.
Q So, all of your answers to those written questions are true and correct under oath?
A Well, we didn't do an oath at the time that I signed this, no.
Q You did not?
A We did not. You mailed this to me, and I just answered the questions and sent it back to you. There was no oath taken.
Q You didn't sign it in front of a notary public?
A That's just meaning my name, that my name is taken by photo I.D. for signature.
Q Right here, it says -- this is the last page of Defendant's Exhibit 5 -- "Sworn to and subscribed before me this the 17th day of November of 2006." Do you see that?

A I -- I see what you're saying, but if I or you were to put a notary on the stand, they would not make that statement, that that's what they were doing. They would be under the impression that they were just notarizing a state -- my signature, not saying that they could prove this. They have to have something to prove.
Q And I understand what you're saying. Do you see here, again, on the seventh page of Defendant's Exhibit 5, where it says, "I hereby swear, under penalty of perjury, that the answers contained herein are true and correct"?
A Yes. I understand that.
Q Do you see that your signature is --
A Yes, I do.
Q -- contained underneath that statement?
A Yes.
Q And did you understand, at the time you signed these, that you were swearing your answers were true --
A Yes, I did.
Q -- and correct? And, in fact, Ms. Nails, isn't it true that question number 12 to

Defendant's Exhibit 5, asked you, pointblank, and very clearly, I might add, do you understand that you're answering these questions under oath and you're swearing to tell that they are true statements? It tells you that, doesn't it?
A Yes.
Q And isn't it true that question number 13 of Defendant's Exhibit 5 says you're aware of the possible penalties and sanctions for failing to tell the truth, and your response is yes?
A Yes.
Q So, your responses, then, in Defendant's Exhibit 5, are true and correct statements, and I can count on them being the truth? Correct?
A Yes.
Q Good. One of the questions that I asked you in the written discovery is for you to admit that the Dothan Rescue Mission is a religious organization. Okay? Do you understand that?
A Yes.
Q Your response was that you do not know, and I'm referring to Defendant's Exhibit 6, question number three. Do you see that?

A Uh-huh. Yes. I see that.
Q And here's my next question: Do you have any evidence or any information that would indicate and tell us that the Dothan Rescue Mission is not a religious organization?
A Business license. If I was to look at the business license, I don't believe the business license would have anything on there reference to that.
Q Have you looked at the business license?
A No, I haven't.
Q So, as you sit here today, under --
A That's why I say I don't know.
Q Yes, ma'am. You agreed with me, to start with, that how this process works is that I ask a question, and then, you respond to the question. Okay?
A Okay. Yes.
Q I'm trying to be courteous to you. I'm trying to be nice to you. I would appreciate it, ma'am, if you would allow me to finish my question before you interject and answer it. Okay?
A Yes.

Page 53

```
 1     Q  All right.  Have you looked at the
 2  business license for the Dothan Rescue Mission?
 3     A  No, I have not.
 4     Q  So, as you sit here today, under oath,
 5  you've been sworn to tell the truth by this lady
 6  right over here, do you have any evidence or
 7  information to tell me about today, that
 8  supports the position you're taking, that the
 9  Dothan Rescue Mission is not a religious
10  organization?
11     A  I don't have any information or proof
12  for you today that the Dothan Rescue is not a
13  religious organization.
14     Q  When you stayed at the Dothan Rescue
15  Mission, were you aware or were you made to go
16  to religious services?
17     A  Yes.  Was made, asked, told, that
18  everyone would have to go to a service in the
19  evening.
20     Q  So, was it your understanding, when
21  you stayed at the Dothan Rescue Mission, that if
22  you stayed at the mission, you had to attend
23  religious services?
24     A  Yes.
25     Q  It was a requirement, was it not?
```

Page 54

```
 1     A  Yes.
 2     Q  Do you have plans, before this case
 3  is tried, to come up with any evidence or
 4  information that says the Dothan Rescue Mission
 5  is not a religious organization?
 6     A  I had not really thought about it
 7  seriously.  The only thing that I would have
 8  thought about, if I do, would be to check the
 9  business license and any other sources in
10  Houston County that would give me that
11  information.
12     Q  What sources would you check?
13     A  I would check the business license
14  with the county or the city.  I would check with
15  the county and the city.
16     Q  What other sources?
17     A  I might check with -- I think they
18  have an organization in Birmingham, that
19  shelters have to, within the Alabama state, have
20  to be registered with something, like, when they
21  get their block grants.  I'm just not sure of
22  the correct name.
23     Q  And as we sit here today, while you're
24  under oath in your deposition, have you
25  consulted with or checked with this registry or
```

Page 55

```
 1  organization in Birmingham you're talking about?
 2     A  Not in reference to religious
 3  organization, no, I have not.
 4     Q  Have you checked with them in any way
 5  related to the Dothan Rescue Mission?
 6     A  Yes, I have.
 7     Q  And what, if anything, did you learn?
 8     A  If they were getting any types of
 9  grants from the state.
10     Q  And what, if anything, did you learn
11  related to that?
12     A  That they had filed for a grant, but
13  they did not submit all of the paperwork, so the
14  grant was -- information was not completed, and
15  they had not received the grant.
16     Q  And who was it that told you this
17  information?
18     A  It was a little while back.  I don't
19  have that -- that name, right now, with me.
20     Q  Was this a telephone call you made?
21     A  Yes.
22     Q  Did you follow up in writing in any
23  way?
24     A  No, I did not.
25     Q  But, the information you received
```

Page 56

```
 1  through this telephone call was that the Dothan
 2  Rescue Mission did not receive a grant?
 3     A  From that particular agency, that's
 4  correct.
 5     Q  The agency that we're talking about,
 6  was it a government agency or a private agency?
 7     A  I think that it was the federal
 8  government.
 9     Q  But, again, the information that you
10  received through this telephone call is that the
11  Dothan Rescue Mission did not get that grant?
12     A  Right.  Matter of fact, it was through
13  the Bush campaign for the homeless shelters.  I
14  went on the Internet and found that.
15     Q  Let me show you what I have marked as
16  Defendant's Exhibit No. 7, and ask if you
17  recognize that document?
18     A  I think that is something that you had
19  sent to me.  Is this the insurance or something?
20     Q  Ma'am, I'll represent to you that it's
21  certainly not an insurance policy, and I think
22  you know that.
23     A  No.  You sent me something about
24  insurance, as well.  Right?
25     Q  I sent you many things --
```

Page 57

1    A  Okay.
2    Q  -- Ms. Nails.  Do you recognize
3  Defendant's Exhibit 7 as being one of the
4  documents I sent to you as part of the
5  disclosure process in this case?
6    A  Yes, I do.
7    Q  And what is the title of Defendant's
8  Exhibit 7?
9    A  Articles of Incorporation of the
10  Dothan Rescue Mission, a Nonprofit Corporation.
11    Q  And would you please read for me
12  Section A of the objects and purposes of the
13  corporation, that's contained there on the first
14  page of Defendant's Exhibit 7?
15    A  "Objects and Purpose of Corporation.
16  The objects and purpose of this corporation
17  should be: A. To serve as an arm of the church
18  given to the soul-savings ministry among the
19  rejected and neglected people being found in
20  need of assistance, including, but without
21  limitation, those in need of food, clothing,
22  housing and other material necessities and
23  special -- specifically in need of knowing the
24  Good News of the Gospel of Jesus Christ."
25    Q  And would you agree with me, ma'am,

Page 58

1  that according to this document, Defendant's
2  Exhibit 7, one of the objects or purposes of the
3  Dothan Rescue Mission is to serve as an arm of
4  the church?  That's what it says, doesn't it?
5    A  That's what that document says, yes.
6    Q  Yes, ma'am.  And is not an arm of the
7  church a religious organization?
8    A  Yes.
9    Q  Let me show you what I've marked as
10  Defendant's Exhibit No. 8, and that is a copy of
11  another document produced to you in the
12  disclosure process in this case.  Do you
13  recognize it?
14    A  Yes, I do.
15    Q  And what is that document?
16    A  Dothan Rescue Mission.
17    Q  It's a brochure for the Dothan Rescue
18  Mission, isn't it?
19    A  It's a copy of a brochure, yes.
20    Q  Yes, ma'am.  I acknowledge that it's
21  a copy.  While you were at the Dothan Rescue
22  Mission, did you ever see originals of brochures
23  that were similar to what is marked as
24  Defendant's Exhibit 8?
25    A  No.

Page 59

1    Q  You never saw those in the office part
2  of the mission?
3    A  No.  Can't say that I have.
4    Q  One of the issues in this case is
5  whether the Dothan Rescue Mission is a public
6  entity or a private entity.  Do you understand
7  that as one of the issues here?
8    A  Yes.  I do now, yes.
9    Q  Do you have any evidence or
10  information, to tell me about, today, while
11  you're under oath, that would support a position
12  that the Dothan Rescue Mission is a public
13  organization, an arm of the State of Alabama, an
14  arm of the City of Dothan, an arm of the federal
15  government?
16    A  I don't have any information today,
17  no.
18    Q  What, if any, steps do you plan on
19  taking before trial, to obtain such information,
20  if, in fact, it exists?
21    A  I would have to do some research.
22    Q  Such as?
23    A  Computer.  Internet.
24    Q  And has somebody prevented you from
25  doing that before today?

Page 60

1    A  No one has.
2    Q  I want to make sure I'm clear on this.
3  Do you have any evidence or information to
4  support an allegation that the Dothan Rescue
5  Mission receives money from the federal
6  government?
7    A  I don't know if it's the federal
8  government, if it's the state, but I know that
9  they are getting grants, yes.  I know that
10  they're getting grants.  But from what, state or
11  federal, I am not sure.
12    Q  And are you assuming that the only
13  types of grants are grants from the federal
14  government or the state government?
15    A  No.  City, as well.
16    Q  Is it not possible that there are
17  private grants?
18    A  It's possible.
19    Q  As you sit here today under oath, you
20  can't tell me that the Dothan Rescue Mission is
21  receiving a federal grant, can you?
22    A  No.
23    Q  As you sit here today under oath,
24  ma'am, can you tell me that the Dothan Rescue
25  Mission is receiving a grant from the State of

Page 61

1 Alabama?
2    A  No.
3    Q  And as you sit here today, ma'am,
4 under oath, can you tell me that the Dothan
5 Rescue Mission is receiving a grant from the
6 City of Dothan?
7    A  Yes.  I -- I can say that they are
8 receiving a grant from the City of Dothan for
9 lights and for -- I guess it's health and beauty
10 aids, like, soap and tissue paper, toilet paper.
11    Q  And where did this information come
12 from?
13    A  From the city.
14    Q  Yes, ma'am.  You understand that the
15 city is a corporate entity?  It's --
16    A  I don't know, sir.  I didn't memorize
17 -- I didn't memorize this.
18    Q  And, Ms. Nails, I've tried to be as
19 nice to you as I know how to be.
20    A  Uh-huh.
21    Q  I really have.  You have filed a
22 federal lawsuit.
23    A  Uh-huh.
24    Q  Against the Dothan Rescue Mission.
25    A  Uh-huh.  Yes.

Page 62

1    Q  Do you understand that?
2    A  Yes.  I understand that.
3    Q  You have filed a complaint in the
4 United States District Court for the Middle
5 District of Alabama, which is a very serious
6 thing?
7    A  Yes.
8    Q  We both participated in a conference
9 with Judge Walker.  Do you recall participating
10 in that conference?
11    A  I do.
12    Q  Did you gather, at any point during
13 that conference, that Judge Walker did not take
14 this case seriously?
15    A  I gathered she did.  She asked me the
16 same questions you just asked me, and I gave her
17 the information.
18    Q  Yes, ma'am.  And do you understand
19 that, as the person bringing this lawsuit, you
20 are required, by law, to prove the allegations
21 you have made?
22    A  I gave her the information on all the
23 names of the federal, state or city grants that
24 they were getting.  She -- she asked that
25 information over the telephone.

Page 63

1    Q  Yes, ma'am.  Would you answer my
2 question?
3    A  What is it again?  I'm sorry.
4    Q  Do you understand that, as the person
5 who has brought this lawsuit, in federal court,
6 you are required to prove the allegations you've
7 made?
8    A  I understand that, but this is a
9 deposition.  This is not a --
10    Q  Yes, ma'am.
11    A  -- courtroom hearing.  Yes, I
12 understand that.  I am going to prove that, but
13 not here today.  I'm just answering your
14 questions.  And I've answered them to the best
15 that I can.
16    Q  Yes, ma'am.  I understand what you're
17 saying, but do you understand that the purpose
18 of this deposition is for me to obtain the
19 information you intend to submit to the Court to
20 prove your allegations?
21    A  Yes, sir.  But, I thought when we had
22 our telephone conference, those questions about
23 the grants, we had already discussed that, and I
24 thought maybe you had already written that down.
25 Me knowing that, I could have --

Page 64

1    Q  Yes, ma'am.  I'm not going to let you
2 make speeches on the record.  Okay?  The process
3 works by you answering my questions.  All right?
4 I want you to understand that what you have done
5 here, by filing this lawsuit, is a very serious
6 thing, and I take it seriously, and I'd like you
7 to take it seriously.
8    A  (Witness saying something court
9 reporter could not understand).
10    Q  I would like --
11       COURT REPORTER:  Wait, wait.  What did
12       you say?
13       THE WITNESS:  Nothing.  I didn't -- I
14       was just swallowing.
15    Q  Tell me how you came about the
16 information that the Dothan Rescue Mission
17 receives some sort of grant or monies from the
18 City of Dothan, regarding lights?
19    A  I don't have that information today.
20    Q  So, you don't know that?
21    A  Yes, I do know that, but I just
22 don't --
23    Q  How do you know it, ma'am?
24    A  I contacted the City of Dothan.
25    Q  Who did you contact?

Page 65

1    A  I do not have that person's name with
2  me today.
3    Q  What did you say to the person at the
4  City of Dothan?
5    A  I asked them, does the City of Dothan
6  receive any city grant money.
7    Q  And what did the person tell you?
8    A  Yes.
9    Q  That the City of Dothan receives city
10  grant money?
11    A  Yes.
12    Q  Is that all the information you
13  learned during this conversation with this
14  person from the City of Dothan?
15    A  I learned that they get the grant for
16  a certain purpose.
17    Q  And what purpose was that?
18    A  Lights, soap, tissue paper, et cetera.
19    Q  And you can't tell me the name of the
20  person --
21    A  Not at this time, no, I cannot.
22    Q  And what, if anything, would you do to
23  come up with that person's name?
24    A  I would look at my notes.
25    Q  So, you have notes of the telephone

Page 66

1  conversation you had with someone from the City
2  of Dothan, that might potentially support your
3  claims and allegations in this case?
4    A  Yes, I do.
5    Q  And have you produced those notes to
6  me, ma'am?
7    A  No, I haven't.
8    Q  Why?
9    A  Was that one of the questions on the
10  questionnaire, that I produce the names of
11  grants?
12    Q  No, ma'am.  You just told me that you
13  had notes of a telephone conversation that you
14  had with someone from the City of Dothan?
15    A  That is true.
16    Q  And you just admitted, under oath,
17  that you did not produce those to me as part of
18  the disclosure process in this case?
19    A  That is true.
20    Q  And you just admitted that you did not
21  produce them to me, pursuant to my request for
22  production of documents?  True?
23    A  That's not a document.  That is a
24  written conversation -- a written conversation
25  information note.  It is a note.

Page 67

1    Q  Yes, ma'am.  It's a note written on a
2  piece of paper?
3    A  (No visible or audible response.)
4    Q  Yes?
5    A  Yes.
6    Q  And you're taking the position that a
7  note written on a piece of paper is not a
8  document?
9    A  Yes.
10    Q  Do you understand what the word
11  "tangible" means, ma'am?
12    A  No.  What does it mean?
13    Q  Ma'am, did you testify earlier that
14  you were approximately 25 credit hours away from
15  having a bachelor's degree in business?
16    A  Sir, I said I didn't know what it
17  means.  Did you want to tell me?
18    Q  You're telling me, honestly, as a
19  person --
20    A  I'm telling you honestly.
21    Q  I'm not done speaking, ma'am.
22    A  Sir, I can just go and leave if you
23  can't, you know, do as if you say for me to
24  answer the question.  I answered the question
25  no, I don't know what it means.  So, what else

Page 68

1  is it that you need?
2    Q  I want to understand why it is you
3  think that you didn't have to produce this note
4  to me?
5    A  I never thought that I didn't have to
6  produce the note to you, if the specific
7  statement would have said "note, notes."
8  Documents.  It says "documents."  Documents and
9  notes is different.
10    Q  How is it different?
11    A  Because a note is something that you
12  jot down.  A document is something that is taken
13  -- a response, and put in a letter form.
14    Q  Okay.  Tell me how you have come about
15  the information that the Dothan Rescue Mission
16  receives some sort of grant money from the City
17  of Dothan for health and beauty aids?
18    A  For soap and toilet paper.  From the
19  city.
20    Q  Yes, ma'am.  How did you come by the
21  information?
22    A  I contacted the City of Dothan.
23    Q  Is that the same conversation you told
24  me about earlier?
25    A  In reference to the grant, that they

Page 69

1  get grant money, yes, it is.
2      Q  So, there was one telephone
3  conversation you had with someone with the City
4  of Dothan?
5      A  Yes.
6      Q  And you can't tell me who that person
7  was?
8      A  No, I cannot.
9      Q  Can you tell me when the conversation
10  happened?
11      A  No, I cannot.
12      Q  Would you believe that the note that
13  you made might tell you this information?
14      A  Yes, it will.
15      Q  And can you see how that would be
16  important to the process we're going through
17  today?
18      A  It could be, yes.
19      Q  Do you understand that, if I had a
20  copy of that note, we could talk about that
21  conversation more intelligently?  Do you
22  understand that?
23      A  We could not, because the only
24  information that you would be able to ask me is
25  what the city is giving the Dothan Rescue

Page 70

1  Mission a grant for, and that would be the same
2  answer you would have received, was only for
3  lights, tissue paper and soap.
4      Q  So, you didn't make a note of whom you
5  spoke with at the City of Dothan?
6      A  I got the individual lady's first and
7  last name, yes, I did.
8      Q  So, then, if I had a copy of that
9  written note, I would know that lady's name
10  today, wouldn't I?
11      A  Yes, you would.
12      Q  But, we're sitting here today in your
13  deposition and you're under oath, and you can't
14  tell me who that lady was?  Correct?
15      A  No, I cannot tell you her name,
16  because I do not have the information with me
17  today.
18      Q  Do you have any other evidence or
19  information that supports this position you're
20  taking, that the Dothan Rescue Mission receives
21  money or financial funds from the City of
22  Dothan?
23      A  Do I have what?
24      Q  I'm not sure.
25      A  I'm sorry.  You're looking -- you're

Page 71

1  looking down.  I can't -- I can barely
2  understand what you're saying.
3      Q  If you'll stop, she'll read the
4  question to you.
5          (Thereupon, previous question
6           read back by court reporter.)
7      A  No, I do not.
8      Q  Thank you, ma'am.  Let's go back to my
9  question about, do you have any evidence or
10  information to support a position that the
11  Dothan Rescue Mission is somehow a public
12  mission, as opposed to a private religious
13  organization?
14      A  I believe, in my complaint, I have
15  something on there about the USAD, Section
16  Number 28 something.
17      Q  Okay.  You're referring to Defendant's
18  1 or 2?
19      A  "Section 28 UDHA states Homeless
20  Shelters can" -- (witness continues reading to
21  herself.
22          MR. WALDING:  She's just reading.
23          Don't try to take that down.
24      A  Could you repeat your question?
25      Q  I'm sure Ms. Linda can.

Page 72

1          (Thereupon, requested portion
2           read back by court reporter.)
3      A  No.
4      Q  Let's talk about this Section 28 of
5  the -- I'm sorry.  What was it?  The USDH?
6      A  It's Section 28 UDHA.  State homeless
7  shelter.
8      Q  And part of your allegations in this
9  case are based on this law?
10      A  Yes.
11      Q  Is it a law?
12      A  I would say yes.
13      Q  Where did you learn of this Section 28
14  UDHA?
15      A  Through the Stewart B. McKinney
16  Homeless Assistance Act.  Section 5.
17  "Consolidate existing homeless housing programs
18  under Title Five (sic)."
19      Q  Yes, ma'am.  You're reading your
20  complaint to me?
21      A  That's where I found it.  Under the
22  Stewart B. McKinney Homeless Act.
23      Q  Okay.  Where did you find this Stewart
24  B. McKinney Homeless Act?
25      A  I found all of this under the civil

Page 73

1 procedure.
2    Q Yes, ma'am. What is that?
3    A Civil procedure?
4    Q Yes, ma'am. What are you talking
5 about?
6    A The civil procedure rule.
7    Q And, again, what are you talking
8 about, ma'am?
9    A A legal access to law rules.
10    Q Yes, ma'am. I'm a lawyer --
11    A You never heard of it?
12    Q Yes, ma'am. That's what I was about
13 to tell you. I'm a lawyer --
14    A Well, I don't know how to explain it
15 to you, because it's a rule that all federal
16 civil procedure, civil procedure rules, are in
17 the law books.
18    Q There is a set of rules called the
19 Federal Rules of Civil Procedure. I will agree
20 with you on that, and I think Judge Walker and
21 Judge -- the federal -- the district judge
22 assigned to the case, and his name is escaping
23 me right now, would agree with that.
24    My question to you, ma'am, is, where do you
25 find the Section 28?

Page 74

1    A Go to Section 28 UDHA. Put that in
2 your Internet part, it will pull this -- it will
3 pull the section up.
4    Q And I will represent to you that my
5 associate, Mr. Moody, did precisely that.
6    A Uh-huh.
7    Q And what we came up with is marked as
8 Defendant's Exhibit 21.
9    A Uh-huh.
10    Q Will you acknowledge that section one
11 of the document I have marked as Defendant's
12 Exhibit 21 says, "This Act shall be known as the
13 Urban Development and Housing Act of 1992"?
14    A That's what it says. That's section
15 one. Yes. That's what it says.
16    Q So, that would be the UDHA?
17    A Yes.
18    Q And then, you have said that we should
19 look at Section 28 of the UDHA? Correct?
20    A (No visible or audible response.)
21    Q Ma'am?
22    A No, I didn't say that.
23    Q That's what your complaint says, does
24 it not?
25    A Yes. My complaint does state that.

Page 75

1    Q And so, if we go to Section 28 of the
2 UDHA, what I've marked as Defendant's Exhibit
3 21, that section deals with what?
4    A Evictions and demo-- democilation.
5    Q How about "demolition"?
6    A Demolition.
7    Q And if you flip the page here, Ms.
8 Nails, would you agree with me that virtually
9 everything you've outlined here in Defendant's
10 Exhibit 2 is covered?
11    A Not everything, no.
12    Q It covers this 30-day notice that you
13 have in your amended complaint?
14    A Yes.
15    Q Does it appear to cover this adequate
16 consultation that you have in your amended
17 complaint?
18    A Yes.
19    Q Does it appear to say something about
20 only during office hours and good weather?
21    A No. Not that one, no, it does not.
22    Q Look there at paragraph five, where
23 I've highlighted for you?
24    A During good weather. Regular office
25 hours.

Page 76

1    Q And you have it in your amended
2 complaint as only during office hours and good
3 weather?
4    A I don't know. I can't see from where
5 you're --
6    Q You can't see that?
7    A No, I can't. Uh-huh. So, yes, it
8 does. My complaint does state correctly to the
9 document you're showing me.
10    Q So, then, what I've marked as
11 Defendant's Exhibit 21 is what you're referring
12 to in your amended complaint?
13    A Correct.
14    Q All right. Good enough. Thank you.
15 And you found this document, or one that you
16 have, by putting Stewart McKinney Homeless Act
17 into your web browser?
18    A For that particular paragraph, yes.
19    Q Did you pull up a copy of the Stewart
20 McKinney Homeless Act?
21    A I did.
22    Q And do you possess a copy of that act?
23    A I do.
24    Q Have you produced to me a copy of that
25 act?

**Page 77**

1    A  No, I haven't.
2    Q  And why have you not produced to me a
3  copy?
4    A  Because you're a lawyer.  You're
5  defending them.  I'm not just helping you.
6    Q  Yes, ma'am.  I understand what you're
7  saying.  Look at Defendant's Exhibit 4 for me.
8  Request number eight, which is on page two?
9    A  Uh-huh.
10    Q  I requested of you "Any and all
11  documents or tangibles, regardless of media,
12  showing that the Dothan Rescue Mission is
13  governed by the Stewart McKinney Homeless
14  Assistance Act."  Do you see that?
15    A  I do see that.
16    Q  Did you produce to me a single
17  document?
18    A  No, I did not.
19    Q  Pursuant to that request?
20    A  No, I did not.
21    Q  So, then, you don't have a single
22  document that --
23    A  I have the computer --
24    Q  -- supports that allegation?
25    A  -- printout document sheet, that I did

**Page 78**

1  get off of the computer, yes, I do.
2    Q  But, you didn't produce that to me?
3    A  I didn't, and I wasn't going to, even
4  though the question does ask that, that I
5  produce that.  Was this a "yes" or "no" answer
6  anywhere else?  Because, if not, that's not my
7  responsibility to send you any legal documents
8  where I looked up a legal remedy.  You did that
9  yourself, and that was well taken.
10    Q  Flip to the first page of Defendant's
11  Exhibit 4.  It says there, to start with, "The
12  Defendant, the Dothan Rescue Mission, by and
13  through counsel" --
14    A  Where is -- four is on the second
15  page.
16    Q  Four is the whole document, and I'm
17  reading from right here (indicating).
18    -- "pursuant to Rule 34 of the Federal
19  Rules of Civil Procedure, requests that the
20  Plaintiff" -- that's you, ma'am -- "make the
21  following documents and/or tangible items
22  available for inspection and/or copying."
23    Do you see that?
24    A  Yes, I do.
25    Q  That means that if you have any

**Page 79**

1  document that's within the four walls of these
2  requests (indicating), you have to let me look
3  at them, and you have to let me copy them.  Do
4  you understand that?
5    A  I understand that you're saying that,
6  yes.  I do understand what you're saying, yes, I
7  do.
8    Q  Okay.  You just think I'm incorrect in
9  my position?
10    A  I think that I -- I know that you are
11  incorrect.  When it comes to federal, state, any
12  governing law, that is not my responsibility to
13  send you any statute or anything that governs a
14  relationship to a body of information related to
15  the law.
16    Q  Okay.
17    A  Because that's --
18    Q  Do you recall the conference we had
19  with Judge Walker?  We talked about it earlier?
20    A  Okay.  So, what is your point?
21    Q  I'm asking you if you recall that
22  conference?  Do you?
23    A  I remember the telephone conference,
24  yes, sir.
25    Q  Good.  Do you recall Judge Walker

**Page 80**

1  asking you specifically where the UDHA was
2  located?
3    A  No.  She did not ask me that.
4    Q  Okay.  Tell me what leads you to
5  believe that the Stewart B. McKinney Homeless
6  Act somehow applies to the Dothan Rescue
7  Mission?
8    A  The reasons you got surrounded and
9  highlighted, the 30-day notice.  The 30-day
10  notice, the -- all of this, in this highlighted
11  area, here (indicating).
12    Q  Just for our record, you're pointing
13  to a highlighted area on page two of Defendant's
14  Exhibit 2?
15    A  Uh-huh.
16    Q  And it says, "30-day notice, adequate
17  consultation, only during office hours and good
18  weather, presence of LGC, all those" --
19    A  Yes.  That basically deals with the
20  eviction policies as a shelter.
21    Q  I want to make sure I'm understanding
22  you.  The Stewart B. McKinney Homeless Act
23  applies to the Dothan Rescue Mission somehow
24  through this Section 28 UDHA and all these
25  requirements that are contained in it?

**Multi-Page™**

Page 81

1    A  Uh-huh.  Yes.
2    Q  All right.  And you agree with me that
3  we've got a copy of the UDHA over here as
4  Defendant's Exhibit 21?
5    A  Yes.
6    Q  All right.  Good.  I want us to go
7  back, now, Ms. Nails, and talk a little bit more
8  about the two incidents that your lawsuit is
9  based on?
10    A  Could I ask you what time it is?
11    Q  Sure.  It is almost 3:00 o'clock.
12    A  Do you think we'll be finished by
13  3:00?
14    Q  No, ma'am.
15    A  Can we do this another day?  I've been
16  -- what time did I come?  1:00 o'clock.  I've
17  been here two hours.
18    Q  Well, ma'am, it's really not unheard
19  of, for a deposition to last two, three,
20  sometimes four hours.  I really think that we
21  can be done in about half an hour, if you will
22  let me ask my questions, and then, you respond
23  to them.  But I would prefer not to --
24    A  Well, you didn't let me --
25    Q  -- reschedule.

Page 82

1    A  You didn't let me know -- let me know.
2  I never did a deposition.  You never asked if I
3  had ever done one.  You never gave me a time.  I
4  was expecting to be here no more than two hours.
5    Q  Well, ma'am, I'm sorry about that.
6  Your deposition is set and scheduled today, and
7  I'm going to complete it today.
8    A  Well, if you talk to me like that, no,
9  you won't.
10    Q  Well, ma'am, all I will say to you is
11  that your deposition is properly scheduled and
12  noticed, and that if you choose to end your
13  deposition before I have completed it --
14    A  Uh-huh.
15    Q  -- I will file a motion with the
16  judge.
17    A  Well, that's -- that's quite fine, and
18  I -- you know, I will file my motion, too, as
19  the reason to as why.
20    Q  Yes, ma'am.  I understand that.
21    A  With the civil -- federal civil rule
22  behind that, because, normally, I would think
23  that, if you're going to ask me if the time,
24  1:00 o'clock, and the day is okay, it seems like
25  you would give some type of length of time that

Page 83

1  I -- you know, I wouldn't expect to be here four
2  hours.
3    Q  And, ma'am, I haven't said you'll be
4  here four hours.
5    A  No.  But, you did say that it could
6  last that long.
7    Q  You simply asked what time it was.
8    A  Uh-huh.
9    Q  You told me earlier that the first
10  incident upon which your lawsuit is based
11  occurred in May of 2003.  Correct?
12    A  Correct.
13    Q  And you told me that you resided at
14  the mission at the time, and you were there for
15  some sort of three-day trial stay?
16    A  Yes.
17    Q  And that the decision whether you
18  could stay for longer than that time, was left
19  up to this housemother?
20    A  Yes.
21    Q  Can you tell me the name of the
22  housemother?
23    A  I think her name was Connie.  I'm not
24  going to be one hundred percent sure.
25    Q  Can you tell me her last name?

Page 84

1    A  No, I cannot.
2    Q  Can you describe the lady?
3    A  Yes, I can.
4    Q  Would you describe her for me, please?
5    A  She was a short lady, about five foot
6  one.  She may have weighed about 135 pounds.
7  She had either brown or blond long hair.
8    Q  What was her race?
9    A  She was a Caucasian.
10    Q  And what would you estimate her age?
11    A  I don't know.  She was old.  She was
12  an older lady.  But, as far as her age, I
13  couldn't determine that.
14    Q  All right.  You told me earlier that
15  the housemother told you, you have to move, you
16  asked why, and that this housemother understood,
17  from Lisa Smith, I believe, in the main office,
18  that you'd be better off finding another place
19  to live.  Is that accurate?
20    A  No, it's not.
21    Q  All right.  Tell me, again, what you
22  said?
23    A  As I was preparing to leave, the
24  housemother is the person that told me that I
25  would be better off with another place to go.

Page 85

1    Lisa Smith is the individual, I went over
2 to the office, to speak to her, about the reason
3 to as why I was being asked to leave.
4    Q  And what was it that Lisa Smith said
5 to you?
6    A  I talked to Mr. Herbert Culbreth, and
7 Mr. Culbreth had stated that I was not welcome.
8 In so many words, I was not welcome.  And I
9 asked him would I be able to come back, and he
10 said he did not know.
11    Q  Did he state to you why you were not
12 welcome?
13    A  The information that was given to him
14 by the housemother, which I do not know what
15 that information was.
16    Q  When you told me about this May 2003
17 incident, initially, you said that the decision
18 to ask you to leave had something to do with
19 your age?
20    A  There were young -- younger people
21 there than I was, when I was asked to leave.  I
22 didn't know the reason why I was being asked to
23 leave.  I was older.  A lot older by years.
24    Q  How old were you in May of 2003?
25    A  I am forty-five, now, and that's been

Page 86

1 three years ago.  So, what are we looking at?
2 Forty-two.
3    Q  When you told me about this incident,
4 initially, you mentioned that your color had
5 some bearing?
6    A  I was the only -- I was the -- not the
7 oldest African -- there was one -- I'm not sure.
8 I'm trying to think if it was the three days or
9 was it the time when they had barred me for
10 life, that the African-American younger person
11 was there.  Okay.  Color.  African-American is
12 color?  Right?
13    Q  Yes, ma'am.  I understood all that.
14 But, I'm just trying to understand what, if
15 anything, do you know, that supports your
16 statement that color had something to do or your
17 race had something to do with you being asked to
18 leave in May of 2003?
19    A  Well, if I was the only
20 African-American there --
21    Q  Uh-huh.
22    A  -- and no one else was being asked to
23 leave, I would think that color may have played
24 a part, because no one ever stated to what the
25 real reason was.

Page 87

1    Q  Well, other than you thinking that it
2 may have played a part, do you have any evidence
3 to show that it did, in fact, play a part?
4    A  Only my testimony.  I have nothing
5 other than that.
6    Q  Yes, ma'am.  But, do you understand
7 that you're guessing?
8    A  I'm not guessing.  I was the only
9 African-American there.  I was the only older
10 person there.  When I asked responsibly what the
11 problem was, I was given negative answers.  I
12 was looked down upon, and I wasn't given any
13 answer to the reason why I was being asked to
14 leave, either by Lisa, Herbert Culbreth or the
15 lady that was the housemother.
16    Q  Okay?
17    A  And matter of fact, when I left, she
18 was very negative in watching me leave away from
19 the building.
20    Q  Well, were there any problems or
21 incidents that occurred in the three days that
22 you stayed there?  The trial stay?
23    A  Not with anyone else where they were
24 wrong or with myself where I was wrong.
25    Q  So, it was just wonderfully peaceful

Page 88

1 and perfect three days?
2    A  For me, yes, it was.
3    Q  Did you understand that the three days
4 was, in fact, a trial period?
5    A  That's what I was told.
6    Q  And would you agree with me that the
7 word "trial period," implies that there's no
8 guarantee?
9    A  No, I would not.
10    Q  Well, why would you call it a trial
11 period?
12    A  Just to see how you would work
13 together with the other people.
14    Q  Right.
15    A  I think that's what -- it doesn't --
16 it doesn't -- yeah.  That's your question.  To
17 see how you work together.
18    Q  And if the purpose of calling it a
19 trial period is to see if you work together or
20 live together well with the other people,
21 doesn't that imply that if you don't live
22 together or work together well with the other
23 people, then, the relationship has to end?
24    A  If that happened, yes, it does.
25    Q  I want to make positive I understand

Page 89

1 this. This incident that we're talking about,
2 the trial period, and you being asked to leave
3 after the three days, that occurred in May of
4 2003. That's what your complaints says, and
5 you've agreed with me on that already. Correct?
6    A Well, what I -- I believe that I was
7 there twice in 2003, because -- what year was it
8 that they had barred me for life? I think that
9 was in 2003.
10    And then, I went back in 2003, and that's
11 when Mr. Culbreth said that I could take a
12 three-day trial.
13    Q You're thinking you were barred for
14 life before this incident in May of 2003?
15    A No. I'm saying that I was barred for
16 life in 2003 or -- that's what I'm trying to
17 figure out. The trial period had to come
18 second.
19    So, that's what I was wanting to know, are
20 you talking about -- you hadn't gotten to the
21 barred for life yet. Okay? So, that had to
22 come first, before the trial period.
23    Q Okay. And understand, ma'am, this is
24 your lawsuit?
25    A Uh-huh.

Page 90

1    Q You're the one that's supposed to know
2 the information.
3    A Uh-huh.
4    Q Are you telling me that your being
5 barred for life occurred before this incident
6 that you've sued about in May of 2003?
7    A I'm saying that I was there twice, and
8 -- maybe not. Maybe the trial period, then,
9 when the trial period, I was barred -- I'm just
10 trying to get it together where you're trying to
11 come from with the trial period and where you --
12    Q I was just following up on your
13 testimony, ma'am. You agreed with me earlier --
14 your amended complaint, that's Defendant's
15 Exhibit 2?
16    A Uh-huh.
17    Q The last page. It says, "The date of
18 the alleged violation, May 2003."
19    A Uh-huh.
20    Q "The date of the alleged violation,
21 June 2005."
22    A Uh-huh.
23    Q That's what the document says?
24    A It is.
25    Q Correct?

Page 91

1    A Yes.
2    Q That's your signature on the document?
3    A Uh-huh.
4    Q When the judge asked you, during our
5 conference, were there two incidents, you told
6 her there were two and you agreed that these
7 were the dates of them? Right?
8    A Right. Yes.
9    Q All right. So, I'm following up on
10 those incidents. Okay?
11    A Okay.
12    Q And I think I understand the one in
13 May of 2003. What I'm trying to understand is,
14 are you saying you were barred for life before
15 this incident of May 2003?
16    A It could have been after. I don't
17 know. It could have been after. It would have
18 -- if it was a trial period, it would have had
19 to be before --
20    Q Being barred?
21    A The bar had to be before.
22    Q So, then, the trial period, the
23 three-day period that we've been talking about
24 in May of 2003, was after you're barred for life
25 and they're giving you another chance?

Page 92

1    A That's correct, yes.
2    Q Now, let's talk about the June of 2005
3 incident just a little bit. Let me make sure
4 I've got all of it, an understanding of it.
5 Okay? The whole thing in June of 2005 had to do
6 with meal tickets?
7    A Uh-huh.
8    Q Correct?
9    A Yes.
10    Q It had nothing to do with you actually
11 residing at the mission?
12    A No.
13    Q Do you recall the name of this
14 lunchroom supervisor that you talked to during
15 this incident?
16    A It's in my "yes" and "no" answer
17 questions. He's a black male.
18    Q Are you saying Defendant's Exhibit 5?
19    A Lee Armstrong, yes.
20    Q Lee Armstrong. All right. Good.
21 Believe it or not, I think I understand that
22 incident. Good. Let me just look at my notes
23 real quick and we may be just about done.
24    Let's go back to May of 2003. Do you have
25 any evidence or information to support a claim

Page 93

1 that you being asked to leave after this trial
2 period in May of 2003, had something to do with
3 a physical disability that you had?
4    A  No.
5    Q  Do you have any evidence or
6 information that might support a position that
7 your meal tickets being taken away from you in
8 June of 2005, had something to do with a
9 physical disability that you had?
10    A  No.
11    Q  Let me show you some documents and
12 just kind of get them identified.  Defendant's
13 Exhibit 9, have you seen that before?
14    A  Yes.
15    Q  And that was one of the documents
16 produced to you during the disclosure process in
17 this case?
18    A  Yes.
19    Q  Is that your signature on the second
20 page of Defendant's Exhibit 9?
21    A  Yes.
22    Q  Does the second page of Defendant's
23 Exhibit 9 contain a note that indicates, in
24 November of 1995, that someone at the mission
25 made a decision not to assist you, because

Page 94

1 Personnel Resources could not verify a true
2 employment, except for only one day last week?
3    A  That -- that seems to be what someone
4 at the mission has written, yes.
5    Q  It says that?
6    A  Yes.
7    Q  Defendant's Exhibit 10, have you seen
8 that document before?
9    A  Yes.
10    Q  And that also is a document produced
11 to you during the disclosure process in this
12 case, is it not?
13    A  Yes.
14    Q  And does this document, Defendant's
15 10, it has notations dated in November of '95,
16 January of '96 and February of '96?  Is that
17 correct?
18    A  Yes.
19    Q  And does it also have a notation that
20 you were banned from the mission at that time?
21    A  It doesn't say my name, no.
22    Q  Would you agree that the document
23 concerns you?
24    A  As an information sheet, yes.
25    Q  And your name is up here at the top?

Page 95

1 Correct?
2    A  Yes.
3    Q  And it has your date of birth?
4 Correct?
5    A  Yes.
6    Q  And it has your Social Security number
7 even, doesn't it?
8    A  Yes.
9    Q  Do you know a gentleman named Richard
10 Johnson?
11    A  Yes.
12    Q  Who is Richard Johnson?
13    A  Someone that I knew in Fort Walton
14 Beach, Florida.
15    Q  And did you and he come to the Dothan,
16 Alabama area in late 1995 or early 1996?
17    A  I thought it was 2003.  I thought the
18 year was 2003.  I thought --
19    Q  Well, I'm asking, based on the
20 document?
21    A  Not that I'm aware of.  I thought the
22 year was 2003.
23    Q  Defendant's Exhibit 11, another
24 document that was produced to you as part of the
25 disclosure process in this lawsuit, have you

Page 96

1 seen that before?
2    A  Yes.
3    Q  And is that your signature on the
4 document?
5    A  Yes.
6    Q  And is the date of the document
7 February 15 of 1996?
8    A  Yes.
9    Q  And does it not note across the
10 document that you were barred?
11    A  Yes.
12    Q  Would you read for me the words that
13 are written above your signature on the
14 Defendant's Exhibit 11?
15    A  This small print (indicating)?
16    Q  Yes, ma'am.  That small print?
17    A  I can't see that.  I'm sorry.
18    Q  You're unable to read that at all?
19    A  I'm unable to read that at all.
20    Q  But, the words say what they say?
21 Would you agree?
22    A  There's words there, yes, sir.
23    Q  Defendant's 12, another document
24 produced to you during the disclosure process in
25 this lawsuit.  Have you seen that before?

Page 97

1    A  Yes.
2    Q  And would you agree that that document
3 concerns you?
4    A  Yes.
5    Q  And would you agree that it's dated
6 November of 2002? I can't make out the exact
7 date. The highlighted portion right there?
8    A  Yes.
9    Q  Are you able to read the words above
10 your signature on Defendant's Exhibit 12?
11    A  It says, "I relieve the Dothan Rescue
12 Mission, Inc., of all liability for any and all
13 losses, injuries, damages, whatever, whether
14 though (sic) intent, negligence, accident,
15 whatever, and whatever situation (sic) --
16 sustained." I can't get -- make that last word
17 out.
18    Q  But, there is writing that's above
19 your signature on that document, Defendant's 12?
20    A  Yes.
21    Q  And you were able to read most of it?
22 Would you agree with that?
23    A  Yes.
24    Q  Let me show you Defendant's 13,
25 another document produced to you during the

Page 98

1 disclosure process in this lawsuit. Have you
2 seen that document?
3    A  Yes.
4    Q  And would you acknowledge that it
5 deals with you, Ms. Nails?
6    A  Yes.
7    Q  And would you acknowledge that the
8 document is dated February of 2002 (indicating)?
9    A  No. December of 2002.
10    Q  Oh, I'm sorry. December of 2002. You
11 acknowledge it's dated December --
12    A  Yes.
13    Q  -- of 2002? And I apologize. I
14 didn't see the "1."
15    Defendant's 14, another document produced
16 to you during the disclosure process in this
17 case. Have you seen it?
18    A  Yes.
19    Q  And will you acknowledge that it deals
20 with you?
21    A  Yes.
22    Q  And does it also appear to be dated
23 December of 2002 (indicating)?
24    A  Yes.
25    Q  Defendant's Exhibit 15, another

Page 99

1 document produced to you during the disclosure
2 process in this case. Do you recognize it?
3    A  Yes, I do.
4    Q  What is that?
5    A  I can't tell. This copy is -- not all
6 the writing visible.
7    Q  Does it appear to be dated -- well,
8 you tell me if you can read the date at the top?
9    A  I don't -- I don't know what date it
10 -- day it has, but it -- I don't know what date
11 it has.
12    Q  Well, to me, it's either December or
13 November of 2002. Does it look like December --
14    A  The month, yes.
15    Q  One or the other?
16    A  December.
17    Q  Of 2002?
18    A  Yes.
19    Q  And it's some sort of lease or appears
20 to be? Would you agree with that?
21    A  Something to do with something. I
22 don't know which something it is.
23    Q  Do you know how such a document
24 would come into the Dothan Rescue Mission's
25 possession?

Page 100

1    A  Either by request or from someone or
2 from me.
3    Q  So, you could have provided this
4 document to the Dothan --
5    A  I could have, yes.
6    Q  Do you recall providing this document?
7    A  I don't recall. If it's there, I must
8 have or somebody must have. I don't recall, but
9 if it's there, I must have or someone else must
10 have.
11    Q  Defendant's 16, another document
12 produced to you during the disclosure process in
13 this case. Do you recognize it?
14    A  Yes.
15    Q  And what is it?
16    A  It's paycheck stubs from Stillman
17 College.
18    Q  So, you worked at Stillman College at
19 some point?
20    A  No. I was a student at Stillman
21 College.
22    Q  You used the phrase "paychecks"?
23    A  Well, you're paid to go to school.
24 So, it's a refund check. This says "check" --
25 it says "check number." So, I just used that.

## Page 101

1    Q  Do you know how this would have come
2 into the possession of Dothan Rescue Mission?
3    A  I would have given them the check or
4 the check stubs, stubs to be copies.
5    Q  So, you would have provided that to
6 them?
7    A  Yes.
8    Q  It actually says "Student Refund
9 Account." What sort of refund did you get from
10 Stillman College?
11    A  A student refund for any Pell or
12 loans.
13    Q  I see. So, those monies would have
14 gone to the college, and that would have paid
15 your tuition, and then, you had gotten the
16 difference?
17    A  Yes.
18    Q  Defendant's 17, another document
19 produced to you in the disclosure process in
20 this case. Do you recognize it?
21    A  Yes.
22    Q  And what is that document?
23    A  Social Security card. My Social
24 Security card. A driver's license. My Texas
25 driver's license.

## Page 102

1    Q  So, you had a driver's license from
2 Texas at some point?
3    A  Yes.
4    Q  Do you still have a driver's license
5 from Texas?
6    A  No.
7    Q  And did you provide these documents to
8 the Dothan Rescue Mission or copies of the
9 originals?
10    A  Yes.
11    Q  Defendant's 18, yet another document
12 produced to you during the disclosure process in
13 this case. Do you recognize it?
14    A  It's the same document, yes, that I
15 seen earlier, yes.
16    Q  Well, would you acknowledge that
17 Defendant's 18 concerns you? It has your name
18 up at the top (indicating)?
19    A  Yes.
20    Q  What's the date of the document?
21    A  March is the month. 22nd.
22    Q  Of what year, ma'am?
23    A  2003.
24    Q  Thank you. Defendant's 19, yet
25 another document produced to you during the

## Page 103

1 disclosure process in this case. Have you seen
2 that document before?
3    A  Yes.
4    Q  And would you acknowledge that the
5 document concerns you?
6    A  Yes.
7    Q  It has your name at the top and your
8 Social Security number?
9    A  Yes.
10    Q  Defendant's Exhibit 20, yet another
11 document produced to you during the disclosure
12 process in this case. Have you seen it before?
13    A  I've seen it before, yes.
14    Q  Would you acknowledge that the
15 document concerns you?
16    A  Yes.
17    Q  It's about you?
18    A  Yes.
19    Q  It notes that, at the time -- well,
20 first, is it dated January of 2005?
21    A  Yes.
22    Q  And does it have a notation that you
23 received $792.00 a month in Social Security?
24    A  Yes.
25    Q  Is there a notation on Defendant's 20

## Page 104

1 that, "As of this time, Ms. Nails is not
2 homeless. She is seeking shelter to save money
3 on rent"?
4    A  That's what -- yes. It states that,
5 yes.
6         MR. WALDING:  All right. I want to
7         make sure I have all of the
8         documents. Give me two minutes.
9         Okay?
10         (Short break in deposition.)
11    Q  Ms. Nails, I do apologize to you. I
12 want to make certain that I'm clear on a couple
13 of things. Do you have any evidence or
14 information that the Dothan Rescue Mission
15 actually receives block grants from a government
16 entity?
17    A  No.
18    Q  And, Ms. Nails, would you tell me for
19 our record when you filed your original
20 complaint in this case, what we have marked as
21 Defendant's Exhibit 1?
22    A  You want to know the name of the
23 complaint?
24    Q  No, ma'am. I want to know when you
25 filed it with the Court?

Page 105

1  A  It looks like --
2  Q  Is that August?
3  A  Yes.  August 16th, but I don't see --
4  16th or 15th.  I don't -- I don't see that
5  clearly or do I see the year.
6  Q  Well, wasn't it this year, ma'am?
7  A  I don't know.  It could have been last
8  year.
9  Q  You don't know when you filed your
10  lawsuit?
11  A  No, I don't.
12  Q  Well, doesn't it say, right there,
13  2006 August 16?
14  A  I don't see that clearly, no.
15  Q  But, whatever records the clerk's
16  office for the United States District Court,
17  whatever they show as to when you filed it,
18  would be when you filed it.  Would you agree
19  with that?
20  A  Yes.
21  Q  Because you actually either mailed it
22  to them or took it there yourself?
23  A  I mailed it to them, yes.
24  Q  And they would have received it in
25  the mail and stamped it in, in some way

Page 106

1  (indicating)?
2  A  Yes.
3  Q  So, whatever day they stamped it in,
4  would be the day it was filed?  Correct?
5  A  Yes.
6  MR. WALDING:  All right.  Thank you,
7      ma'am.  I don't have any more
8      questions.
9  THE WITNESS:  Okay.  Thank you.
10  (Off-record discussion.)
11
12  END OF DEPOSITION
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 107

1  DEFENDANT'S EXHIBIT NO. 1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 108

1  DEFENDANT'S EXHIBIT NO. 2
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| Page 109 | |
|---|---|
| 1 | DEFENDANT'S EXHIBIT NO. 3 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| Page 110 | |
|---|---|
| 1 | DEFENDANT'S EXHIBIT NO. 4 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| Page 111 | |
|---|---|
| 1 | DEFENDANT'S EXHIBIT NO. 5 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| Page 112 | |
|---|---|
| 1 | DEFENDANT'S EXHIBIT NO. 6 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 113 |
|---|---|
| | DEFENDANT'S EXHIBIT NO. 7 |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 115 |
|---|---|
| | DEFENDANT'S EXHIBIT NO. 9 |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 114 |
|---|---|
| | DEFENDANT'S EXHIBIT NO. 8 |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 116 |
|---|---|
| | DEFENDANT'S EXHIBIT NO. 10 |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| Page 117 |
|---|
| 1  DEFENDANT'S EXHIBIT NO. 11 |
| 2 |
| 3 |
| 4 |
| 5 |
| 6 |
| 7 |
| 8 |
| 9 |
| 10 |
| 11 |
| 12 |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

| Page 119 |
|---|
| 1  DEFENDANT'S EXHIBIT NO. 13 |
| 2 |
| 3 |
| 4 |
| 5 |
| 6 |
| 7 |
| 8 |
| 9 |
| 10 |
| 11 |
| 12 |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

| Page 118 |
|---|
| 1  DEFENDANT'S EXHIBIT NO. 12 |
| 2 |
| 3 |
| 4 |
| 5 |
| 6 |
| 7 |
| 8 |
| 9 |
| 10 |
| 11 |
| 12 |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

| Page 120 |
|---|
| 1  DEFENDANT'S EXHIBIT NO. 14 |
| 2 |
| 3 |
| 4 |
| 5 |
| 6 |
| 7 |
| 8 |
| 9 |
| 10 |
| 11 |
| 12 |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

| Page 121 | Page 123 |
|---|---|

DEFENDANT'S EXHIBIT NO. 15

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

DEFENDANT'S EXHIBIT NO. 17

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

| Page 122 | Page 124 |
|---|---|

DEFENDANT'S EXHIBIT NO. 16

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

DEFENDANT'S EXHIBIT NO. 18

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

| Page 125 | | Page 127 | |
|---|---|---|---|
| 1 | DEFENDANT'S EXHIBIT NO. 19 | 1 | DEFENDANT'S EXHIBIT NO. 21 |
| 2 | | 2 | |
| 3 | | 3 | |
| 4 | | 4 | |
| 5 | | 5 | |
| 6 | | 6 | |
| 7 | | 7 | |
| 8 | | 8 | |
| 9 | | 9 | |
| 10 | | 10 | |
| 11 | | 11 | |
| 12 | | 12 | |
| 13 | | 13 | |
| 14 | | 14 | |
| 15 | | 15 | |
| 16 | | 16 | |
| 17 | | 17 | |
| 18 | | 18 | |
| 19 | | 19 | |
| 20 | | 20 | |
| 21 | | 21 | |
| 22 | | 22 | |
| 23 | | 23 | |
| 24 | | 24 | |
| 25 | | 25 | |

**Page 126**

| 1 | DEFENDANT'S EXHIBIT NO. 20 |
|---|---|
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

**Page 128**

1  STATE OF ALABAMA
2  HOUSTON COUNTY
3
4      I, Linda G. Petty, Court Reporter, and
5  Notary Public, State at Large, do hereby certify
6  that the foregoing transcript, pages 1 through
7  127, is a true and correct transcript of the
8  testimony and proceedings taken at said time and
9  place; and that the same was taken down by me in
10 stenograph shorthand, and transcribed by me
11 personally or under my personal supervision.
12     I further certify that I have no interest
13 in this matter, financial or otherwise, or how
14 it may develop or what its outcome may be.  I
15 further certify that I am not of counsel for any
16 of the parties, nor am I related to counsel or
17 litigants or associated with anyone connected
18 with this cause to my knowledge.
19     Witness my hand this 12th day of December,
20 2006.
21
22
23     --------------------------
       Court Reporter, and Notary
24         Public, State at Large
25

Page 125 - Page 128

**1:06-CV-00737-WKW** [1]    1:6
**1st** [1]    22:8

**-$-**

**$5,000.00** [2]    23:22    23:24
**$792.00** [1]    103:23

**-&-**

**&** [1]    1:14

**-'-**

**'81** [1]    22:8
**'82** [1]    22:11
**'84** [1]    38:3
**'85** [1]    38:3
**'91** [2]    38:4    38:5
**'95** [1]    94:15
**'96** [3]    9:23    94:16    94:16
**'97** [3]    9:23    28:17    29:23
**'98** [1]    9:23
**'99** [1]    9:23

**-1-**

**1** [11]    6:3    39:8    39:10    39:11    39:20    46:14    71:18    98:14    104:21    107:1    128:6
**10** [4]    9:16    94:7    94:15    116:1
**103** [3]    6:2    6:5    7:18
**11** [3]    95:23    96:14    117:1
**12** [5]    50:25    96:23    97:10    97:19    118:1
**127** [1]    128:19
**12th** [1]    128:19
**13** [3]    51:8    97:24    119:1
**135** [1]    84:6
**14** [2]    98:15    120:1
**15** [4]    9:17    96:7    98:25    121:1
**15th** [1]    105:4
**16** [3]    100:11    105:13    122:1
**16th** [2]    105:3    105:4
**17** [2]    101:18    123:1
**17th** [1]    49:24
**18** [3]    102:11    102:17    124:1
**19** [2]    102:24    125:1
**1980** [4]    20:14    21:23    21:24    22:2
**1992** [1]    74:13
**1995** [2]    93:24    95:16
**1996** [3]    9:19    95:16    96:7
**1997** [1]    21:1
**1:00** [3]    1:15    81:16    82:24

**-2-**

**2** [10]    39:9    40:1    40:25    41:2    46:14    71:18    75:10    80:14    90:15    108:1
**20** [3]    103:10    103:25    126:1
**20-something** [1]    24:24
**2000** [5]    9:23    29:11    29:12    31:12    38:8
**2001** [8]    9:24    10:3    10:4    10:20    10:20    29:12    29:18    31:12
**2002** [13]    10:5    10:6    30:20    30:22    30:22    97:6    98:8    98:9    98:10    98:13    98:23    99:13    99:17
**2003** [45]    7:24    7:25    8:1    8:4    8:13    9:18    10:3    10:5    10:5    10:7    21:5    28:8    28:18    28:25    29:23    35:15    35:17    37:22    38:7    41:3    41:13    41:21    41:25    42:2    82:11    85:16    85:24    86:18    89:4    89:7    89:9    89:10    89:14    89:16    90:6    90:18    91:13    91:15    91:24    92:24    93:2    95:17    95:18    95:22    102:23
**2004** [4]    29:2    29:4    30:4    35:10
**2005** [14]    34:15    34:17    34:21    35:8    38:8    41:6    41:14    41:21    43:8    90:21    92:2    92:5    93:8    103:20
**2006** [9]    1:15    29:6    32:4    32:5    33:11    34:9    49:25    105:13    128:20
**21** [6]    74:8    74:12    75:3    76:11    81:4    127:1
**22nd** [1]    102:21
**25** [2]    31:15    67:14
**28** [10]    71:16    71:19    72:4    72:6    72:13    73:25    74:1    74:19    75:1    80:24

**-3-**

**3** [2]    46:16    109:1
**30-day** [4]    35:12    80:9    80:9    80:16
**34** [1]    78:18
**342** [1]    5:16
**36301** [1]    5:18

**3:00** [2]    81:11    81:13

**-4-**

**4** [4]    47:6    77:7    78:11    110:1
**40** [1]    15:3
**46** [1]    15:3

**-5-**

**5** [9]    49:2    49:23    50:11    51:1    51:8    51:13    72:16    92:18    111:1

**-6-**

**6** [5]    38:8    41:17    46:15    51:25    112:1
**6th** [1]    1:14

**-7-**

**7** [6]    56:16    57:3    57:8    57:14    58:2    113:1
**76** [1]    22:19

**-8-**

**8** [3]    58:10    58:24    114:1
**80-something** [1]    14:8
**808** [1]    5:17
**8th** [1]    15:4

**-9-**

**9** [4]    93:13    93:20    93:23    115:1

**-A-**

**A-l-i-s-h-a** [1]    12:16
**Abbeville** [1]    11:19
**Aberdeen** [1]    22:17
**ability** [2]    4:24    5:7
**able** [7]    5:12    9:17    43:3    69:24    85:9    97:9    97:21
**above** [3]    96:13    97:9    97:18
**accepted** [1]    23:13
**access** [1]    73:9
**accident** [1]    97:14
**according** [1]    58:1
**Account** [1]    101:9
**accurate** [6]    27:14    38:7    40:11    40:19    49:4    84:19
**acknowledge** [9]    58:20    74:10    98:4    98:7    98:11    98:19    102:16    103:4    103:14
**act** [12]    72:16    72:22

**6:4**    72:24    74:12    74:13    76:16    76:20    76:22    76:25    77:14    80:6    80:22
**activities** [1]    7:3
**ad** [1]    27:17
**add** [1]    51:2
**address** [1]    5:20
**adequate** [2]    75:15    80:16
**Administration** [1]    36:21
**admissions** [1]    41:18
**admit** [2]    41:19    51:19
**admitted** [3]    30:14    66:16    66:20
**affect** [2]    5:6    5:11
**African** [1]    86:7
**African-American** [4]    86:10    86:11    86:20    87:9
**afternoon** [1]    8:3
**again** [14]    13:5    14:10    21:6    21:7    29:5    30:21    34:24    39:15    43:23    50:10    56:9    63:3    73:7    84:21
**against** [3]    2:13    40:10    61:24
**age** [4]    42:19    84:10    84:12    85:19
**agency** [5]    32:13    56:3    56:5    56:6    56:6
**ago** [2]    5:23    86:1
**agree** [19]    4:7    4:12    4:16    41:1    41:11    41:19    57:25    73:19    73:23    75:8    81:2    88:6    94:22    96:21    97:2    97:5    97:22    99:20    105:18
**agreed** [4]    52:15    89:5    90:13    91:6
**ahead** [1]    43:20
**aids** [2]    61:10    68:17
**Air** [1]    24:21
**Alabama** [28]    1:2    1:14    1:23    5:17    6:4    7:22    8:1    8:20    8:21    8:23    8:23    8:25    10:1    10:9    10:13    11:11    13:2    31:1    32:10    32:11    33:19    33:20    54:19    59:13    61:1    62:5    95:16    128:1
**Aliceville** [8]    8:21    8:23    8:25    10:1    10:9    10:13    11:11    13:2
**Alisha** [2]    12:16    12:22
**allegation** [3]    46:25

**72:24**    74:12    74:13
**76:16**    76:20    76:22
**76:25**    77:14    80:6
**80:22**

**60:4**    77:24
**allegations** [11]    40:9    47:4    47:13    47:22    48:8    48:13    62:20    63:6    63:20    66:3    72:8
**alleged** [4]    41:2    41:6    90:18    90:20
**allow** [1]    52:22
**almost** [3]    20:22    24:24    81:11
**alone** [5]    6:12    6:20    9:12    15:1    15:2
**always** [1]    44:4
**amended** [7]    40:2    40:14    75:13    75:16    76:1    76:12    90:14
**among** [1]    57:18
**Andrews** [4]    5:16    6:1    6:11    6:24
**Angela** [4]    1:4    1:9    2:1    2:9
**answer** [13]    3:19    4:13    4:16    5:8    5:12    35:25    52:24    63:1    67:24    70:2    78:5    87:13    92:16
**answered** [3]    49:16    63:14    67:24
**answering** [4]    5:3    51:3    63:13    64:3
**answers** [6]    31:13    49:4    49:9    50:13    50:22    87:11
**Anyways** [1]    44:9
**apartment** [8]    5:17    6:3    6:23    6:24    7:6    15:2    16:16    16:19
**apartments** [3]    16:17    16:17    26:22
**apologize** [5]    13:19    34:24    39:15    98:13    104:11
**appear** [4]    75:15    75:19    98:22    99:7
**APPEARANCES** [1]    1:20
**applies** [2]    80:6    80:23
**appreciate** [1]    52:22
**appropriated** [1]    24:12
**April** [6]    22:8    22:9    34:4    34:6    34:7    34:8
**area** [19]    11:16    12:6    13:5    14:10    14:11    14:14    14:23    15:12    18:6    26:8    29:23    31:4    31:21    32:25    33:1    80:11    80:13    95:16
**areas** [1]    14:16
**Ariton** [1]    11:20
**arm** [6]    57:17    58:3

58:6   59:13   59:14
59:14
**Armstrong** [2]   92:19
92:20
**Army** [6]
22:14   22:18   22:21
24:21   38:22   20:18
**Articles** [1]   57:9
**assign** [2]   32:15
33:2
**assigned** [1]   73:22
**assist** [1]   93:25
**assistance** [4]   17:5
57:20   72:16   77:14
**assistant** [1]   42:5
**associate** [3]   2:11
16:24   74:5
**associated** [2]   45:14
128:17
**assume** [2]   9:3
26:4
**assuming** [1]   60:12
**athletic** [1]   18:2
**attachment** [1]   48:2
**attend** [5]   10:21
29:15   30:8   30:19
53:22
**attended** [8]   21:11
21:12   21:13   28:5
30:3   30:9   30:13
30:14
**attending** [2]   20:25
29:7
**attorney** [1]   35:22
**attorneys** [2]   1:23
2:11
**audible** [2]   67:3
74:20
**audio** [2]   48:6
48:9
**August** [8]   22:9
22:10   22:11   35:7
35:8   105:2   105:3
105:13
**auto** [1]   32:21
**available** [1]   78:22
**awarded** [3]   35:13
35:16   37:21
**aware** [3]   51:8
53:15   95:21
**away** [5] 7:10   31:15
67:14   87:18   93:7

**-B-**

**B** [5]   72:15   72:22
72:24   80:5   80:22
**bachelor's** [4]   21:9
31:15   31:20   67:15
**background** [2] 37:17
37:21
**bad** [1]   44:20
**Baker** [1]   31:9
**balcony** [1]   16:20
**banned** [1]   94:20
**bar** [1]   91:21

**barely** [1]   71:1
**barred** [11]   86:9
89:8   89:13   89:15
89:21   90:5   90:9
91:14   91:20   91:24
96:10
**based** [4]   72:9
81:9   83:10   95:19
**basic** [2]14:18   4:20
**basing** [1]   40:18
**Beach** [16]   9:10
9:20   10:2   10:5
14:7   25:20   26:13
26:15   29:22   30:10
30:12   30:16   33:25
34:12   34:23   95:14
**bearing** [1]   86:5
**beauty** [1]   61:9
68:17
**began** [1]   27:18
27:20
**behind** [3]   7:1
7:9   82:22
**Bella** [4]   27:19
27:23   27:23   28:10
**benefit** [1]   23:15
**benefits** [1]   3:22
**best** [4] 4:12   63:14
**better** [4]   7:4
42:17   84:18   84:25
**between** [4]   10:3
10:19   31:11   46:13
**Bible** [1]   18:13
**big** [2]   11:5   11:8
**Birmingham** [2]
54:18   55:1
**birth** [1] 95:3
**bit** [3]   39:16   81:7
92:3
**black** [2]   44:8
92:17
**blending** [1]   27:5
**block** [1]   54:21
104:15
**blond** [1]   84:7
**body** [1] 79:14
**book** [2] 18:12   18:16
**books** [1]   18:11
18:12   73:17
**Books-A-Million** [1]
18:24
**bottle** [1]   46:6
**boxes** [1]   32:25
**Brad** [4] 1:24   44:14
44:24   45:5
**branch** [1]   22:12
30:15
**break** [6]   38:14
45:19   45:23   46:9
46:11   104:10
**bringing** [1]   62:19
**brochure** [1]   58:17
58:19
**brochures** [1]   58:22
**brought** [1]   46:14

63:5
**brown** [3]   36:1
36:2   84:7
**browser** [1]   76:17
**building** [2]   17:3
87:19
**Bush** [1] 56:13
**business** [15]   31:22
34:1   34:3   34:11
34:16   34:20   35:6
52:6   52:7   52:8
52:10   53:2   54:9
54:13   67:15
**buying** [1]   7:2

**-C-**

**c** [4]   11:4   11:5
11:8   11:8   91:21
**campaign** [1]   56:13
**cannot** [6]   43:5
65:21   69:8   69:11
70:15   84:1
**capacity** [1]   28:11
**card** [3] 18:21   101:23
101:24
**Carolina** [1]   22:16
**case** [31] 9:4   15:24
16:1   39:21   40:4
46:21   47:1   47:4
47:14   47:23   48:8
48:13   54:2   57:5
58:12   59:4   62:19
66:3   66:18   72:9
73:22   93:17   94:12
98:17   99:2   100:13
101:20   102:13   103:1
103:12   104:20
**catch** [1]   18:16
**Caucasian** [1]   84:9
**caused** [2]   42:2
42:2   43:8
**Center** [2]   19:3
19:6
**certain** [4]   8:2
18:5   65:16   104:12
**certainly** [1]   15:6
56:21
**certify** [3]   128:5
128:12   128:15
**cetera** [1]   65:18
**chance** [1]   2:22
91:25
**check** [10]   54:8
54:12   54:13   54:14
54:17   100:24   100:24
100:25   101:3   101:4
**checked** [1]   54:25
55:4
**chemical** [1]   4:23
5:2
**children** [2]   10:9
12:13
**choose** [2]   22:20
82:12
**Christ** [1]   57:24
**chronic** [1]   35:20

**church** [4]   17:16
57:17   58:4   58:7
**city** [28]   8:15   11:20
54:14   54:15   59:14
60:15   61:6   61:8
61:13   61:15   62:23
64:18   64:24   65:4
65:5   65:6   65:9
65:9   65:14   66:1
66:14   68:16   68:19
68:22   69:3   69:25
70:5   70:21
**civic** [2]   17:21   17:23
**civil** [12]   1:11
25:7   38:23   72:25
73:3   73:16   73:16
73:16   73:19   78:19
82:21   82:21
**claim** [1]   92:25
**claims** [1]   66:3
**class** [1] 30:6
**cleaned** [1]   26:22
**cleaning** [15]   27:4
27:13   27:14   27:19
28:11   28:15   34:1
34:3   34:11   34:16
34:20   35:5   38:6
38:10   38:24
**clear** [4] 3:24   47:20
60:2   104:12
**clearly** [3]   51:2
105:5   105:14
**clerk** [2] 22:19   24:8
**clerk's** [1]   105:15
**close** [7] 14:9   14:13
14:15   14:17   15:11
16:3   25:13
**clothing** [1]   57:21
**code** [2]   5:18   6:4
**Coffee** [4]   11:23
11:24   13:7   14:13
**college** [27]   8:19
21:1   21:8   21:13
21:13   21:16   21:17
21:18   25:17   25:21
26:5   26:12   27:12
28:5   28:24   29:10
29:16   29:16   30:3
30:18   30:24   31:10
100:17   100:18   100:21
101:10   101:14
**colleges** [1]   25:18
**color** [6] 42:19   86:4
86:11   86:12   86:16
86:23
**Columbus** [1]   14:3
**coming** [1]   17:4
**communicate** [1]
35:3
**communicating** [1]
2:20
**community** [16]
21:1   21:8   21:12
21:13   21:16   25:16
25:21   26:5   26:12
27:12   28:5   28:24
29:10   29:16   30:2
31:9

**companies** [2]   26:19
26:21
**company** [5]   26:17
27:13   27:19   27:19
28:1
**complaint** [17]   39:21
40:2   40:13   40:14
62:3   71:14   72:20
74:23   74:25   75:13
75:17   76:2   76:8
76:12   90:14   104:20
104:23
**complaints** [3]   40:10
41:8   89:4
**complete** [1]   82:7
**completed** [1]   55:14
82:13
**computer** [3]   59:23
77:23   78:1
**concentrate** [1]   39:11
**concerned** [1]   11:17
**concerns** [5]   5:11
94:23   97:3   102:17
103:5   103:15
**conditions** [2]   5:5
5:5   5:6
**condo** [1]   27:13
**Condominium** [1]
26:19
**condos** [4]   26:23
26:24   26:25   27:13
**conference** [15]   62:8
62:10   62:13   63:22
79:18   79:22   79:23
91:5
**connected** [1]   128:17
**Connie** [1]   83:23
**consider** [1]   15:10
**Consolidate** [1] 72:17
**constitutional** [1]
40:21
**consultation** [2]
75:16   80:17
**consulted** [1]   54:25
**contact** [1]   64:25
**contacted** [1]   64:24
68:22
**contain** [1]   93:23
**contained** [4]   50:13
50:17   57:13   80:25
**continues** [1]   71:20
**conversation** [9]
65:13   66:1   66:13
66:24   66:24   68:23
69:3   69:9   69:21
**copies** [2]   101:4
102:8
**copy** [12]   58:10
58:19   59:13   69:20
70:8   76:19   76:22
76:24   77:3   79:3
81:3   99:5
**copying** [1]   78:22
**corporate** [1]   61:15
**corporation** [4] 57:10
57:13   57:15   57:16

**correct** [32]   16:14
17:14   30:4   31:18
33:8   36:3   41:3
41:4   41:6   41:7
48:5   49:10   50:13
50:24   51:13   51:15
54:22   56:4   70:14
74:19   76:13   83:11
83:12   89:5   90:25
92:1   92:8   94:17
95:1   95:4   106:4
128:7
**correctly** [4]   25:15
28:4   33:6   76:8
**counsel** [3]   78:13
128:15   128:16
**count** [3]   21:2
21:4   51:14
**counted** [1]   28:7
**counties** [6]   12:3
12:7   13:6   13:7
13:8   13:10
**county** [19]   9:10
11:17   11:18   11:19
11:21   11:22   11:24
12:9   12:9   13:7
14:12   14:12   14:12
14:12   14:13   54:10
54:14   54:15   128:2
**couple** [4]   17:3
32:24   33:24   104:12
**course** [1]   11:22
**court** [14]   1:1
1:12   3:5   62:4
63:5   63:19   64:8
64:11   71:6   72:2
104:25   105:16   128:4
128:23
**courteous** [1]   52:20
**courtroom** [1]   63:11
**cover** [1]   75:15
**covered** [3]   37:17
39:1   75:10
**covers** [1]   75:12
**crazy** [2]   15:23
16:11
**credit** [1]   67:14
**credits** [1]   28:7
**CST** [1]   1:15
**Culbreth** [6]   42:9
42:23   85:6   85:7
87:14   89:11

-D-

**daddy** [1]   14:2
**Dale** [4]   11:19   11:21
13:6   14:12
**damages** [1]   97:13
**date** [11]   41:2   41:5
90:17   90:20   95:3
96:6   97:7   99:8
99:9   99:10   102:20
**dated** [7]   94:15
97:5   98:8   98:11
98:22   99:7   103:20
**dates** [1] 91:7
**daughter** [1]   10:11

**daughters** [4]   8:20
10:12   12:11   12:12
**daughters'** [1]   12:15
**days** [13]   32:23
42:8   42:12   43:6
43:13   43:14   43:22
43:22   86:8   87:21
88:1   88:3   89:3
**deals** [4] 75:3   80:19
98:5   98:19
**deceased** [1]   14:2
**December** [10]   1:15
32:3   98:9   98:10
98:11   98:23   99:12
99:13   99:16   128:19
**decision** [4]   42:10
83:17   85:17   93:25
**Defendant** [4]   1:8
1:10   1:21   78:12
**Defendant's** [80]
39:8   39:8   39:10
39:20   39:25   40:25
41:2   41:17   46:14
46:15   46:15   47:6
49:2   49:23   50:11
51:1   51:8   51:13
51:24   56:16   57:3
57:7   57:14   58:1
58:10   58:24   71:17
74:8   74:11   75:2
75:9   76:11   77:7
78:10   80:13   81:4
90:14   92:18   93:12
93:20   93:22   94:7
94:14   95:23   96:14
96:23   97:10   97:19
97:24   98:15   98:25
100:11   101:18   102:11
102:17   102:24   103:10
103:25   104:21   107:1
108:1   109:1   110:1
111:1   112:1   113:1
114:1   115:1   116:1
117:1   118:1   119:1
120:1   121:1   122:1
123:1   124:1   125:1
126:1   127:1
**defending** [1]   77:5
**definitely** [2]   22:1
22:2
**degree** [4]   21:9
31:16   31:20   67:15
**demand** [1]   15:25
**demo** [1]   75:4
**democilation** [1]
75:4
**demolition** [2]   75:5
75:6
**Denise** [4]   1:4
1:9   2:1   2:9
**department** [2]   24:12
24:14
**depending** [1]   28:6
**deposition** [17]   1:9
2:17   2:17   2:22
46:9   46:18   54:24
63:9   63:18   70:13
81:19   82:2   82:6
82:11   82:13   104:10

106:12

**describe** [2]   84:2
84:4
**determine** [1]   84:13
**Detroit** [1]   14:3
**develop** [1]   128:14
**Development** [1]
74:13
**diagnosed** [1]   36:16
**difference** [1]   101:16
**different** [5]   8:17
14:25   26:21   68:9
68:10
**diploma** [1]   20:11
**disability** [8]   35:14
35:17   35:23   36:8
37:22   38:11   93:3
93:9
**disabled** [2]   31:25
36:7
**discharge** [3]   20:19
23:2   23:9
**discharged** [1]   22:21
**discipline** [1]   31:21
**disclosure** [17]   46:18
46:23   57:5   58:12
66:18   93:16   94:11
95:25   96:24   98:1
98:16   99:1   100:12
101:19   102:12   103:1
103:11
**disclosures** [1]   46:19
**discovery** [3]   31:14
30:15   51:18
**discussed** [1]   63:23
**discussion** [1]   106:10
**district** [6]   1:1
1:2   62:5   62:5
73:21   105:16
**DIVISION** [1]   1:3
**divorced** [1]   11:2
**doctor** [2]   36:5
36:11
**doctors** [2]   36:22
37:1
**doctors'** [1]   37:12
**document** [49]   56:17
58:1   58:5   58:11
58:15   66:23   67:8
68:12   74:11   76:9
76:15   77:17   77:22
77:25   78:16   79:1
90:23   91:2   94:8
94:10   94:14   94:22
95:20   95:24   96:4
96:6   96:10   96:13
97:2   97:19   97:25
98:2   98:8   98:15
99:1   100:6   100:4
100:6   100:11   101:18
101:22   102:11   102:14
102:20   102:25   103:2
103:5   103:11   103:20
**documents** [27] 39:6
40:7   46:13   46:24
47:3   47:5   47:17
47:9   47:10   47:12

47:18   47:21   47:24
48:5   48:17   57:4
66:22   68:8   68:8
68:8   77:11   78:7
78:21   93:11   93:15
102:7   104:8
**doesn't** [9]   11:14
51:5   58:4   88:15
88:16   88:21   94:21
95:7   105:12
**done** [6]   44:23   64:4
67:21   81:21   82:3
92:23
**door** [1] 44:10
**dorm** [1] 31:5
**Dothan** [86]   1:7
1:14   1:23   2:12
2:13   5:17   6:3
6:7   7:22   7:23
8:1   8:3   10:7
11:18   32:10   32:11
33:2   33:19   33:20
36:2   37:3   37:5
40:8   40:9   40:10
42:3   42:7   43:9
43:10   45:15   48:24
51:19   52:4   53:2
53:9   53:12   53:14
53:21   54:4   55:5
56:1   56:11   57:10
58:3   58:16   58:17
58:21   59:5   59:12
59:14   60:4   60:20
60:24   61:4   61:6
61:8   61:24   64:16
64:18   64:24   65:4
65:5   65:9   65:14
66:2   66:14   68:15
68:17   68:22   69:4
69:25   70:5   70:20
70:22   71:11   77:12
78:12   80:6   80:23
95:15   97:11   99:24
100:4   101:2   102:8
104:14
**double** [4]   11:5
11:8   11:9   23:23
**down** [14]   3:6
3:22   4:14   14:6
25:16   30:15   33:17
34:11   63:24   68:12
71:1   71:23   87:12
128:9
**drawings** [2]   48:12
48:15
**drink** [2]   38:18
45:22
**driver's** [4]   101:24
101:25   102:1   102:4
**drugs** [3]   4:22
5:1   7:2
**duly** [1]   2:2
**during** [24]   10:2
28:11   28:17   33:16
33:22   42:4   62:12
65:13   75:20   75:24
76:2   80:17   91:4
92:14   93:16   94:11
96:24   97:25   98:16
99:1   100:12   102:12
102:25   103:11

-E-

**early** [1] 95:16
**East** [5]   6:2   6:6
6:16   6:23   7:18
**eat** [2]   15:1   15:2
**eating** [1]   44:25
**EDP** [1]   22:22
**education** [5]   20:6
20:15   27:7   28:22
31:6
**educational** [1] 37:16
**eight** [2] 16:16   77:8
**either** [11]   8:22
10:1   13:21   28:10
42:19   42:19   84:7
87:14   99:12   100:1
105:21
**El** [3]   10:16   29:20
29:24
**Elba** [1] 11:25
**eliminate** [1]   16:7
**embarrassing** [1]
39:16
**emotional** [1]   5:6
**employed** [4]   32:2
34:10   36:19   37:23
**employers** [1]   33:3
**employment** [5]
32:12   32:14   33:15
33:21   94:2
**encouraging** [1]
23:6
**end** [5]   10:6   16:19
82:12   88:23   106:12
**ended** [1]   43:23
**Enterprise** [1]   11:24
**entire** [1]   29:23
**entitled** [1]   36:7
**entity** [5]   2:23
59:6   59:6   61:15
104:16
**escaping** [1]   73:22
**estimate** [2]   84:10
**et** [1]   65:18
**evening** [1]   53:19
**everybody** [1]   44:5
**eviction** [1]   80:20
**Evictions** [1]   75:4
**evidence** [1]   52:3
53:6   54:3   59:9
60:3   70:18   71:9
87:2   92:25   93:5
104:13
**ex-husband** [2] 12:1
12:17
**exact** [1]   97:6
**exactly** [3]   8:6
22:7   31:2
**EXAMINATION** [1]
2:5
**example** [2]   18:24
23:10
**except** [2]   25:2

94:2

**exception** [1]    15:5
**exchange** [1]    23:8
**Exhibit** [66]
39:9    39:10    39:20
39:25    40:25    41:2
41:17    46:16    47:6
49:2    49:23    50:11
51:1    51:8    51:13
51:24    56:16    57:3
57:8    57:14    58:2
58:10    58:24    74:8
74:12    75:2    75:10
76:11    77:7    78:11
80:14    81:4    90:15
92:18    93:13    93:20
93:23    94:7    95:23
96:14    97:10    98:25
103:10    104:21    107:1
108:1    109:1    110:1
111:1    112:1    113:1
114:1    115:1    116:1
117:1    118:1    119:1
120:1    121:1    122:1
123:1    124:1    125:1
126:1    127:1.
**existing** [1]    72:17
**exists** [1]    59:20
**expect** [1]    83:1
**expecting** [1]    82:4
**experience** [2]    27:8
27:9
**explain** [2]    15:23
73:14
**explanation** [2] 45:11
45:15

**-F-**

**face** [1]    15:19
**fact** [6]    50:24    56:12
59:20    87:3    87:17
88:4
**failing** [1]    51:9
**Fair** [3]    17:15    17:15
19:18
**family** [1]    14:3
**far** [2]    28:22    84:12
**fast** [1]    11:6
**February** [3]    94:16
96:7    98:8
**fed** [1]    44:5
**federal** [17]    1:10
56:7    59:14    60:5
60:7    60:11    60:13
60:21    61:22    62:23
63:5    73:15    73:19
73:21    78:18    79:11
82:21
**females** [1]    17:3
**few** [3]    15:17    39:5
46:3
**Field** [1] 24:22
**figure** [1]    89:17
**file** [2]    82:15    82:18
**filed** [12]    2:13
39:21    40:3    55:12
61:21    62:3    104:19

104:25    105:9    105:17
105:18    106:4
**filing** [1]    64:5
**financial** [2]    70:21
128:13
**finding** [1]    84:18
**fine** [3]    13:24    27:8
82:17
**finish** [2]    37:15
52:23
**finished** [1]    81:12
**fired** [2] 26:1    26:2
**first** [15] 2:2    26:11
28:2    28:3    30:5
30:6    30:9    30:12
39:11    57:13    70:6
78:10    83:9    89:22
103:20
**five** [9]    13:7    13:10
20:22    25:11    25:13
45:25    72:18    75:22
84:5
**Flint** [5] 9:24    10:20
29:14    29:24    31:11
**flip** [1] 75:7    78:10
**floors** [1]    16:16
**Florida** [20]    9:3
9:5    9:9    9:20
10:2    20:24    25:16
26:13    26:15    28:14
30:10    30:12    32:18
32:20    33:7    33:18
33:25    34:12    34:23
95:14
**follow** [1]    55:22
**following** [7]    4:19
4:21    42:24    43:2
78:21    90:12    91:9
**follows** [1]    2:3
**food** [1] 57:21
**foot** [2]    35:18    84:5
**Force** [1]    24:21
**foregoing** [1]    128:6
**form** [1] 68:13
**Fort** [24] 9:10    9:19
10:1    10:4    14:6
14:7    22:16    24:22
25:18    25:19    26:4
26:6    26:13    26:15
29:22    30:10    30:12
30:15    33:24    34:11
34:11    34:23    35:6
95:13
**forty-five** [1]    85:25
**Forty-six** [1]    15:9
**Forty-two** [1]    86:2
**found** [1]    56:14
57:19    72:21    72:25
76:15
**four** [16] 6:8    6:17
9:22    19:22    20:21
20:23    22:10    22:11
25:10    25:12    78:14
78:16    79:11    81:20
83:1    83:4
**frame** [4]    21:20
28:12    28:13    28:17

**frequent** [1]    18:19
18:23
**friends** [9]    14:9
14:13    14:16    14:17
14:19    14:20    14:21
15:11    16:4
**front** [1] 49:18
**full** [1] 2:8
**fund** [2] 24:12    24:14
**funds** [2]    24:9
24:20    70:21
**fuzzy** [1]    24:1

**-G-**

**G** [2]    1:11    128:4
**gainful** [1]    33:15
33:21
**gainfully** [3]    32:2
34:10    37:23
**gather** [1]    62:12
**gathered** [1]    62:15
**Geneva** [4]    11:22
11:23    13:6    14:12
**gentleman** [1]    95:9
**Georgia** [3]    24:22
25:18    25:23
**given** [7]    2:17
45:15    57:18    85:13
87:11    87:12    101:3
**giving** [4]    23:19
23:20    69:21    91:25
**glad** [1] 38:18
**goes** [1] 35:19
**Gold's** [1]    19:14
**gone** [2] 9:1    101:14
**good** [22]    3:18
4:12    4:18    4:18
4:22    26:14    27:10
37:20    41:24    46:8
49:1    51:17    57:24
76:14    79:25    80:17
81:6    92:20    92:22
**Gospel** [1]    57:24
**governed** [1]    77:13
**governing** [1]    79:12
**government** [14]
20:21    24:2    24:7
36:20    38:2    38:23
56:6    56:8    59:15
60:6    60:8    60:14
60:14    104:15
**governs** [1]    79:13
**graduated** [3]    20:14
21:22    22:1
**graduating** [1] 20:16
**grandfather** [2] 9:11
14:6
**grandmother** [1]
9:6
**grant** [17]    55:12
55:14    55:15    56:2
56:11    60:21    60:25
61:5    61:8    64:17
65:6    65:10    65:15
65:16    68:25    69:1

70:1
**grants** [11]    54:21
55:9    60:9    60:10
60:13    60:13    60:17
62:23    63:23    66:11
104:15
**Ground** [1]    22:17
**groups** [2]    17:19
17:20
**guarantee** [1]    88:8
**guess** [3]    42:6
47:11    61:9
**guessing** [2]    87:7
87:8
**Gym** [1] 19:14

**-H-**

**hair** [1] 84:7
**half** [8]    20:19    22:5
22:6    22:7    32:24
33:6    33:16    81:21
**hand** [1] 128:19
**hard** [1] 13:18
**hardly** [1]    16:25
**Hardwick** [1]    1:13
**Hardy** [3]    1:24
44:15    45:5
**Harry** [1]    42:9
42:23
**Hartford** [1]    11:22
**Hause** [1]    1:13
**head** [5] 3:15    3:21
4:14    35:4    35:24
**Headland** [1]    11:19
**health** [2]    61:9
68:17
**hear** [1] 39:19
**heard** [1]    73:11
**hearing** [1]    13:18
34:25    63:11
**help** [3] 13:21    17:5
24:10
**helping** [1]    77:5
**Henry** [3]    11:18
13:6    14:12
**Herbert** [1]    24:22
85:6    87:14
**hereby** [1]    50:11
128:5
**herein** [1]    50:13
**herself** [1]    71:21
**high** [7]    20:7    20:8
20:9    20:16    21:22
22:1    31:6
**high-paying** [1]24:13
**highlighted** [5] 75:23
80:9    80:10    80:13
97:7
**history** [2]    38:21
39:2
**hobbies** [3]    17:25
18:4    19:21
**hobby** [1]    19:1
**homeless** [13]    56:13

71:19    72:6    72:16
72:17    72:22    72:24
76:16    76:20    77:13
80:5    80:22    104:2
**honestly** [2]    67:18
67:20
**honorable** [1]    20:19
23:2    23:9
**hostile** [1]    45:9
45:10
**hour** [1] 81:21
**hours** [1]    31:15
67:14    75:20    75:25
76:2    80:17    81:17
81:20    82:4    83:2
83:4
**house** [1]    7:6
7:6
**housekeeping** [1]
26:16
**housemother** [9]
42:6    42:11    83:19
83:22    84:15    84:16
84:24    85:14    87:15
**houses** [1]    26:22
27:4
**housing** [1]    57:22
72:17    74:13
**Houston** [1]    11:17
13:6    14:11    54:10
128:2
**Houston-Love** [1]
18:20
**Howard** [4]    10:22
10:24    21:15    29:15
**Huh-uh** [1]    28:13
36:18
**hundred** [1]    83:24
**hygiene** [1]    37:5

**-I-**

**I.D** [1]    49:21
**identified** [2]    19:22
93:12
**illegal** [2]    7:3
7:11
**imbalance** [1]    5:2
**impair** [1]    4:24
**implies** [1]    88:7
**imply** [1]    88:21
**important** [3]    3:11
3:18    69:16
**impression** [1]    50:5
**Inc** [1] 97:12
**incident** [11]    41:25
83:10    85:17    86:3
89:1    89:14    90:5
91:15    92:3    92:15
92:22
**incidents** [10]    40:16
40:23    40:24    41:9
41:12    41:20    81:8
87:21    91:5    91:10
**including** [1]    57:20
**Incorporation** [1]
57:9

**incorrect** [2]        79:8
79:11
**indicate** [1]        52:4
**indicates** [1]        93:23
**indicating** [8]        78:17
79:2    80:11    96:15
98:8    98:23    102:18
106:1
**indication** [1]        3:25
**individual** [2]        70:6
85:1
**individuals** [1]    32:25
**information** [39]
36:14    40:15    52:3
53:7    53:11    54:4
54:11    55:14    55:17
55:25    56:9    59:10
59:16    59:19    60:3
61:11    62:17    62:22
62:25    63:19    64:16
64:19    65:12    66:25
68:15    68:21    69:13
69:24    70:16    70:19
71:10    79:14    85:13
85:15    90:2    92:25
93:6    94:24    104:14
**injuries** [1]        97:13
**inside** [2]        44:11
48:24
**inspection** [1]    78:22
**installations** [1]
25:5
**institution** [1]    29:19
**insurance** [4]    23:16
56:19    56:21    56:24
**intelligently** [1]
69:21
**intend** [1]        63:19
**intent** [1]        97:14
**interact** [2]        18:5
19:4
**interest** [2]        18:16
128:12
**interested** [1]    19:25
**interject** [1]    52:23
**Internet** [3]        56:14
59:23    74:2
**inventory** [1]    24:25
25:3
**issues** [2]        59:4
59:7
**items** [1]        78:21

-J-

**Jackson** [1]        22:16
**January** [7]        7:24
8:13    9:18    10:7
15:3    94:16    103:20
**Jesus** [1]        57:24
**job** [3]    3:6    25:7
25:10    26:3    26:9
26:14    27:16    38:23
**jobs** [2]    25:25    28:17
**Johnson** [2]    95:10
95:12
**join** [1]    23:15

**jot** [1]        68:12
**judge** [9]        62:9
62:13    73:20    73:21
73:21    79:19    79:25
82:16    91:4
**July** [1]    22:9
**June** [17]        7:25
8:1    8:4    9:17
10:8    22:9    34:7
34:8    34:12    41:6
41:14    41:21    43:8
90:21    92:2    92:5
93:8
**jury** [3]    15:25    16:2
16:3

-K-

**Kansas** [2]        20:10
21:23
**keep** [1]    25:4
**Kelly** [6]        32:9
33:2    33:7    33:11
33:18    38:25
**Kevin** [2]        1:22
2:10
**kind** [8]    4:23    21:19
26:4    27:5    32:13
35:1    48:12    93:12
**kitchen** [1]        44:25
**knee** [1]    35:21
**knees** [1]        35:20
**knew** [1]        95:13
**knowing** [2]    57:23
63:25
**knowledge** [1]    128:18
**known** [1]        74:12

-L-

**labor** [2] 28:20    28:20
**lady** [12] 3:5    3:25
15:3    27:3    27:14
27:21    53:5    70:14
84:2    84:5    84:12
87:15
**lady's** [2]        70:6
70:9
**Lafayette** [5]        6:3
6:6    6:16    6:23
7:18
**Large** [3]        1:13
128:5    128:24
**last** [15]    9:15    12:17
22:25    28:2    32:1
41:1    49:23    70:7
81:19    83:6    83:25
90:17    94:2    97:16
105:7
**late** [1]    95:16
**law** [9]    1:13    1:23
62:20    72:9    72:11
73:9    73:17    79:12
79:15
**lawsuit** [17]        2:13
2:25    16:5    40:18
40:20    41:12    61:22
62:19    63:5    64:5

**81:8    83:10    89:24
95:25    96:25    98:1
105:10
**lawyer** [5]        2:23
40:8    73:10    73:13
77:4
**leads** [1] 80:4
**learn** [3] 55:7    55:10
72:13
**learned** [2]        65:13
65:15
**lease** [3] 7:1    7:16
99:19
**least** [3] 8:4    11:21
46:1
**leave** [17]        23:6
23:7    25:22    42:7
42:22    67:22    84:23
85:3    85:18    85:21
85:23    86:18    86:23
87:14    87:18    89:2
93:1
**Leavenworth** [3]
20:9    20:10    21:22
**leaving** [1]    42:16
**Lee** [2] 92:19    92:20
**left** [16]    7:24    8:9
8:12    8:18    8:23
10:5    10:7    20:24
22:9    25:18    35:18
35:21    42:9    45:4
83:18    87:17
**legal** [2] 73:9    78:7
78:8
**length** [1]        82:25
**Lester** [2]        11:4
11:10
**letter** [1] 68:13
**LGC** [1] 80:18
**liability** [1]    97:12
**library** [3]        18:11
18:20    18:21
**license** [11]        52:6
52:7    52:8    52:11
53:2    54:9    54:13
101:24    101:25    102:1
102:4
**life** [10]    23:15    23:15
86:10    89:8    89:14
89:16    89:21    90:5
91:14    91:24
**lights** [4]        61:9
64:18    65:18    70:3
**limitation** [1]    57:21
**Linda** [3]        1:11
71:25    128:4
**line** [3]    44:5    44:9
44:10
**Lisa** [8]    42:9    42:15
43:11    43:24    84:17
85:1    85:4    87:14
**listen** [3]    4:24
5:7    5:12
**litigants** [1] 128:17
**live** [36]    5:15    5:16
5:25    6:1    6:5
6:9    6:10    6:12

**6:17    7:7    7:15
7:17    8:20    9:7
9:9    10:13    11:10
11:12    12:2    13:2
13:4    13:9    13:14
14:10    14:13    14:16
15:12    16:15    16:19
17:3    18:6    31:3
43:15    84:19    88:20
88:21
**lived** [17]        5:19
6:15    6:20    6:25
7:18    7:21    8:3
8:7    9:7    9:25
10:15    10:16    10:17
12:8    14:6    31:5
35:12
**lives** [5] 9:12    11:11
13:15    14:1    16:21
**living** [1]        7:6
13:12    15:18    28:14
**loans** [1]        101:12
**located** [4]        29:13
29:19    30:24    80:2
**longer** [1]        83:18
**look** [9]    40:25    52:6
65:24    74:19    75:22
77:7    79:2    92:22
99:13
**looked** [5]        46:14
52:10    53:1    78:8
87:12
**looking** [3]        70:25
71:1    86:1
**looks** [1]        105:1
**losses** [1]        97:13
**loud** [2] 3:19    4:13
**loudly** [1]        39:18
**lower** [1]        35:19
**lower-paying** [1]
24:15
**lunch** [2]        44:25
45:3
**lunchroom** [2]    44:3
92:14

-M-

**M** [1]    11:8
**M-c-C-a-a** [1]    11:4
**M-o-t-t** [1]        21:15
**ma'am** [57]        20:6
30:21    34:6    34:18
35:12    35:25    39:11
40:22    41:1    52:15
52:22    56:20    57:25
58:6    58:20    60:24
61:3    61:14    62:18
63:1    63:10    63:16
64:1    64:23    66:6
66:12    67:1    67:11
67:13    67:21    68:20
71:8    72:19    73:2
73:4    73:8    73:10
73:12    73:24    74:21
77:6    78:20    81:14
81:18    82:5    82:10
82:20    83:3    86:13
87:6    89:23    90:13

**96:16    102:22    104:24
105:6    106:7
**Magazines** [1]    18:14
**mail** [1]    105:25
**mailbox** [1]        18:14
49:15
**mailed** [3]        49:15
105:21    105:23
**main** [2] 42:15    84:17
**makes** [1]        44:5
**male** [3] 16:22    44:8
92:17
**manager** [1]    31:22
**March** [1]        102:21
**Marianna** [4]    32:17
32:19    33:7    33:17
**marked** [10]        39:8
41:17    56:15    58:9
58:23    74:7    74:11
75:2    76:10    104:20
**married** [5]        6:13
11:1    11:3    12:24
13:1
**Maryland** [5]        13:15
13:16    13:17    14:1
22:17
**material** [1]    57:22
**matter** [3]        56:12
87:17    128:13
**may** [36] 9:25    13:22
15:22    16:10    18:15
18:16    18:17    22:9
34:8    35:7    35:8
41:3    41:13    41:21
41:25    42:1    48:25
83:11    84:6    85:16
85:24    86:18    86:23
87:2    89:3    89:14
90:6    90:18    91:13
91:15    91:24    92:23
92:24    93:2    128:14
128:14
**McCaa** [4]        11:4
11:10    12:1    12:18
**McKinney** [5]    72:15
72:22    72:24    76:16
76:20    77:13    80:5
80:22
**meal** [10]        43:12
43:13    43:18    43:24
44:2    45:6    45:12
45:16    92:6    93:7
**meals** [1]        44:15
**mean** [5]        15:18
24:11    26:20    34:18
67:12
**meaning** [1]    49:20
**means** [5]        16:1
67:11    67:17    67:25
78:25
**media** [1]        77:11
**Medicaid** [1]    35:14
**medical** [2]        5:5
36:5
**Medicare** [1]    35:14
**medications** [1]
4:23
**member** [4]        17:16

17:18    17:21    17:23

**members** [1]    17:20

**Memorial** [1]    18:20

**memorize** [2]    61:16
61:17

**mental** [2]    5:5
37:5

**mentioned** [2]    30:7
86:4

**met** [1]    14:24

**Michael** [1]    36:1

**Michigan** [6]    9:24
10:19    10:20    14:3
29:14    29:24

**Middle** [2]    1:2
62:4

**Midland** [1]    11:20

**might** [15]    4:24
5:6    5:11    9:13
16:1    16:7    36:23
48:7    48:12    48:18
51:2    54:17    66:2
69:13    93:6

**Mike** [1] 36:2

**military** [5]    20:17
22:4    22:12    22:24
23:18

**mind** [1] 13:24

**ministry** [1]    57:18

**minutes** [3]    46:1
46:3    104:8

**mission** [56]    1:7
2:12    2:14    40:8
40:9    40:10    42:3
42:8    42:25    43:9
43:11    45:15    48:25
51:19    52:5    53:2
53:9    53:15    53:21
53:22    54:4    55:5
56:2    56:11    57:10
58:3    58:16    58:18
58:22    59:2    59:5
59:12    60:5    60:20
60:25    61:5    64:16
64:16    68:15    70:1
70:20    71:11    71:12
77:12    78:12    80:7
80:23    83:14    92:11
93:24    94:4    94:20
97:12    101:2    102:8
104:14

**Mission's** [1]    99:24

**mom** [1] 14:1

**money** [10]    23:2
23:10    23:11    60:5
65:6    65:10    68:16
69:1    70:21    104:2

**monies** [2]    64:17
101:13

**month** [4]    32:3
99:14    102:21    103:23

**months** [8]    6:8
6:17    10:10    20:23
22:10    22:11    25:12
33:24

**Moody** [3]    1:22
2:11    74:5

**most** [2] 21:25    97:21

**Mostly** [1]    15:1

**mother** [1]    13:15

**motion** [2]    82:15
82:18

**Mott** [3] 21:13    21:14
29:10

**move** [1]    8:15
42:13    84:15

**moved** [11]    5:22
6:22    7:3    8:4
9:2    9:14    9:19
26:15    26:21    29:24
32:25

**moving** [1]    7:10

**Ms** [18]    2:10    5:15
13:18    14:17    29:21
38:13    39:23    46:11
50:24    57:2    61:18
71:25    75:7    81:7
98:5    104:1    104:11
104:18

**mumbling** [1]    35:1

**must** [10]    10:6
10:8    29:17    30:20
30:22    31:10    100:7
100:8    100:9    100:9

### -N-

**Nails** [21]    1:4
1:9    2:1    2:9
2:10    5:15    13:19
14:18    29:21    38:13
39:24    46:11    50:25
57:2    61:18    75:8
81:7    98:5    104:1
104:11    104:18

**name** [34]    2:8
12:17    15:11    16:23
16:23    27:24    27:25
28:1    28:2    28:2
28:3    36:12    44:4
44:6    49:20    49:21
54:22    55:19    65:1
65:19    65:23    70:7
70:9    70:15    73:22
83:21    83:23    83:25
92:13    94:21    94:25
102:17    103:7    104:22

**named** [2]    30:2
95:9

**names** [13]    12:15
15:14    15:20    15:21
16:13    16:15    17:8
17:13    18:8    37:2
37:12    62:23    66:10

**necessities** [1]    57:22

**need** [9]    17:5    38:13
38:17    38:17    44:12
57:20    57:21    57:23
68:1

**negative** [2]    87:11
87:18

**neglected** [1]    57:19

**negligence** [1]    97:14

**neighbor** [1]    7:11

**neighborhood** [1]
7:4

**neighbors** [4]    15:15

15:16    16:14    16:20
                   12:25

**never** [8]    11:10
30:14    59:1    68:5
73:11    82:2    82:2
82:3

**News** [1]    57:24

**Newspapers** [1]
18:14

**next** [4]    16:21    27:18
27:18    52:2

**nice** [2]    52:21    61:19

**nine** [2]    20:23    25:12

**nonappropriated** [3]
24:9    24:14    24:20

**Nonprofit** [1]    57:10

**nontenant** [2]    7:12
7:14

**nor** [1]    128:16

**normally** [1]    82:22

**northside** [1]    19:18

**notarizing** [1]    50:5

**notary** [5]    1:12
49:19    50:2    128:5
128:23

**notation** [3]    94:19
103:22    103:25

**notations** [1]    94:15

**note** [14] 66:25    66:25
67:1    67:7    68:3
68:6    68:7    68:11
69:12    69:20    70:4
70:9    93:23    96:9

**notes** [9]    23:25
65:24    65:25    66:5
66:13    68:7    68:9
92:22    103:19

**nothing** [3]    64:13
8:4    92:10

**notice** [5]    1:16
75:12    80:9    80:10
80:16

**noticed** [1]    82:12

**November** [8]    35:15
35:17    37:22    49:25
93:24    94:15    97:6
99:13

**now** [22] 9:11    11:10
12:5    13:5    15:18
16:19    16:22    23:25
29:7    31:13    36:14
40:6    43:5    47:7
47:24    48:23    55:19
59:8    73:23    81:7
85:25    92:2

**nowhere** [1]    19:24

**number** [12]    5:17
6:3    41:22    41:22
50:25    51:7    51:25
71:16    77:8    95:6
100:25    103:8

### -O-

**o'clock** [3]    81:11
81:16    82:24

**oath** [13] 49:6    49:11
49:12    49:17    51:3
53:4    54:24    59:11

60:19    60:23    61:4
66:16    70:13

**objects** [4]    57:12
57:15    57:16    58:2

**obtain** [3]    35:23
59:19    63:18

**Obviously** [1]    16:2

**occasion** [1]    18:15

**Occasionally** [1]
19:14

**occurred** [4]    83:11
87:21    89:3    90:5

**off** [6]    38:6    42:17
42:20    78:1    84:18
84:25

**Off-record** [1]    106:10

**offering** [1]    23:1

**office** [10]    42:15
42:21    59:1    75:20
75:24    76:2    80:17
84:17    85:2    105:16

**offices** [1]    1:13

**Ohio** [1] 14:4

**Okaloosa** [3]    9:10
25:19    25:19

**Okaloosa-Walton** [8]
20:25    21:12    25:16
25:21    26:2    26:11
27:11    28:24

**old** [8]    12:20    12:22
14:8    15:3    15:6
15:9    84:11    85:24

**older** [4] 84:12    85:23
85:23    87:9

**oldest** [1]    86:7

**one** [47]    3:13    4:8
5:21    5:21    16:21
19:18    19:19    19:20
22:24    26:11    26:20
26:20    31:9    32:17
32:25    37:4    37:8
37:14    38:24    41:12
41:13    41:20    41:21
41:22    51:17    57:3
58:2    59:4    59:7
60:1    66:9    69:2
74:10    74:15    75:21
76:15    82:3    83:24
84:6    86:7    86:22
86:24    90:1    91:12
93:15    94:2    99:15

**ones** [2]    37:9    47:25

**operate** [1]    35:5

**opposed** [3]    3:21
4:14    71:12

**order** [1] 35:22

**organization** [11]
51:20    52:5    53:10
53:13    54:5    54:18
55:1    55:3    58:7
59:13    71:13

**organizations** [2]
17:22    17:24

**original** [1]    104:19

**originals** [2]    58:22
102:9

**otherwise** [1]    128:13

**outcome** [1]    128:14

**outlined** [1]    75:9

**outside** [2]    44:9
46:3

**overextended** [1]
22:22

**overweight** [1]    13:21

**own** [6]    33:25    34:11
34:16    34:20    36:15
37:7

**Ozark** [2]    11:20
21:8

### -P-

**P.M** [1]    1:15

**page** [12]    41:1
49:23    50:10    57:14
75:7    77:8    78:10
78:15    80:13    90:17
93:20    93:22

**pages** [1]    128:6

**paid** [2] 100:23    101:14

**pain** [2] 35:20    35:21

**panel** [1]    16:3

**paper** [9]    27:17
47:21    61:10    61:10
65:18    67:2    67:7
68:18    70:3

**paperwork** [1]    55:13

**paragraph** [2]    75:22
76:18

**part** [15] 16:5    23:24
32:21    35:19    46:23
48:1    57:4    59:1
66:17    72:8    74:2
86:24    87:2    87:3
95:24

**participated** [1] 62:8

**participating** [1]
62:9

**particular** [4]    9:2
26:20    56:3    76:18

**particularly** [2] 17:2
42:25

**parties** [1]    128:16

**Paso** [3] 10:16    29:20
29:24

**passed** [1]    9:11

**past** [2]    9:17    43:6

**Patrick** [2]    1:22
2:11

**paycheck** [1]    100:16

**paychecks** [1]    100:22

**Payne** [4]    10:22
10:24    21:15    29:15

**peaceful** [1]    87:25

**Pell** [1]    101:11

**penalties** [1]    51:9

**penalty** [1]    50:12

**people** [18]    14:24
16:3    16:7    16:8
18:6    18:7    19:4
21:25    22:24    22:25
23:6    25:2    48:24
57:19    85:20    88:13

| | |
|---|---|
| 88:20    88:23 | |
| **percent** [1] | 83:24 |
| **perfect** [1] | 88:1 |
| **period** [15] | 10:2 |
| 88:4    88:7    88:11 | |
| 88:19    89:2    89:17 | |
| 89:22    90:8    90:9 | |
| 90:11    91:18    91:22 | |
| 91:23    93:2 | |
| **perjury** [1] | 50:12 |
| **person** [3] | 2:23 |
| 16:21    62:19    63:4 | |
| 65:3    65:7    65:14 | |
| 65:20    67:19    69:6 | |
| 84:24    86:10    87:10 | |
| **person's** [2] | 65:1 |
| 65:23 | |
| **personal** [2] | 5:10 |
| 128:11 | |
| **personally** [1] | 128:11 |
| **Personnel** [1] | 94:1 |
| **Petty** [2] 1:11 | 128:4 |
| **photo** [1] | 49:21 |
| **photographs** [2] | |
| 48:11    48:14 | |
| **phrase** [1] | 100:22 |
| **physical** [2] | 93:3 |
| 93:9 | |
| **physically** [1] | 36:6 |
| **physician** [3] | 36:6 |
| 36:15    37:8 | |
| **picked** [1] | 29:5 |
| **Pickens** [2] | 12:9 |
| 12:9 | |
| **piece** [3] 25:4 | 67:2 |
| 67:7 | |
| **place** [9] | 19:8 |
| 19:13    24:23    33:13 | |
| 37:5    42:18    84:18 | |
| 84:25    128:9 | |
| **places** [1] | 32:16 |
| **Plaintiff** [3] | 1:5 |
| 1:21    78:20 | |
| **plan** [1]  59:18 | |
| **plans** [1] | 54:2 |
| **play** [1] 87:3 | |
| **played** [1] | 86:23 |
| 87:2 | |
| **pleading** [1] | 40:3 |
| **point** [5] 16:1 | 62:12 |
| 79:20    100:19    102:2 | |
| **pointblank** [1] | 51:1 |
| **pointing** [1] | 80:12 |
| **policies** [1] | 8:20 |
| **policy** [1] | 56:21 |
| **portion** [2] | 72:1 |
| 97:7 | |
| **position** [12] | 24:20 |
| 25:22    25:25    26:16 | |
| 38:25    53:8    59:11 | |
| 67:6    70:19    71:10 | |
| 79:9    93:6 | |
| **positive** [1] | 88:25 |
| **possess** [1] | 76:22 |
| **possession** [2]  99:25 | |

| | |
|---|---|
| 101:2 | |
| **possible** [3] | 51:9 |
| 60:16    60:18 | |
| **possibly** [1] | 48:18 |
| **potentially** [1]  66:2 | |
| **pounds** [1] | 84:6 |
| **precisely** [1] | 74:5 |
| **prefer** [1] | 81:23 |
| **preparing** [1] | 84:23 |
| **presence** [1] | 80:18 |
| **PRESENT** [1] | 1:23 |
| **presently** [1] | 6:10 |
| **prevented** [1] | 59:24 |
| **previous** [1] | 71:5 |
| **print** [2] 96:15 | 96:16 |
| **printout** [1] | 77:25 |
| **private** [4] | 56:6 |
| 59:6    60:17    71:12 | |
| **PRO** [1] 1:22 | |
| **problem** [2] | 34:25 |
| 87:11 | |
| **problems** [3] | 5:11 |
| 37:14    87:20 | |
| **procedure** [8] | 1:11 |
| 73:1    73:3    73:6 | |
| 73:16    73:16    73:19 | |
| 78:19 | |
| **proceedings** [1] 128:8 | |
| **process** [25] | 2:21 |
| 2:25    3:12    4:19 | |
| 4:21    16:5    46:23 | |
| 52:16    57:5    58:12 | |
| 64:2    66:18    69:16 | |
| 93:16    94:11    95:25 | |
| 96:24    98:1    98:16 | |
| 99:2    100:12    101:19 | |
| 102:12    103:1    103:12 | |
| **produce** [9] | 47:8 |
| 66:10    66:17    66:21 | |
| 68:3    68:6    77:16 | |
| 78:2    78:5 | |
| **produced** [17] | 48:19 |
| 58:11    66:5    76:24 | |
| 77:2    93:16    94:10 | |
| 95:24    96:24    97:25 | |
| 98:15    99:1    100:12 | |
| 101:19    102:12    102:25 | |
| 103:11 | |
| **production** [1]  66:22 | |
| **program** [2] | 22:22 |
| 23:4    23:5 | |
| **programs** [1] | 72:17 |
| **proof** [1] | 53:11 |
| **properly** [1] | 82:11 |
| **property** [2] | 25:4 |
| 44:16 | |
| **prove** [6] | 50:7 |
| 50:8    62:20    63:6 | |
| 63:12    63:20 | |
| **provide** [1] | 102:7 |
| **provided** [1] | 100:3 |
| 101:5 | |
| **providing** [1] | 100:6 |
| **Proving** [1] | 22:17 |
| **public** [8] | 1:12 |

| | |
|---|---|
| 18:11    49:19    59:5 | |
| 59:12    71:11    128:5 | |
| 128:24 | |
| **pull** [3] 74:2 | 74:3 |
| 76:19 | |
| **purchase** [1] | 18:11 |
| **purpose** [7] | 35:2 |
| 57:15    57:16    63:17 | |
| 65:16    65:17    88:18 | |
| **purposes** [2] | 57:12 |
| 58:2 | |
| **pursuant** [5] | 1:10 |
| 1:16    66:21    77:19 | |
| 78:18 | |
| **put** [7]  23:12    23:21 | |
| 23:22    44:7    50:2 | |
| 68:13    74:1 | |
| **putting** [1] | 76:16 |

**-Q-**

| | |
|---|---|
| **questionnaire** [1] | |
| 66:10 | |
| **questions** [22] | 2:24 |
| 3:13    4:8    4:13 | |
| 4:17    15:22    15:24 | |
| 16:10    39:6    49:3 | |
| 49:10    49:16    51:3 | |
| 51:17    62:16    63:14 | |
| 63:22    64:3    66:9 | |
| 81:22    92:17    106:8 | |
| **quick** [1] | 92:23 |
| **quite** [2] 9:7 | 82:17 |

**-R-**

| | |
|---|---|
| **race** [2] 84:8 | 86:17 |
| **rambled** [1] | 35:1 |
| **read** [16] 18:1 | 18:10 |
| 18:13    18:17    40:13 | |
| 41:8    57:11    71:3 | |
| 71:6    72:2    96:12 | |
| 96:18    96:19    97:9 | |
| 97:21    99:8 | |
| **reading** [4] | 71:20 |
| 71:22    72:19    78:17 | |
| **real** [2] 86:25 | 92:23 |
| **really** [12] | 8:18 |
| 16:11    16:20    19:25 | |
| 21:4    24:17    27:6 | |
| 28:21    54:6    61:21 | |
| 81:18    81:20 | |
| **reason** [5] | 82:19 |
| 85:2    85:22    86:25 | |
| 87:13 | |
| **reasons** [1] | 80:8 |
| **Rec** [1]  19:5 | |
| **receive** [2] | 56:2 |
| 65:6 | |
| **received** [7] | 38:11 |
| 55:15    55:25    56:10 | |
| 70:2    103:23    105:24 | |
| **receives** [6] | 60:5 |
| 64:17    65:9    68:16 | |
| 70:20    104:15 | |
| **receiving** [2] | 60:21 |
| 60:25    61:5    61:8 | |
| **recognize** [9] | 39:10 |

| | |
|---|---|
| 39:12    56:17    57:2 | |
| 58:13    99:2    100:13 | |
| 101:20    102:13 | |
| **record** [5] | 3:25 |
| 46:16    64:2    80:12 | |
| 104:19 | |
| **records** [3] | 36:24 |
| 37:6    105:15 | |
| **Recreation** [1] | 19:3 |
| **reference** [4] | 44:20 |
| 52:9    55:2    68:25 | |
| **referring** [4] | 27:21 |
| 51:24    71:17    76:11 | |
| **refund** [4] | 100:24 |
| 101:8    101:9    101:11 | |
| **regarding** [1] | 64:18 |
| **regardless** [1] | 77:11 |
| **registered** [1] | 54:20 |
| **registry** [1] | 54:25 |
| **Regular** [1] | 75:24 |
| **regularity** [1] | 20:1 |
| **regularly** [2] | 19:5 |
| 36:16 | |
| **rejected** [1] | 57:19 |
| **related** [4] | 55:5 |
| 55:11    79:14    128:16 | |
| **relationship** [1] 79:14 | |
| 88:23 | |
| **relative** [1] | 12:2 |
| **relatives** [6] | 11:12 |
| 12:2    13:4    13:9 | |
| 13:12    16:4 | |
| **relieve** [1] | 97:11 |
| **relieved** [1] | 25:25 |
| **religious** [10] | 51:20 |
| 52:5    53:9    53:13 | |
| 53:16    53:23    54:5 | |
| 55:2    58:7    71:12 | |
| **remedy** [1] | 78:8 |
| **remember** [8] | 7:19 |
| 7:20    8:18    28:21 | |
| 35:11    37:10    39:4 | |
| 79:23 | |
| **remembering** [1] | |
| 17:8 | |
| **rent** [1]  104:3 | |
| **repeat** [2] | 13:22 |
| 71:24 | |
| **repeating** [1] | 13:24 |
| **reporter** [8] | 1:12 |
| 3:6    64:9    64:11 | |
| 71:6    72:2    128:4 | |
| 128:23 | |
| **represent** [2] | 56:20 |
| 74:4 | |
| **representing** [1] | |
| 2:12 | |
| **request** [4] | 66:21 |
| 77:8    77:19    100:1 | |
| **requested** [2] | 72:1 |
| 77:10 | |
| **requests** [5] | 41:18 |
| 47:7    47:9    78:19 | |
| 79:2 | |
| **required** [3] | 46:20 |
| 62:20    63:6 | |

| | |
|---|---|
| **requirement** [1] 53:25 | |
| **requirements** [1] | |
| 80:25 | |
| **reschedule** [1] | 81:25 |
| **Rescue** [49] | 1:7 |
| 2:12    2:14    40:8 | |
| 40:9    40:10    42:3 | |
| 42:7    43:9    43:10 | |
| 45:15    48:25    51:19 | |
| 52:4    53:2    53:9 | |
| 53:12    53:14    53:21 | |
| 54:4    55:5    56:2 | |
| 56:11    57:10    58:3 | |
| 58:16    58:17    58:21 | |
| 59:5    59:12    60:4 | |
| 60:20    60:24    61:5 | |
| 61:24    64:16    68:15 | |
| 69:25    70:20    71:11 | |
| 77:12    78:12    80:6 | |
| 80:23    97:11    99:24 | |
| 101:2    102:8    104:14 | |
| **research** [1] | 59:21 |
| **reserves** [1] | 23:3 |
| **resided** [1] | 83:13 |
| **resident** [3] | 42:4 |
| 42:5    43:16 | |
| **residing** [1] | 92:11 |
| **Resources** [1] | 94:1 |
| **respond** [4] | 3:2 |
| 4:25    52:17    81:22 | |
| **response** [3] | 3:7 |
| 4:1    47:9    51:10 | |
| 51:23    67:3    68:13 | |
| 74:20 | |
| **responses** [2] | 41:18 |
| 51:12 | |
| **responsibility** [3] | |
| 25:3    78:7    79:12 | |
| **responsibly** [1]  87:10 | |
| **rest** [1]  14:2 | |
| **restroom** [1] | 38:17 |
| **return** [1] | 23:14 |
| **revisit** [1] | 21:21 |
| **revoked** [3] | 44:15 |
| 45:6    45:16 | |
| **revoking** [1] | 45:12 |
| **Richard** [2] | 95:9 |
| 95:12 | |
| **right** [57] | 4:5 |
| 7:5    7:8    7:9 | |
| 13:22    17:15    18:4 | |
| 20:5    24:5    25:17 | |
| 26:6    26:25    29:10 | |
| 30:1    33:9    35:20 | |
| 38:5    38:9    39:5 | |
| 39:13    39:13    41:16 | |
| 41:24    43:5    43:7 | |
| 45:8    46:10    47:14 | |
| 48:4    48:17    48:23 | |
| 49:1    49:7    49:22 | |
| 53:1    53:6    55:19 | |
| 56:12    56:24    64:3 | |
| 73:23    76:14    78:17 | |
| 81:2    81:6    84:14 | |
| 84:21    86:12    88:14 | |
| 91:7    91:8    91:9 | |
| 92:20    97:7    104:6 | |
| 105:12    106:6 | |

**room** [2] 25:1    25:2
**roughly** [4]          28:17
29:9    38:3    38:6
**rule** [4] 73:6       73:15
78:18   82:21
**rules** [10]          1:11
42:24   43:1    43:2
46:20   73:9    73:16
73:18   73:19   78:19

—S—

**Saint** [4] 5:16      6:1
6:11    6:24
**sanctions** [1]       51:9
**sauna** [3]           18:3
19:10   19:11
**save** [1] 104:2
**saw** [4]   17:9      17:11
36:16   59:1
**says** [25] 40:20     41:2
41:5    44:14   49:22
50:11   51:8    54:4
58:4    58:5    68:8
74:12   74:14   74:15
74:23   78:11   80:16
89:4    90:17   90:23
94:5    97:11   100:24
100:25  101:8
**scale** [2] 24:13     24:15
**scattered** [1]       31:23
**scheduled** [2]       82:6
82:11
**school** [17]         10:21
20:7    20:8    20:9
20:16   21:2    21:22
22:1    23:1    23:10
23:20   23:23   25:15
25:20   31:7    31:9
100:23
**SE** [1]    1:22
**season** [1]          27:18
**second** [6]          44:1
44:2    78:14   89:18
93:19   93:22
**section** [3]         57:12
71:15   71:19   72:4
72:6    72:13   72:16
73:25   74:1    74:3
74:10   74:14   74:19
75:1    75:3    80:24
**Security** [14]       35:13
35:17   35:23   36:7
36:11   36:20   37:8
37:21   38:11   95:6
101:23  101:24  103:8
103:23
**see** [33]   17:4     23:5
23:25   25:1    25:2
28:22   36:23   38:2
41:22   41:23   49:25
50:1    50:10   50:15
51:25   52:1    58:22
69:15   76:4    76:6
77:14   77:15   78:23
88:12   88:17   88:19
96:17   98:14   101:13
105:3   105:4   105:5
105:14

**seeking** [1]         104:2
**Segrest** [1]         1:14
**seldom** [1]          18:18
**self-employed** [3]
33:23   33:24   34:2
**selling** [1]         7:2
**semesters** [1]       21:3
**send** [2] 78:7       79:13
**sent** [11] 37:7      47:8
48:1    48:4    48:5
49:3    49:16   56:19
56:23   56:25   57:4
**September** [4]       32:5
32:6    33:12   35:8
**serious** [2]         62:5
64:5
**seriously** [4]       54:7
62:14   64:6    64:7
**serve** [2] 57:17     58:3
**service** [4]         22:23
25:7    38:23   53:18
**services** [14]       28:19
28:20   28:20   32:9
33:2    33:8    33:11
33:18   38:6    38:10
38:24   38:25   53:16
53:23
**set** [4] 47:7        49:2
73:18   82:6
**seven** [6]           21:3
28:6    43:13   43:14
43:22   43:22
**seventh** [1]         50:10
**several** [1]         39:17
**shaking** [2]         3:21
4:14
**shall** [1] 74:12
**sheet** [2] 77:25     94:24
**shelter** [2]         72:7
80:20   104:2
**shelters** [3]        54:19
56:13   71:20
**shelving** [2]        32:25
33:1
**shopping** [3]        18:3
19:15   19:16
**short** [3] 46:9      84:5
104:10
**shorthand** [1]       128:10
**show** [12]           39:5
39:7    41:16   46:15
47:6    49:1    56:15
58:9    87:3    93:11
97:24   105:17
**showing** [2]         76:9
77:12
**sic** [4]   46:18     72:18
97:14   97:15
**side** [2]  16:18     16:22
**sides** [1] 16:17
**sideways** [1]        3:22
4:15
**sight** [1] 17:10
**sign** [3] 43:11      43:24
49:18

**signature** [10]      39:13
49:21   50:6    50:15
91:2    93:19   96:3
96:13   97:10   97:19
**signed** [2]          49:13
50:21
**similar** [1]         58:23
**simply** [1]          83:7
**single** [5]          6:14
11:1    12:25   77:16
77:21
**sit** [7]   8:2       52:13
53:4    54:23   60:19
60:23   61:3
**sitting** [1]         70:12
**situation** [2]       45:11
97:15
**six** [4]   10:10     21:4
21:4    28:6
**slip** [1] 43:22
**Slocomb** [1]         11:23
**small** [4]           11:4
11:8    96:15   96:16
**Smith** [6]           42:9
43:11   43:25   84:17
85:1    85:4
**soap** [4] 61:10      65:18
68:18   70:3
**social** [16]         17:18
17:20   35:13   35:16
35:23   36:7    36:11
36:20   37:7    37:21
38:11   95:6    101:23
101:23  103:8   103:23
**someone** [9]         36:19
66:1    66:14   69:3
93:24   94:3    95:13
100:1   100:9
**sometimes** [3]       13:22
31:24   81:20
**somewhere** [1]       44:7
**sorry** [18]          7:19
10:23   11:7    13:16
21:14   30:11   30:21
30:23   31:23   34:18
36:13   36:14   63:3
70:25   72:5    82:5
96:17   98:10
**sort** [8]  5:4       17:18
26:18   64:17   68:16
83:15   99:19   101:9
**soul-savings** [1]
57:18
**sound** [1]           15:22
**sounds** [1]          29:21
**sources** [3]         54:9
54:12   54:16
**South** [1]           17:1
**SOUTHERN** [1]
1:3
**southside** [2]       19:19
19:20
**span** [1] 10:19
**speak** [2]           17:1
39:18   85:2
**speaking** [2]        39:18
67:21

**special** [1]         57:23
**specific** [3]        11:15
32:15   68:6
**specifically** [2] 57:23
80:1
**speeches** [1]        64:2
**spoke** [2]           45:8
70:5
**stamped** [2]         105:25
106:3
**stand** [1]           50:2
**standing** [1]        44:9
**start** [5] 20:7      21:7
27:3    52:16   78:11
**started** [11]        20:20
20:25   21:6    25:15
25:20   27:2    27:15
29:2    29:4    30:5
34:4
**starting** [1]        30:4
**state** [24]          1:12
8:17    8:17    8:24
9:2     9:2     9:13
59:13   60:8    60:10
60:14   60:25   62:23
72:6    74:25   76:8
79:11   85:11   128:1
128:5   128:24
**statement** [4]       50:3
50:18   68:7    86:16
**statements** [1]      51:5
51:14
**states** [6]          1:1
20:18   62:4    71:19
104:4   105:16
**stationed** [1]       22:15
**statute** [1]         79:13
**stay** [10] 10:9      15:2
29:22   42:8    42:10
42:18   43:6    83:15
83:18   87:22
**stayed** [9]          9:22
20:18   20:21   21:2
26:20   53:14   53:21
53:22   87:22
**stenograph** [1]      128:10
**step** [1] 66:2
**steps** [1] 59:18
**Stewart** [9]         24:22
72:15   72:22   72:23
76:16   76:19   77:13
80:5    80:22
**still** [3]  14:6     23:16
102:4
**Stillman** [8]        21:17
21:18   30:18   30:23
100:16  100:18  100:20
101:10
**stop** [2] 44:25      71:3
**stopped** [2]         21:5
28:7    28:23   38:1
**stores** [1]          18:12
**Street** [8]          5:16
6:1     6:3     6:6
6:11    6:16    6:23
7:18

**strike** [1]          16:2
**stubs** [3]           100:16
101:4   101:4
**student** [3]         100:20
101:8   101:11
**stye** [1]  35:18
**submit** [2]          55:13
63:19
**subscribed** [1]      49:24
**substances** [1]      4:23
**such** [4] 36:17      59:19
59:22   99:23
**sue** [2]   42:3      43:8
**sued** [2]  2:24      90:6
**suffering** [1]       5:4
**summer** [1]          27:18
**supervision** [1] 128:11
**supervisor** [2]      44:3
92:14
**supervisor's** [1]
24:19
**supply** [2]          22:19
24:8
**support** [15]        47:4
47:13   47:13   47:22
48:7    48:7    48:10
48:12   48:13   59:11
60:4    66:2    71:10
92:25   93:6
**supports** [4]        46:25
47:22   53:8    70:19
77:24   86:15
**supposed** [2]        46:24
90:1
**surrounded** [1]      80:8
**suspended** [2]       45:16
**sustained** [1]       97:16
**swallowing** [1]      64:14
**swear** [1]           50:12
**swearing** [2]        50:21
51:4
**swim** [2]            19:2
19:8
**swimming** [2]        18:2
19:1
**sworn** [4]           2:2
49:6    49:23   53:5
**systems** [1]         24:21

—T—

**taking** [7]          4:22
5:1     23:8    53:8
59:19   67:6    70:20
**tangible** [2]        67:11
78:21
**tangibles** [2]       48:18
77:11
**tapes** [2] 48:7      48:9
**Tasha** [2]           12:16
12:20   12:24
**telephone** [9]       55:20
56:1    56:10   62:25
63:22   65:25   66:13
69:2    79:23
**telling** [4]         17:8

67:18   67:20   90:4
tells [1]   51:5
temporary [4]   28:19
32:12   32:14   38:25
ten [1]   16:17
tenant [1]   6:25
tend [3]   47:13   48:7
48:12
tends [1]   47:22
testified [1]   2:2
testify [1]   67:13
testimony [4]   48:25
87:4   90:13   128:8
Texas [8]   10:15
10:16   29:20   29:25
37:4   101:24   102:2
102:5
Thank [5]   71:8
76:14   102:24   106:6
106:9
theirs [1]   37:6
Thereupon [2]   71:5
72:1
thinking [2]   87:1
89:13
third [1]   44:1
thought [10]   31:1
54:6   54:8   63:21
63:24   68:5   95:17
95:17   95:18   95:21
three [15]   11:21
27:3   27:20   36:13
42:8   42:12   43:6
51:25   81:19   86:1
86:8   87:21   88:1
88:3   89:3
three-day [3]   83:15
89:12   91:23
through [15]   33:7
33:18   35:7   35:8
36:19   36:20   44:10
56:1   56:10   56:12
69:16   72:15   78:13
80:24   128:6
ticket [3]   43:14
44:2   45:4
tickets [8]   43:14
43:18   43:24   45:6
45:12   45:16   92:6
93:7
ties [1]   9:6
times [1]   39:17
tissue [3]   61:10
65:18   70:3
title [2]   57:7   72:18
to-wit [1]   2:3
today [24]   2:16
4:24   5:5   5:11
52:13   53:4   53:7
53:12   54:23   59:10
59:16   59:25   60:19
60:23   61:3   63:13
64:19   65:2   69:17
70:10   70:12   70:17
82:6   82:7
together [10]   16:24
16:25   17:7   88:13

88:17   88:19   88:20
88:22   88:22   90:10
toilet [2]   61:10
68:18
too [3]   11:6   22:23
82:18
took [4]   20:11   26:9
26:16   105:22
top [4]   94:25   99:8
102:18   103:7
toward [2]   23:22
42:20
Towers [1]   7:7
towns [1]   11:21
transcribed [1]   128:10
transcript [2]   128:6
128:7
trespassing [2]   44:17
45:3
Tri-State [2]   32:17
32:19
Tri-States [2]   33:7
33:17
trial [19]   42:8   43:6
59:19   83:15   87:22
88:4   88:7   88:10
88:19   89:2   89:12
89:17   89:22   90:8
90:9   90:11   91:18
91:22   93:1
trick [1]   39:23
tried [2]   54:3   61:18
Troy [4]   21:16   30:7
30:8   30:9
true [15]   47:10   47:11
47:15   49:10   50:13
50:22   50:25   51:4
51:7   51:13   66:15
66:19   66:22   94:1
128:7
truth [3]   51:10   51:15
53:5
truthfully [1]   5:13
try [2]   30:14   71:23
trying [1]   9:16
16:12   39:23   43:15
52:20   52:21   86:8
86:14   89:16   90:10
90:10   91:13
tuition [1]   23:21
101:15
turn [1]   46:24
turned [1]   44:11
Tuscaloosa [4]   30:25
31:3   31:4   37:9
Twenty-three [1]
12:21
Twenty-two [1]
12:23
twice [2]   89:7
90:7
two [22]   10:12   12:10
12:12   16:16   32:23
40:7   40:15   40:23
40:24   41:9   41:12
41:20   41:22   77:8
80:13   81:8   81:17

81:19   82:4   91:5
91:6   104:8
type [2]   5:1   82:25
types [2]   55:8
60:13
typing [1]   39:12

-U-

UDHA [10]   71:19
72:6   72:14   74:1
74:16   74:19   75:2
80:1   80:24   81:3
unable [2]   96:18
96:19
under [20]   23:3
46:20   49:6   49:10
50:4   50:12   51:3
52:13   53:4   54:24
59:11   60:19   60:23
61:4   66:16   70:13
72:18   72:21   72:25
128:11
underneath [1]   50:17
understand [58]   2:14
2:15   2:20   3:3
3:4   3:9   3:10
3:13   4:3   4:8
4:11   4:18   4:20
12:5   12:8   16:6
16:8   16:11   17:11
31:13   35:2   39:24
40:6   50:9   50:14
50:20   51:2   51:21
59:6   61:14   62:1
62:2   62:18   63:4
63:8   63:12   63:16
63:17   64:4   64:9
67:10   68:2   69:19
69:22   71:2   77:6
79:4   79:5   79:6
82:20   86:14   87:6
88:3   88:25   89:23
91:12   91:13   92:21
understood [4]   25:14
28:4   84:16   86:13
unheard [1]   81:18
United [1]   1:1
20:17   62:4   105:16
universities [1]   21:10
University [6]   10:22
10:24   21:15   21:16
29:16   30:7
up [22]   3:21   4:14
11:18   21:6   21:7
25:4   29:5   31:10
42:10   42:12   54:3
55:22   65:23   74:3
74:7   76:19   78:8
83:19   90:12   91:9
94:25   102:18
Urban [1]   74:13
USAD [1]   71:15
USDH [1]   72:5
used [5]   9:7   36:23
37:6   100:22   100:25
using [1]   44:2
Usually [1]   23:17

-V-

Vaughn [1]   7:7
verbal [2]   3:19
4:16
verbally [2]   4:13
4:17
verify [1]   94:1
video [1]   48:9
videotapes [1]   48:6
violation [4]   41:3
41:6   90:18   90:20
virtually [1]   75:8
visible [3]   67:3
74:20   99:6
VS [1]   1:6

-W-

wait [2]   64:11   64:11
Wal-Mart [1]   19:17
Walding [12]   1:14
1:22   2:7   2:10
45:18   45:21   45:24
46:4   46:8   71:22
104:6   106:6
Walker [5]   62:9
62:13   73:20   79:19
79:25
walking [2]   42:20
42:20
Wallace [6]   21:16
29:3   29:5   29:6
29:7   30:2
walls [1]   79:1
Walton [22]   9:10
9:19   10:1   10:4
14:6   14:7   25:19
25:20   26:4   26:6
26:13   26:15   29:22
30:10   30:12   30:15
33:25   34:3   34:12
34:23   35:6   95:13
wanting [1]   89:19
warehouse [1]   32:21
watching [1]   87:18
water [1]   46:7
weather [4]   75:20
75:24   76:3   80:18
web [1]   76:17
week [1]   94:2
weighed [1]   84:6
welcome [1]   85:7
85:8   85:12
whole [3]   35:2
78:16   92:5
Wiregrass [13]   11:13
11:16   12:16   13:5
13:9   14:10   14:11
14:14   14:16   15:12
19:3   19:5   19:12
within [2]   54:19
79:1
without [2]   39:18
57:20
witness [12]   3:15

35:4   35:24   45:20
45:23   46:2   46:5
64:8   64:13   71:20
106:9   128:19
wonderfully [1]
87:25
word [4]   42:14   67:10
88:7   97:16
words [5]   85:8
96:12   96:20   96:22
97:9
worked [9]   28:19
28:20   31:24   33:6
33:13   35:10   38:5
48:24   100:18
works [4]   2:21
3:1   52:16   64:3
writing [3]   55:22
97:18   99:6
written [13]   31:14
40:14   49:3   49:10
51:18   63:24   66:24
66:24   67:1   67:7
70:9   94:4   96:13
wrong [1]   87:24
87:24
wrote [1]   49:4

-Y-

Yankee [1]   22:19
year [28]   5:21   5:23
20:18   21:4   21:5
21:7   22:5   22:5
22:6   22:7   22:10
22:11   29:3   30:11
32:6   33:12   33:14
33:22   34:6   34:12
34:14   89:7   95:18
95:22   102:22   105:5
105:6   105:8
years [20]   9:15
9:23   14:8   20:21
20:22   20:23   21:3
21:4   24:24   25:10
25:11   25:12   25:13
27:3   27:20   28:6
31:11   36:13   85:23
86:1
yet [4]   89:21   102:11
102:24   103:10
young [1]   85:20
younger [2]   85:20
86:10
yourself [3]   15:6
78:9   105:22

-Z-

ZIP [2]   5:18   6:4

# DEFENDANT'S EXHIBITS 7, 12, 13, 15, 18, and 21

# DEFENDANT'S EXHIBIT 7



DEFENDANT'S
EXHIBIT
7

ARTICLES OF INCORPORATION
OF
THE DOTHAN RESCUE MISSION,
A NON-PROFIT CORPORATION

The undersigned, each of whom is over the age of nineteen years, desiring to organize a non-profit corporation under the provisions of the Alabama Non-Profit Corporation Act, Section 10-3-20, Code of Alabama of 1975, have agreed upon and adopted these Articles of Incorporation, the same to constitute and become a charter for carrying out the purposes hereinafter specified upon the proper filing hereof pursuant to law, hereby file these Articles of Incorporation and certify as follows:

## NAME OF CORPORATION

The name of this corporation is The Dothan Rescue Mission.

## LOCATION

The principal office of the corporation in the State of Alabama shall be located in Dothan, Houston County, Alabama.

## DURATION

The duration of the corporation shall be perpetual.

## OBJECTS AND PURPOSES OF CORPORATION

The objects and purposes of this corporation shall be:

A.  To serve as an arm of the church given to a soul-saving ministry among the rejected and neglected people being found in need of assistance, including, but without limitation, those in need of food, clothing, housing, and other material necessities and specifically in need of knowing the Good News of the Gospel of Jesus Christ.

those in need of food, clothing, housing, and other material necessities and specifically in need of knowing the Good News of the Gospel of Jesus Christ.

      B.  To have and to exercise all powers necessary or convenient to effect any and all purposes for which the corporation is organized, presently or hereafter conferred by the

**Defendant's Initial
Disclosure Documents  1**

laws of the State of Alabama of the United States when not in conflict;

C.  Not withstanding any other right, authority or statement of purposes contained in this Article or any other Article of these Articles of Incorporation, the first, foremost, paramount and exclusive purposes of this corporation are religious and charitable.  Any endeavor undertaken by this Corporation shall be exclusively in the furtherance of its religious and charitable purposes as set out herein and such endeavor shall be operated within the meaning and as contemplated by Section 501(C)(3) of the Internal Revenue Code.

## EARNINGS AND ACTIVITIES

This corporation is organized and shall be operated exclusively for religious and charitable purposes; no part of its earnings, if any, shall inure to the benefit of any member, officer or director of this corporation.  The corporation shall have, and may exercise, all powers conferred by the Alabama Non-Profit Corporation Act.

## REGISTERED AGENT

The address of the corporation's initial registered office, and the name of its initial registered agent at such address is:  Frank Williams, Director, 214 South Appletree Drive, Dothan, Alabama 36301.

## MEMBERS

This corporation shall have no shares, no stock, no shareholders and no stockholders, but shall have members and a Board of Directors and such officers and committees as may be provided in the By-Laws of the corporation.  All officers and members of the corporation shall possess such qualifications for membership as may be prescribed by the By-Laws of the corpo-

may be provided in the By-Laws of the corporation. The incorporators and members of the corporation shall possess such qualifications for membership as may be prescribed by the By-Laws of the corporation.

## BOARD OF DIRECTORS

A. The legal title to the property of the corporation

-2-

and the entire control and management of its business and affairs, shall vest in and be exercised solely by the Board of Directors, and their successors in office.

B.  The Board of Directors shall be elected by and from the membership of the corporation, and shall be not less than three (3) and not more than twenty-four (24), or as may be fixed from time to time by the By-Laws of the corporation.

C.  The term for which the Directors shall be elected is for a period of one (1) year, or until their respective successors shall be duly elected and qualified under the provisions of the By-Laws of the corporation.

D.  Vacancies on the Board of Directors resulting from death, resignation, disqualification or otherwise shall be filled for the unexpired term by vote of the majority of the remaining members of the Board and as is provided in the By-Laws.

E.  A majority of the total number of Directors fixed by these Articles of Incorporation and the By-Laws shall constitute a quorum for the transaction of business, unless otherwise provided in the By-Laws. The act of a majority of the Directors present at a meeting at which a quorum is present shall be the act of the Board, unless the act of a greater number is required by law or by the By-Laws.

F.  The Board of Directors may, by a majority vote thereof, adopt, and from time to time, amend, By-Laws and any amendments thereto, which may contain such provisions not inconsistent with the Alabama Non-Profit Corporation Act, as the Board of Directors may deem proper, expedient or necessary.

G.  The Directors reserve the right to amend, alter,

G.   The Directors reserve the right to amend, alter, change or repeal any provision contained in these Articles of Incorporation, in the manner now or hereafter provided by law.

-3-

## DIRECTORS

The initial Board of Directors shall consist of
_____ 17 _____ members who shall hold office until first announced
election which will be held on _____ May 3, 1979 _____.
Thereafter the directors shall be elected or appointed in the
manner for the terms provided by the By-Laws. The names and
addresses of the initial Board of Directors are as follows:

| NAME | ADDRESS | PHONE |
|------|---------|-------|
| E. J. Christian, Jr. | 401 N. Park Ave. (03) | 794-9656 |
| Mrs. Louise Crammer | 509 Roosevelt Dr. (01) | 794-5245 |
| Harry Culbreth | Rt. 2, Box 152-A<br>Columbia, AL 36319 | 696-4385 |
| Charles Dunseth | 402 Gardenia (03) | 793-4457 |
| Robert E. Gainous | Rt. 3, Box 76 (01) | 793-4847 |
| Bruce Hall | #146 Camelot Apts. (03) | 793-3610 |
| Charles H. Jenkins | 602 Reid Drive (01) | 794-5655 |
| Dr. Bernard Johnston | 1507 W. Main St. (01) | 792-3313 |
| Doug Faulk | 703 Dogwood Trail (01) | 792-3686 |
| David McKnight | Rt. 7, Box 302 (01) | 792-5518 |
| Jim Martin | 4003 S. Park Ave. (01) | 793-1004 |
| Gordon Walker | 1210 Fairlane (01) | 794-0188 |
| Carlos Oppert | 511 Gardenia (03) | 792-4856 |
| Warren Palmer | Rt. 2, Box 50 (01) | 793-1751 |
| William J. Senter, Jr. | 3301 Candlewood Dr. (01) | 792-5555 |
| Steven Stowers | 1002 Crestline Dr. (03) | 794-0236 |
| Roger Watkins | 1105 Rendale Road (03) | 793-1669 |

## OFFICERS

The officers of the Corporation shall be elected by the
Board of Directors, and shall consist of a President, Vice President,

of the corporation shall be elected by the Board of Directors, and shall consist of a President, Vice President, a Secretary and a Treasurer, and such other officers as may be prescribed from time to time by the By-Laws.  They shall serve

-4-

for a term as provided in the By-Laws, but may be removed for good cause shown by a two-thirds (2/3) vote of the Directors. The authority, responsibility and duties of the officers shall be as prescribed by the By-Laws of the corporation. The initial officers of the corporation shall be as follows:

President:

Warren P. Palmer
Route 2, Box 50
Dothan, Alabama 36301

Vice President:

David McKnight
Route 7
Dothan, Alabama 36301

Secretary:

Roger Watkins
205 Azalea Drive
Dothan, Alabama 36303

Treasurer:

Eugene J. Christian, Jr.
401 North Park Avenue
Dothan, Alabama 36303

## COMPENSATION OF EMPLOYEES

No member, officer or director shall receive compensation for any services rendered in the capacity as a member, officer or director, but may be reimbursed for necessary, actual expenses incurred or paid in performing any duty as such member, officer or director, provided, however, that nothing herein contained shall prevent the payment of proper compensation to an employee of the corporation, other than a director, for services rendered by virtue of his contract of employment, even though such employee may also be a member or officer of the corporation. No member, officer or director of the corporation shall be liable for any debt, default or obligation of the corporation.

## INCORPORATORS

The names and addresses of the incorporators are as follows:

1.  Warren P. Palmer, Route 2, Box 50, Dothan, Alabama 36301

INCORPORATORS

The names and addresses of the incorporators are as follows:

1. Warren P. Palmer, Route 2, Box 50, Dothan, Alabama 36301

2. David McKnight, Route 7, Dothan, Alabama 36301

3. Roger Watkins, 205 Azalea Drive, Dothan, Alabama 36303

4. Eugene J. Christian, Jr., 401 North Park Avenue, Dothan, Alabama 36303

## DISSOLUTION

The corporation may be dissolved at any time, as provided by the Alabama Non-Profit Corporation Act. All assets of the corporation, after its liabilities and obligations have been paid, satisfied and discharged, or adequate provisions shall have been made therefor, shall be applied, distributed or otherwise transferred to:

Any exempt organization recognized by the Internal Revenue Bureau as an exempt organization described in Section 501(C)(3) of the Internal Revenue Code, contributions to which are fully tax deductible, and which shall be designated by the Board of Directors as to be deserving of and in need of said assets. Such designation shall be determined by majority vote of the Board of Directors.

BOOK **021** PAGE **561**

IN WITNESS WHEREOF, we, being all of the Incorporators of said

~~corp~~oration, have hereunto set our hands and seals on this the ___10th___

of March, 1979.

_[signatures]_

~~sw~~orn to and subscribed before me this the ___19___ day of ~~M~~ar~~ch~~

~~19~~79.

~~M~~y Commission Expires: _10⁰⁰_

Notary Public

orn to and subscribed before me this the ___ 19 ___ day of ~~~

79.

y Commission Expires:    10⁰⁰

Notary Public

Commission Expire May 1, 197:

Filed this 30 day of March 197 9 at 3:57 PM M. $_____ Mtg. Tax

$____ ____ Deed Tax Paid. Recorded Cop Book 21 Page 555

B. S. Stembridge Judge of Probate No. 13475

HOUSTON COUNTY, ALABAMA

Ct. Bruce Hall

# DEFENDANT'S EXHIBIT 12

DOTHAN RESCUE MISSION                    REGISTRATION CARD

Name _Angela Nails_                    Race   W (B) O

S.S. No. _212- 782 -86Z_               Date of Birth _1-8-61_

Where were you                         Do you have medication
last night _friends house_             with you _one tablet_

Coming from _Tuscaloosa_               Going to _Dothan_

Next of kin _Annabelle Kelly_          Relation _grandmother_

Address _342 Okaloosa Rd_              City & State _Ft. Walton Beach Fla_

*I relieve the Dothan Rescue Mission, Inc., of all liability for any and all losses, injuries,
damages, whatever, wether through intent, negligence, accident, whatever, and
whenever sustained*

Signed _Angela Nails_                  Date _11-39-02_

Registered By _Darius Brown_           Time _12:30 Am_

DEFENDANT'S
EXHIBIT

12

Defendant's Initial
Disclosure Documents   4

Check in 11-30-02  1230 Am
Checked out 11-30-02  6 AM

# DEFENDANT'S EXHIBIT 13



**DEFENDANT'S EXHIBIT 13**

## DOTHAN RESCUE MISSION

### FINANCIAL ASSISTANCE APPLICATION

HUSBAND_____ D.O.B._____ RACE_____

~~WIFE~~ Self Angela Nails    D.O.B. 1/8/61    RACE B

HUSBAND'S SS#_____    ~~WIFE'S~~ Self SS# 212 78 2867

ADDRESS ~~801 Lindson St~~ 403 Holly Cir    CITY Dothan    STATE AL

ZIP CODE 30603    PHONE #_____    HOW MANY IN HOME 1

MARTIAL STATUS (Circle One)  M  (S)  W  D  Sep.

DO YOU OWN?_____OR RENT? ✓ YOUR HOME.    NAME OF LANDLORD OR

MORTGAGE COMPANY ~~Bill Hicks~~    ~~Real Estate~~ AM Prop.

PLEASE LIST EVERYONE IN THE HOME AND THEIR AGES.

| NAME | AGE | NAME | AGE |
|------|-----|------|-----|
| Angela D. Nails | ~~47~~ 42 | | |
| | | | |
| | | | |
| | | | |
| | | | |

TYPE OF INCOME: (Place Of Employment) ~~College Student~~ none

Salary $ ~~1,000.00~~ ~~600. monthly~~ Unemployment $_____ AFDC $_____

SS $_____ Disability (VA, SSI, Or OTHER) $_____

Food Stamps $_____ Other $_____

WHAT CONTACTS HAVE YOU MADE TO GET ASSISTANCE? Appointment for Rent

WHO REFERRED YOU TO THE MISSION? I Came In to the mission

Defendant's Initial
Disclosure Documents  10

MONTHLY BUDGET

RENT or MORTGAGE PAYMENT: $ 250.00

UTILITIES (gas, water, & power): $ ___

LOANS:  $ ___

MEDICAL EXPENSES (include medicine): $ ___

FOOD (DO NOT INCLUDE FOOD STAMPS): $ ___

TRANSPORTATION: $ ___

OTHER: $

I, *Angela Nails* , authorize the release of all information as requested by the Dothan Rescue Mission, for the determining assistance to meet my requested need. I, also authorize the Dothan Rescue Mission to release any of my case information to other agencies and vendors necessary to reach a determination on my requested needs.

12-06-02          *Angela Nails*
DATE                    CLIENT'S SIGNATURE

_____FOR OFFICE USE ONLY_____

ELIGIBILITY FACTORS: 12-16-02 - CH pd $50.00 to Billy Nicks ck#7008
12-11-01 - 4 glass & 4 spoons - $19
1-14-03 - One King Set, One chair - 4pcs
4-8-03 - DNA (Never) Mr. Harry said never help again.

# DEFENDANT'S EXHIBIT 15

FORM APPROVED BY DOTHAN BOARD OF R... ORS

THIS AGREEMENT made this _Ond_ day of _December 3_ _2002_ between _Bill S_
Agent for Landlord, and _Angela Wallis_, tenant at _801 E Linden_
NEAREST RELATIVE: _Dothan AL_

WITNESSETH, that the said landlord hereby rents to the said tenant (Furnished) (Unfurnished), premises known.
_801 Linden St_ for the sum of $ _250.00_ per month payable in advance on the
day of each month, for a term of _12_ months beginning on the _2nd_ day of _December 2002_, 19___
Upon the execution of this lease, the tenant shall pay to the landlord the rent as aforesaid, that tenant will keep the premises in good order and
hereby covenants with the said landlord to pay the rent as aforesaid, that tenant will keep the premises in good order and
surrender the peaceful and quiet possession of the same at the termination of this lease, in as good a condition as when it
ceived (normal wear and decay of property expected) and further, in that the said tenant will not do, suffer or permit an
thing to be done in or about the premises which will contravene, the policy of insurance against loss by fire ($50.00 deductal
agreement): nor use, nor permit their use, for the purposes of other than those of natural tenancy and will not at any th
assign this agreement, nor sublet the property thus let or any portion thereof, without the written consent of the said lan
lord. Upon termination of this lease, the landlord checks the premises to be vacated and if acceptable, the landlord shall, u
return of the keys, make a refund of the deposit to the tenant, less any sums due for the damage of the furniture or buildi
which might have been inflected by the tenant, or for cleaning the building and yards.

AND IT IS ALSO FURTHER AGREED, that this agreement with all its provisions and covenants shall continue in fo
from term to term after the expiration of the term above mentioned provided however, that the parties hereto, or either
them, can terminate the same at the end of the term above mentioned, or any _____ days thereafter, by giving at le
_____ days previous notice thereof in writing.

AND IT IS ALSO FURTHER AGREED, that _all utilities_ will be paid by _Tenant_
(gas, elec., water, etc.) (tenant, landlord

AND IT IS ALSO FURTHER AGREED, that any special privileges to be accorded said tenant, or any exceptions to any
the provisions above will be listed below:
Your rent in the amount of $ _250.00_ is due on the _2nd_ day of each month IN ADVANCE. Rent due on
_2nd_ day of each month should be paid by the _____ day of each month, or a late charge of $... will be
ed for each day thereafter as a part of your rent.

PAID BY (CHECK - CASH) $ _200.00_, THIS _2nd_ DAY OF _Dec_ _2002_ RENT.
PAID BY (CHECK - CASH) $ _0_, THIS _____ DAY OF_____, 19___ DEPOSIT.

SPECIAL STIPULATIONS:

_12/2/02 Tenant will pay $200.00 12/2/02 with_
_Balance due 12/28/02 ($150.00)_
_DRM_
_50.00_

DEFENDANT'S
EXHIBIT
15

AND IT IS FURTHER AGREED, that in the case of military personnel, that this agreement become null and void
_____ days written notice in the event the tenant is ordered to move to another military installation by prope
thorities.

THIS LEASE CONSTITUTES THE ENTIRE AGREEMENT BETWEEN TENANT AND LANDLORD.

IN TESTIMONY WHEREOF, The said parties have hereunto subscribed their names and affixed their seals the day an
above written, agreeing to abide by all of the terms set out above.

Defendant's Initial
Disclosure Documents 11

_____
AGENT FOR LANDLORD

_____
TENANT(s)

# DEFENDANT'S EXHIBIT 18

DOTHAN RESCUE MISSION ·    · REGISTRATION CARD

Name Angela Denise Nails    Race W (B) I O

S.S. No )212 78 2867    Date of Birth Jan 8, 61

Where were you    Motel    Do you have medication
last night    with you No

Coming from Dothan    Going to

Next of kin Martha    Relation Step Sister in Law

Address 156 Craig Street Aliceville    City & State Aliceville Alabama
Alabama 35442

*I relieve the Dothan Rescue Mission, Inc., of all liability for any and all losses, injuries,
damages, whatever, wether through intent, negligence, accident, whatever, and
whenever sustained*

Signed Angela Denise Nails    Date 03-22-03

Registered By Lydia Caldwell    Time

**DEFENDANT'S
EXHIBIT**

18



(334) 393-6583
Martha Barnett

This person is
persistent —
She's been barred —
for life 1-30-05
about 2 whs ago
she attempted to register
- I told her she did have      barred for life
a place & I notice a very        since 1996
nice car —
This is able I does
have a place to stay —
she just wanted to
stay here — has jobs opportunity
has
is waiting for ins. funds
was in accident

# DEFENDANT'S EXHIBIT 21

# REPUBLIC OF THE PHILIPPINES

Congress of the Philippines

Metro Manila

Fifth Regular Session

Begun and held in Metro Manila, on Monday, the twenty-second day of July, nineteen hundred and ninety-one.

---

(REPUBLIC ACT No. 7279)

**AN ACT TO PROVIDE TO PROVIDE FOR A COMPREHENSIVE AND CONTINUING URBAN DEVELOPMENT AND HOUSING PROGRAM, ESTABLISH THE MECHANISM FOR ITS IMPLEMENTATION, AND FOR OTHER PURPOSES**

*Be it enacted by the Senate and House of Representatives of the Philippines in Congress assembled:*

ARTICLE I

TITLE, POLICY, PROGRAM AND DEFINITION OF TERMS

Section 1. Title. "This Act shall be know as the "Urban Development and Housing Act of 1992."

Section 2. Declaration of State Policy and Program Objectives.

It shall be the policy of the State to the State to undertake, in cooperation with the private sector a comprehensive and continuing Urban Development and Housing Program, hereinafter referred to as the Act which shall:

    a. Uplift the conditions of the underprivileged and homeless citizens in urban areas and in resettlement areas by making available to them decent housing at affordable cost, basic services, and employment opportunities;

    b. Provide for the rational use and development of urban land in order to bring about the following:

        1. Equitable utilization of residential lands in urban and urbanizable areas with particular attention to the needs and requirements of the underprivileged and homeless citizens and not merely on the basis of market forces;

        2. Optimization of the use and productivity of land and urban resources;

        3. Development of urban areas conducive to commercial and industrial activities which can generate more economic opportunities for the people;

        4. Reduction in urban dysfunctions, particularly those that adversely affect public health, safety and ecology; and

        5. Access to land and housing by the underprivileged and homeless citizens;

DEFENDANT'S EXHIBIT 21

a.  Adopt workable policies to regulate and direct urban growth and expansion towards a dispersed urban net and more balanced urban-rural interdependence;
b.  Provide for an equitable land tenure system that shall guarantee security of tenure to Program beneficiaries but shall respect the rights of small property owners and ensure the payment of just compensation;
c.  Encourage more effective people's participation in the urban development process; and
d.  Improve the capability of local government units in undertaking urban development and housing programs and projects.

Section 3 *Definition of Terms* – For purposes of this Act:

a.  Affordable cost refers to the most reasonable price of land and shelter based on the needs and financial capability of Program beneficiaries and appropriate financing schemes;
b.  "Areas for priority development" refers to those areas declared as such under existing statutes and pertinent executive issuances.
c.  "Blighted lands' refers tot he areas where the structures are dilapidated, obsolete and unsanitary, tending to depreciate the value of the land and prevent normal development and use of the area.
d.  "Consultation" refers to the constitutionally mandated process whereby the public, on their own or through people's organizations, is provided an opportunity to be heard and to participate in the decision-making process on matters involving the protection and promotion of its legitimate collective interests, which shall include appropriate documentation and feedback mechanisms;
e.  "Idle lands" refers to non-agricultural lands in urban and urbanizable areas on which no improvements, as herein defined, have been made by the owner, as certified by the city, municipal or provincial assessor;
f.  "Improvements refers to all types of buildings and residential units, walls, fences structures or constructions of all kinds of a fixed character or which are adhered to the soil but shall not include trees, plants and growing fruits, and other fixtures that are mere super impositions on the land, and the value of improvements shall not be less that fifty percent (50%0 of the assessed value of the property;
g.  "Joint venture" refers to the commitment or agreement by two (2) or more persons to carry out a specific or single business enterprise for their mutual benefit, for which purpose they combine their funds, land resources, facilities and services;
h.  "Land assembly or consolidation" refers to the acquisition of lots of varying ownership through purchase or expropriation for the purpose of planned and rational development and socialized housing programs without individual property boundary restrictions;
i.  "Land banking" refers to the acquisition of land at values based on existing use in advance of actual need to promote planned development and socialized housing programs;
j.  "Land swapping" refers to the process of land acquisition by exchanging land for another piece of land of equal value, or for shares of stock in a government or quasi-government corporations whose book value is of equal value to the land being exchanged, for the purpose of planned and rational development and provision for socialized housing where land values are determined based on land classification, market value and assessed value taken from existing tax

declarations: Provided, That more valuable lands owned by private persons maybe exchanged with less valuable lands to carry out the objectives of this Act;

k.  "Land use plan" refers to the rational approach of allocating available land resources as equitably as possible among competing user groups and for different functions consistent with the development plan of the area and the Program under this Act;

l.  "On–site development" refers to the processed of upgrading and rehabilitation of blighted and slum urban areas with a view of minimizing displacements of dwellers in said areas, and with provisions for basic services as provided for in Section 21 hereof;

m.  "Professional squatters" refers to individuals or groups who occupy lands without the express consent of the landowner and who have sufficient income for legitimate housing. The term shall also apply to persons who have been previously awarded home lots or housing units by the Government but who sold, leased or transferred the same to settle illegally in the same place or in another urban area, and *non-bona fide* occupants and intruders of lands reserved for socialized housing period. The term shall not apply to individuals or groups who simply rent land and housing from professional squatters or squatting syndicates;

n.  "Resettlement areas" refers to areas identified by the appropriate national agency or by the local government unit with respect to areas within its jurisdiction, which shall be used for the relocation of the underprivileged and homeless citizens;

o.  "Security of tenure" refers to the degree of protection afforded to qualified Program beneficiaries against infringement or unjust, unreasonable and arbitrary eviction or disposition, by virtue of the right of ownership, lease agreement, usufruct and other contractual arrangements;

p.  "Slum Improvement and Resettlement Program or SIR" refers to the program of the National Housing Authority of upgrading and improving blighted squatter areas outside of Metro Manila pursuant to existing statutes and pertinent executive issuances;

q.  "Small property owners" refers to those whose only real property consists of residential land not exceeding three hundred square meters (300 sq. m.) in highly urbanized cities and eight hundred square meters (800 sq. m.) in other urban areas;

r.  "Socialized housing" refers to housing programs and projects covering houses and lots or home lots only undertaken by the Government or the private sector for the underprivileged and homeless citizens which shall include sites and services development, long-term financing, liberalized terms on interest payments, and such other benefits in accordance with the provisions of this Act;

s.  "Squatting syndicates" refers to groups of persons engaged in the business of squatter housing for profit or gain;

t.  "Underprivileged and homeless citizens" refers to the beneficiaries of this Act and to individuals or families residing in urban and urbanizable areas whose income or combined household income falls within the poverty threshold as defined by the National Economic and Development Authority and who do not own housing facilities. This shall include those who live in makeshift dwelling units and do not enjoy security of tenure;

u.  "Unregistered or abandoned lands' refers to lands in urban and urbanizable areas which are not registered with the Register of Deeds, or with the city of municipal assessor's office concerned, or which are uninhabited by the owner and have not been developed of devoted for any useful purpose, of appears unutilized for a period of three (3) consecutive years immediately prior to the issuance and receipt of publication of notice of acquisition by the Government as provided under this Act. It does not included land which has been abandoned by

reason of *force majeure* of any other fortuitous event: *Provided,* That prior to such event, such land was previously used for some useful or economic purpose;

v.  " Urban areas" refers to all cities regardless of their population density, and to municipalities with a population density of at least five hundred (500) persons per square kilometer;

w.  " Urbanizable areas" refers to sites and lands which, considering present characteristics and prevailing conditions, display marked and great potential of becoming urban areas within the period of five (5) years; and

x.  "Zonal Improvement Program of ZIP" refers to the program of the National Housing Authority of upgrading and improving blighted squatter areas within the cities and municipalities of Metro Manila pursuant to existing statutes and pertinent executive issuances.


## ARTICLE II

### COVERAGE AND EXEMPTIONS

Sec. 4. *Coverage.* – The Program shall cover all lands in urban and urbanizable areas, including existing areas for priority development, zonal improvement sites, slum improvement and resettlement sites, and in other areas that may be identified by the local government units as suitable for socialized housing.

Sec. 5. *Exemptions.* – The following lands shall be exempt from the coverage of this Act:

a.  Those included in the coverage of Republic Act No. 6657, otherwise known as the Comprehensive Agrarian Reform Law;

b.  Those actually used for national defense and security of the State;

c.  Those used, reserved or otherwise set aside for government offices, facilities and other installations, whether owned by the National Government, its agencies and instrumentalities, including government-owned or –controlled corporations, or by the local government units: *Provided, however,* That the lands herein mentioned, or portions thereof, which have not been used for the purpose for which they have been reserved or set aside for the past ten (10) years from the effectivity of this Act, shall be covered by this Act;

d.  Those used or set aside for parks, reserves for flora and fauna, forests and watersheds, and other areas necessary to maintain ecological balance or environmental protection, as determined and certified to by the proper government agency, and

e.  Those actually and primarily used for religious, charitable, or educational purposes, cultural and historical sites, hospitals and health centers, and cemeteries or memorial parks.

The exemptions herein provided shall not apply when the use or purpose of the abovementioned lands has ceased to exist.


## ARTICLE III

**NATIONAL URBAN DEVELOPMENT AND HOUSING FRAMEWORK**

Sec. 6. *Framework for Rational Development.*- There shall be a National Urban Development and Housing Framework to be formulated by the Housing and Land Use Regulatory Board under the direction of the Housing and Urban Development Coordinating Council in coordination with all local government units and other concerned public and private sectors within one (1) year from the effectivity of this Act:

The Framework shall refer to the comprehensive plan for urban and urbanizable areas aimed at achieving the objectives of the Program. In the formulation of the Framework, a review and Rationalization of existing town and land use plans, housing programs, and all other projects and activities of government agencies and the private sector which may substantially affect urban land use patterns, transportation and public utilities, infrastructure, environment and population movements shall be undertaken with the concurrence of the local government units concerned.

ARTICLE IV

LAND USE, INVENTORY, ACQUISITION AND DISPOSITION

Sec. 7. *Inventory of Lands* - Within one (1) year from the effectivity of this Act, all city and municipal governments shall conduct an inventory of all lands and improvements thereon within their respective localities . The inventory shall include the following:

      a.  Residential lands;
      b.  Government-owned lands, whether owned by the National Government: or any of its subdivision, instrumentalities, or agencies, including government-owned or controlled corporations and their subsidiaries;
      c.  Unregistered or abandoned and idle lands; and
      d.  Other lands.

In conducting the inventory, the local government units concerned, in coordination with the Housing and Land Use Regulatory Board and with the assistance of the appropriate government agencies, shall indicate the type of land use and the degree of land utilization, and other data or information necessary to carry out the purposes of this Act.

For planning purposes, the Housing and Urban Development Coordinating Council shall be furnished by each local government unit a copy of its inventory which shall be updated every three (3) years.

Sec. 8. *Identification of Sites for Socialized Housing* - After the inventory, the local government units, in coordination with the National Housing Authority, the Housing and Land Use Regulatory Board, the National Mapping Resource Information Authority, and the Land Management Bureau, shall identify lands for socialized housing and resettlement areas for the immediate and future needs of the underprivileged and homeless in the urban areas, taking into consideration the degree of availability of basic services and facilities, their accessibility and proximity to job sites and other economic opportunities , and the actual number of registered beneficiaries.

Government-owned lands under paragraph (b) of the preceding section which have not been used for the purpose for which they have been reserved or act aside for the past ten (10) years from the effectivity of this Act and identified as suitable for socialized housing , shall immediately be transferred to the National Housing Authority subject to the approval of the President of the Philippines or by the local government unit concerned, as the case may be, for proper disposition in accordance with this Act.

Sec. 9. *Priorities in the Acquisition of Land* – Lands for socialized housing shall be acquired in the following order:

    a.  Those owned by the Government or any of its subdivision, instrumentalities, or agencies, including government-owned or controlled corporations and their subsidiaries;

    b.  Alienable lands of the public domain;

    c.  Unregistered or abandoned and idle lands;

    d.  Those within the declared Areas for Priority Development, Zonal Improvement Program sites, and Slum Improvement and Resettlement Program sites which have not yet been acquired;

    e.  Bagong Lipunan Improvement or Sites and Services or BLISS sites which have not yet been acquired; and

    f.  Privately owned lands.

Where on-site development is found more practicable and advantageous to the beneficiaries, the priorities mentioned in this section shall not apply. The local government units shall give budgetary priority to on-site development of government lands.

Sec. 10 *Modes of Land Acquisition* - The modes of acquiring lands for the purposes of this Act shall include, among others, community mortgage, land swapping , land assembly or consolidation , land banking donation to the Government, joint-venture agreement, negotiated purchase and expropriation: Provided, however, That expropriation shall be resorted to only when other modes of acquisition have been exhausted. Provided, further, That where expropriations is resorted to, parcels of land owned by small property owners shall be exempted for purpose of this Act: Provided , finally, That abandoned property , as herein defined , shall be reverted and escheated to the State in a proceeding analogous to the procedures laid downs in Rule 91 of the Rules of Court.

For the purpose of socialized housing, government-owned and foreclosed properties shall be acquired by the local government units, or by the National Housing Authority primarily through negotiated purchase: Provided, That qualified beneficiaries who are actual occupants of the land shall be given the right of the first refusal.

Sec. 11. *Expropriations of Idle Lands* - All idle lands in urban and urbanizable areas, as defined and identified in accordance with this Act, shall be expropriated and shall form part of the public domain. These lands shall be disposed of or utilized by the Government for such purposes that conform with their land use plans. Expropriations proceedings shall be instituted if, after the lapse of one (1) year following receipt of notice of acquisition, the owner fails to introduce improvements as defined in Section 3(f) hereof, except in the case of *force majeure* and other fortuitous events. Exempted from this provision, however, are residential lands owned by small property or those the ownership of which is subject of a pending litigation.

Sec. 12. *Disposition of Lands for Socialized Housin*g – The National Housing Authority , with respect to lands belonging to the National Government ,and the local government units with respect to other lands within their respective localities, shall coordinate with each other to formulate and make available various alternative schemes for the disposition of lands to the beneficiaries of the Program. These schemes shall not be limited to those involving transfer of ownership in fee simple but shall include lease, with option to purchase, usufruct or such other variations as the local government units or the National Housing Authority may deem most expedient in carrying out the purpose of this Act.

Consistent with this provision, a scheme for public rental housing may be adopted.

Sec. 13 *Valuation of Lands for Socialized Housing* - Equitable land valuation guideline for socialized housing shall be set by the Department of Finance on the basis of the market value reflected in the zonal valuation, or in its absence, on the latest real property tax declaration.

For sites already occupied by qualified Program beneficiaries, the Department of Finance shall factor into the valuation the blighted status of the land as certified by the local government unit or the National Housing Authority.

Sec. 14.. *Limitations on the Disposition of Lands For Socialized Housing* - No land for socialized housing, including improvement or rights thereon, shall be sold, alienated , conveyed or encumbered or leased by any beneficiary of this Program except to qualified Program beneficiaries as determined by the government agency concerned.

Should the beneficiary unlawfully sell, transfer, or otherwise dispose of his lot or nay right thereon, the transaction shall be null and void. He shall also lose his right to the land, forfeit the total amortization paid thereon, and shall be barred from the benefits under this Act for a period of ten (10) years from the date of violation.

In the event the beneficiary unlawfully transfer before dies full ownership of the land is vested on him, transfer to his heirs shall take place only upon their assumption of his outstanding obligations. In case of failure by the heirs to assume such obligations, the land shall revert to the Government for disposition in accordance with this Act.

## ARTICLE V

### SOCIALIZED HOUSING

Sec. 15. *Policy* - Socialized housing, as defined in Section 3 hereon, shall be the primary strategy in providing shelter for the underprivileged and homeless. However, if the tenurial arrangement in a particular socialized housing program is in the nature of leasehold or usufruct, the same shall be transitory and the beneficiaries must be encouraged to become independent from the Program within a given period of time, to be determined by the implementing agency concerned.

Sec. 16. *Eligibility Criteria for Socialized Housing Program Beneficiaries* - To qualify for the socialized housing program, a beneficiary:

    a. Must be a Filipino;
    b. Must be an underprivileged and homeless citizen, as defined in Section 3 of this Act;
    c. Must not own any real property whether in the urban or rural areas; and
    d. Must not be a professional squatter or a member of squatting syndicates.

Sec. 17. *Registration of Socialized Housing Beneficiaries* – The Housing and Urban Development Coordinating Council, in coordination with the local government units, shall design a system for the registration of qualified Program beneficiaries in accordance with the Framework. The local government units, within one (1) year from the effectivity of this Act, shall identify and register all beneficiaries their respective localities.

Sec. 18. *Balanced Housing Development* - The Program shall include a system to be specified in the Framework plan whereby developers of proposed subdivision projects shall be required to develop an area for socialized housing equivalent to at least twenty percent (20%) of the total subdivision area or total subdivision project cost, at the option of the developer, within the same city or municipality , whenever feasible, and in accordance with the standards set by the Housing

and Land Use Regulatory Board and other existing laws. The balanced housing development as herein required may also be complied with by the developers concerned in any of the following manner:

    a.  Development of new settlement;

    a.  Slum upgrading or renewal of areas for priority development either through zonal improvement programs or slum improvement and resettlement programs;

    b.  Joint-venture projects with either the local government units or any of the housing agencies; or

    c.  Participation in the community mortgage program.

Sec. 19. *Incentive for the National Housing Authority* - The National Housing Authority, being the primary government agency in charge of providing housing for the underpriviledged and homeless, shall be exempted from the payment of all fees and charges of any kind, whether local or national, such as income and real taxes. All documents or contracts executed by and in favor of the National Housing Authority shall also be exempt from the payment of documentary stamp tax and registration fees, including fees required for the issuance of transfer certificates of titles.

Sec. 20 *Incentives for Private Sector Participating in Socialized Housing* - To encourage greater private sector participation in socialized housing and further reduce the cost of housing units for the benefit of the underprivileged and homeless, the following incentives shall be extended to the private sector:

    a.  Reduction and simplification of qualification and accreditation requirements for participating private developers;

        (b) Creation of one-stop offices in the different regions of the country for the processing, approval and issuances of clearances, permits and licenses: Provided, That clearances, permits and licenses shall be issued within ninety (90) days from the date of submission of all requirements by the participating private developers.

    a.  Simplification of financing procedures; and

    b.  Exemption from the payment of the following:

    1.  Project-related income taxes;

    2.  Capital gains tax on raw lands used for the project;

    3.  Value-added tax for the project contractor concerned;

    4.  Transfer tax for both raw and completed projects; and

    5.  Donor's tax for lands certified by the local government units to have been donated for socialized housing purposes.

: *Provided*, That upon application for exemption, a lien on the title of the land shall be annotated by the Register of Deeds: *Provided further*, That the socialized housing development plan has already been approved by the appropriate government agencies concerned: *Provided, finally*, That all the savings acquired by virtue of this provision shall accrue in favor of the beneficiaries

subject to the implementing guidelines to be issued by the Housing and Urban Development Coordinating Council.

Appropriate implementing guidelines shall be prepared by the Department of finance, in consultation with the Housing and Urban Development Coordinating Council, for the proper implementation of the tax exemption mentioned in this section within one (1) year after approval of this Act.

Property owners who voluntarily provide resettlement sites to illegal occupants of their lands shall be entitled to a tax credit equivalent to the actual non-recoverable expenses incurred in the resettlement, subject to the implementing guidelines jointly issued by the Housing and Urban Development Coordinating Council and the Department of Finance.

SEC. 21. *Basic Services.* – Socialized housing or resettlement areas shall be provided by the local government unit or the National housing Authority in cooperation with the private developers and concerned agencies with the following basic services and facilities.

    a.  Potable water;
    b.  Power and electricity and an adequate power distribution system;
    c.  Sewerage facilities and an efficient and adequate power distribution system; and
    d.  Access to primary roads and transportation facilities.

The provision of other basic services and facilities such as health, education, communications, security, recreation, relief and welfare shall be planned and shall be given priority for implementation by the local government unit and concerned agencies in cooperation with the private sector and the beneficiaries themselves.

The local government unit, in coordination with the concerned national agencies, shall ensure that these basic services are provided at the most cost-efficient rates, and shall set a mechanism to coordinate operationally the thrusts, objectives and activities of other government agencies concerned with providing basic services to housing projects.

SEC. 22. *Livelihood Component.* – To the extent feasible, socialized housing and resettlement projects shall be located near areas where employment opportunities are accessible. The government agencies dealing with the development of livelihood programs and grant of livelihood loans shall give priority to the beneficiaries of the Program.

SEC. 23. *Participation of Beneficiaries.* – The local government units, in coordination with the Presidential Commission for the Urban Poor and concerned government agencies, shall afford Program beneficiaries or their duly designated representatives an opportunity to be heard and to participate in the decision-making process over matters involving the protection and promotion their legitimate collective interests which shall include appropriate documentation and feedback mechanisms. They shall assist the Government in preventing the incursions of professional squatters and members of squatting syndicates into their communities.

In instances when the affected beneficiaries have failed to organize themselves or form an alliance within a reasonable period prior to the implementation of the program or projects affecting them, consultation between the implementing agency and the affected beneficiaries shall be conducted with the assistance of the affected beneficiaries shall be conducted with the assistance of the Presidential Commission for the Urban Poor and the concerned nongovernment organization.

Sec. 24 *Consultation with Private Sector.* – Opportunities for adequate consultation shall be accorded to the private sector involved in socialized housing project pursuant too this Act.

## ARTICLE VI

### AREAS FOR PRIORITY DEVELOPMENT, ZONAL IMPROVEMENT PROGRAM SITES AND SLUM IMPROVEMENT AND RESELLEMENT PROGRAM SITES

Sec. 25. *Benefits.* -In addition to the benefits provided under existing laws and other related issuances to occupants of areas for priority development, zonal improvement program sites, such occupants shall be entitled to priority in all government projects initiated pursuant to this Act. They shall also be entitled to the following support services:

    a.  Land surveys and titling at minimal cost;

    b.  Liberalized terms on credit facilities and housing loans and one hundred percent (100%) deductions from every homebuyer's gross income tax of all interest payments made on documented loans incurred for the construction or purchase of the homebuyer's house;

    c.  Exemption from the payment of documentary stamp tax, registration fees, and other fees for the issuance of transfer certificate of titles;

    d.  Basic services as provided for in Section 21 of this Act; and

    e.  Such other benefits that may arise from the implementation of this Act.

17

## ARTICLE VII

### URBAN RENEWAL AND RESETTLEMENT

SEC. 27. *Action Against Professional Squatters and Squatting Syndicates.* - The local government units, in cooperation with the Philippine National Police, the Presidential Commission for the Urban Poor (PCUP), and the PCUP- accredited urban poor organizations in the area , shall adopt measures to identify and effectively curtail the nefarious and illegal activities of professional squatters and squatting syndicates, as herein defined.

Any person or group identified as such shall be summarily evicted and their dwellings or structures demolished, and shall be disqualified to avail of the benefits of the program. A public official who tolerates or abets the commission of the abovementioned acts shall be dealt with in accordance with existing laws.

For purposes of this Act, professional squatters or members of squatting syndicates shall be imposed the penalty of six (6) years imprisonment or a fine of not less than Sixty thousand pesos ( P 60,000) but not more than One hundred thousand pesos ( P 100,000), or both, at the discretion of the court.

SEC 28. *Eviction and Demolition.* – Eviction or demolition as a practice shall be discouraged. Eviction or demolition, however, may be allowed under the following situations:

    a.  When persons or entities occupy danger areas such as esteros, railroad tracks, garbage dumps, riverbanks, shorelines, waterways, and other public places such as sidewalks, roads, parks, and playgrounds;

b. When government infrastructure projects with available funding are about to be implemented; or

c. When there is a court order for eviction and demolition.

In the execution of eviction or demolition orders involving underprivileged and homeless citizens, the following shall be mandatory;

1. Notice upon the affected persons or entities at least thirty (*30) days prior to the date of eviction or demolition;

2. Adequate consultations on the matter of resettlement with the duly designated representatives of the families to be resettled and the affected communities in the areas where they are to be relocated;

3. Presence of Local government officials or their representatives during eviction or demolitions;

4. Proper identification of all persons taking part in the demolition;

5. Execution of eviction or demolition only during regular office hours from Mondays to Fridays and during good weather, unless the affected families consent otherwise;

6. No use of heavy equipment for demolition except for structures that are permanent and other of concrete materials;

7. Proper uniforms for members of the Philippines National Police who shall occupy the first line of law enforcement and observe proper disturbance control procedures; and

8. Adequate relocation, whether temporary or permanent; provided, however, That in cases of eviction and demolition pursuant to a court order involving underprivileged and homeless citizens, relocation shall be undertaken by the local government unit concerned and the National Housing Authority with the assistance of other government agencies within forty-five (45) days from service of notice of final judgement by the court, after which period the said order shall be executed: provided, further, That should relocation not be possible within the said period, financial assistance in the amount equivalent to the prevailing minimum daily wage multiplied by sixty (60) days shall be extended to the affected families by the local government unit concerned.

The department of the Interior and Local Government and the Housing and Urban Development Coordinating Council shall jointly promulgate the necessary rules and regulations to carry out the above provision.

SEC 29. *Resettlement.* - Within two (2) years from the effectivity of this Act, the Local government units, in coordination with the National Housing Authority, shall implement the relocation and resettlement of persons living in danger areas such as esteros, railroad tracks, garbage dumps, riverbanks, shorelines, waterways, and in other public places such as sidewalks, roads, parks, and playgrounds. The local government unit, in coordination with the National Housing Authority, shall provide relocation or resettlement sites with basic services and facilities and access to employment and livelihood opportunities sufficient to meet the basic needs of the affected families.

SEC. 30. *Prohibition Against New Illegal Structures.* - It shall be unlawful for any person to construct any structure in areas mentioned in the preceding section.

After the effectivity of this Act, the barangay, municipal or city government units shall prevent the construction of any kind of illegal dwelling units or structures within their respective localities. The head of any local government unit concerned who allows, abets or otherwise tolerates the

construction of nay structure in violation of this section shall be liable to administrative sanction under existing laws and to penal sanctions provided for in this Act.


ARTICLE III

COMMUNITY MORTGAGE PROGRAM

Sec 31. *Definition.* – The Community Mortgage Program (CMP) is a mortgage financing program of the National Home Mortgage Finance Corporation which assists legally organized associations of underprivileged and homeless citizens to purchase and develop a tract of land under the concept of community ownership. The primary objective of the program is to assist residents of blighted or depressed areas to own the lots they occupy, or where they choose to relocate to, and eventually improve their neighborhood and homes to the extent of their affordability.

SEC. 32 *Incentives.* - To encourage its wider implementation, participants in the CMP shall be granted with the following privileges or incentives:

>     a.   Government-owned or controlled corporations and local government units, may dispose of their idle lands suitable for socialized housing under the CMP through negotiated sale at prices based on acquisition cost plus financial carrying costs.
>
>     a.   Properties sold under the CMP shall be exempted from the capital gains tax; and

© Beneficiaries under the CMP shall not be evicted nor dispossessed of their lands or improvements unless they have incurred arrearages in payments of amortization for three (3) months.

SEC. 33. *Organization of Beneficiaries.* - Beneficiaries of the Program shall be responsible for their organization into associations to manage their subdivisions or places of residence, to secure housing loans under existing Community Mortgage Program and such other projects beneficial to them. Subject to such rules and regulations to be promulgated by the National Home Mortgage Finance Corporation, associations organized pursuant to this Act may collectively acquire and own lands covered by this Program. Where the beneficiaries fail to form an association by and among themselves, the National Home Mortgage Finance Corporation shall initiate the organization of the same in coordination with the Presidential Commission for the Urban Poor and the local government units concerned. No person who is not a *bona fide* resident of the area shall be a member or officer of such association.


ARTICLE IX

RELATED STRATEGIES

SEC. 34. *Promotion of Indigenous Housing Materials and Technologies.* - The local government units, in cooperation with the National Housing Authority, Technology and Livelihood Resource Center, and other concerned agencies, shall promote the production and use of indigenous, alternative, and low-cost construction materials and technologies for socialized housing.

SEC. 35. *Transport System.* - The local government units, in coordination with the Departments of Transportation and Communications, Budget and Management, Trade and Industry, Finance, and Public Works and Highways, the Home Insurance Guaranty Corporation, and other concerned government agencies, shall device a set of mechanisms including incentives to the private sector so that a viable transport system shall evolve and develop in the urban areas. It shall also formulate standards designed to attain these objectives:

    a.  Smooth flow of traffic;
    b.  Safety and convenience of travel;
    c.  Minimum use of land space;
    d.  Minimum damage to the physical environment; and
    e.  Adequate and efficient transport service to the people and goods at minimum cost.

SEC. 36. *Ecological Balance.* - The local government units shall coordinate with the Department of Environment and Natural Resources in taking measures that will plan and regulate urban activities for the conservation and protection of vital, unique and sensitive ecosystems, scenic landscapes, cultural sites and other similar resource areas.

To make the implementation of this function more effective, the active participation of the citizenry in environmental rehabilitation and in decision-making process shall be promoted and encouraged. The local government units shall recommend to the Environmental and Management Bureau the immediate closure of factories, mines and transport companies which are found to be causing massive pollution.

SEC. 37. *Population Movements.* - The local government units shall set up an effective mechanism, together with the appropriate agencies like the Population Commission, the National Economic and Development Authority and the National Statistics Office, to monitor trends in the movements of population from rural to urban, from urban to urban, and urban to rural areas. They shall identify measures by which such movements can be influenced to achieve balance between urban capabilities and population, to direct appropriate segments of the population into areas where they can have access to opportunities to improve their lives and to contribute to national growth and recommend proposed legislation to Congress, if necessary.

The population Commission, the National Economic and Development Authority, and the National Statistics Office shall likewise provide advanced planning information to national and local government planners on population projections and the consequent levels of services needed in particular urban and urbanizable areas. This service will include early-warning systems on expected dysfunctions in a particular urban area due to population increases, decreases, or age structure changes.

SEC. 38. *Urban-rural Interdependence.* –To minimize rural to urban migration and pursue urban decentralization, the local government units shall coordinate with the National Economic and Development Authority and other government agencies in the formulation of national development programs that will stimulate economic growth and promote socioeconomic development in the countryside.

ARTICLE X

PROGRAM IMPLEMENTATION

SEC. 39. *Role of Local Government Units.* - The local government units shall be charged with the implementation of this Act in their respective localities, in coordination with the Housing and

Urban Development Coordinating Council, the national housing agencies, the Presidential Commission for the Urban Poor, the private sector and other non-government organizations.

They shall prepare a comprehensive land use plan for their respective localities in accordance with the provisions of this Act.

SEC. 40. *Role of Government Housing Agencies.* - In addition to their respective existing powers and functions, and those provided for in this act, the hereunder mentioned housing agencies shall perform the following:

a. The Housing and Urban development Coordinating Council shall, through the key housing agencies, provide local government units with necessary support such as:

1. Formulation of standards and guidelines as well as providing technical support in the preparation of town and land use plans;
2. In accordance with the National Economic and development Authority and the national Statistics Office, provide data and information for forward-planning by the local government units in their areas, particularly on projections as to the population and development trends in their localities and the corresponding investment programs needed to provide appropriate types and levels of infrastructure, utilities, services and land use patterns; and
3. Assistance in obtaining funds and other resources needed in the urban development and housing programs in their areas of responsibility.

a. The National Housing Authority, upon request of local government units, shall provide technical and other forms of assistance in the implementation of their respective urban development and housing programs with the objective of augmenting and enhancing local government capabilities in the provision of housing benefits to their constituents;
b. The National Home Mortgage Finance Corporation shall administer the Community Mortgage Program under this Act and promulgate rules and regulations necessary to carry out the provisions of this Act; and
c. The Home Insurance Guaranty Corporation shall design and appropriate guarantee scheme to encourage financial institutions to go into direct lending for housing.

SEC. 41. *Annual report.* - The Housing and Urban Development Coordinating Council and the local government units shall submit a detailed annual report with respect to the implementation of this Act to the President and the Congress of the Republic of the Philippines.

## ARTICLE XI

## FUNDING

Sec. 42, Funding. – Funds for the urban development and housing program shall come from the following sources:

a.  A minimum of fifty percent (50%) from the annual net income of the Public Estates Authority, to be used by the National Housing Authority to carry out its programs of land acquisition for resettlement purposes under this Act;

b.  Proceeds from the disposition of ill-gotten wealth, not otherwise previously set aside for any other purpose, shall be applied to the implementation of this Act and shall be administered by the National Home Finance Corporation;

c.  Loans, grants, bequests and donations, whether from local or foreign sources;

d.  Flotation of bonds, subject to the guidelines to be set by the Monetary Board;

e.  Proceeds from the social housing tax and, subject to the concurrence of the local government units concerned, idle lands tax as provided in Section 236 of the Local Government Code of 1991 and other existing laws;

f.  Proceeds from the sale or disposition of alienable public lands in urban areas; and

g.  Domestic and foreign investment or financing through appropriate arrangements like the build-operate-and-transfer scheme.

Sec. 43. Socialized Housing Tax. – Consistent with the constitutional principle that the ownership and enjoyment of property bear a social function and to raise funds for the Program, all local government units are hereby authorized to impose an additional one-half percent (0.5%) tax on the assessed value of all lands in urban areas in excess of Fifty thousand pesos (P 50,000).

## ARTICLE XII

## TRANSITORY PROVISIONS

SEC. 44. Moratorium on Eviction and Demolition. – There shall be a moratorium on the eviction of all program beneficiaries and on the demolition of their houses or dwelling units for a period of three (3) years from the effectivity of this Act: Provided, That the moratorium shall not apply to those persons who have constructed their structures after the effectivity of this Act and for cases enumerated in Section 28 hereof.

## ARTICLE XIII

## COMMON PROVISIONS

Sec. 45. Penalty Clause. – Any person who violates any provision of this Act shall be imposed the penalty of not more than six (6) years of imprisonment or a find of not less than Five thousand pesos (P 5,000) but not more than One hundred thousand pesos (P 100,000), or both, at the discretion of the court: Provided, That, if the offender is a corporation, partnership, association or

other juridical entity, the penalty shall be imposed on the officer or officers of said corporation, partnership, association or juridical entity who caused the violation.

SEC. 46. Appropriations. – The amount necessary to carry out the purposes of this Act shall be included in the annual budget of implementing agencies in the General Appropriations Act of the year following its enactment into law and every year thereafter.

SEC. 47. Separability Clause. – If for any reasons, any provision of this Act is declared invalid or unconstitutional, the remaining provisions not affected thereby shall continue to be in full force and effect.

*SEC. 48. Repealing Clause. – All laws, decrees, executive orders, proclamations, rules and regulations, and other issuance, or parts thereof which are inconsistent with the provisions of this Act, are hereby repealed or modified accordingly.*

SEC. 49. Effectivity Clause. – This Act shall take effect upon its publication in at least two (2) national newspapers of general circulation.


Approved,


NEPTALI A. GONZALES RAMON V. MITRA
*President of the Senate Speaker of the House of Representatives*


This act which is a consolidation of House Bill No. 34310 and Senate Bill No. 234 was finally passed by the House of Representatives and the Senate on February 3, 1992.

ANACLETO D. BADOY JR. CAMILO L. SABIO
*Secretary of the Senate Secretary General House of Representatives*

Approved:


CORAZON C. AQUINO

President of the Philippines