IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

ANGELA DENISE NAILS,　　　　*
　　　　　　　　　　　　　　　*
　　　PLAINTIFF,　　　　　　　*　　　1:06-CV-00737.WKW
　　　　　　　　　　　　　　　*
vs.　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　*
DOTHAN RESCUE MISSION,　　　 *
　　　　　　　　　　　　　　　*
　　　DEFENDANT.　　　　　　　*

## BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

THE DEFENDANT, the Dothan Rescue Mission, (hereinafter "the Mission"), moves the court to enter a full, final and appealable summary judgment in its favor as to all counts or portions of the Plaintiff's Complaint and Amended Complaint. In the alternative, Defendant moves the Court to enter one or more partial summary judgments to it and against the Plaintiff as the law and evidence entitle it. In support, the Mission submits this Brief in Support, together with Statements of Undisputed Material Facts and evidentiary materials.

## NATURE OF THE CASE; THE ALLEGATIONS

This matter is a lawsuit alleging discrimination under Title IV of the Stewart B. McKinney Homeless Assistance Act, Section 28 of the "Urban Development & Housing Act," the Americans With Disabilities Act, and the First Amendment. (Amended Complaint, Paragraphs 1-6).  Nails alleges that in May of 2003 the Mission denied her access to the programs it offers. (Nails Depo. 41 lines 11-15, 83 lines 9-12).  Also, she alleges that in June 2005 the Mission gave her meal tickets and then refused to let her use all of them, presumably in violation of one the laws mentioned above.

Nails claims also that this action is governed by CRR 5415, and Civil Rule Procedure Section 60 concerning the ejectment of homeless individuals.  (Complaint Paragraph 1). The Defendant is unable to identify the precise rules or laws to which Nails refers.


## THE MISSION'S POSITION

The Mission is entitled to summary judgment.  The statute of limitations would bar claims based on the alleged May 2003 incident.  The activities of which Nails complains in June of 2005 do not give rise to a valid cause of action.

Page 2 of 50

As to both of the alleged incidents, Nails lacks
substantial evidence showing discrimination based on
disability and substantial evidence that the Mission
receives of federal, state, or local government funding.
Further, most, if not all of Nails' Complaint and Amended
Complaint is based upon a law of the Republic of the
Philippines.  This law would have no territorial application
here and would not support federal question jurisdiction.
The Mission is also entitled to summary judgment because
each time Nails sought help or assistance from the Mission,
she signed a registration card releasing the Mission of all
liability for any injuries, losses or damages sustained
through contact with the Mission.

The Mission did inform Nails that she could no longer
stay at in its facility and that she could not receive its
services.  This decision was made after Nails broke rules at
the Mission, harassed employees, and did not cooperate with
the staff.  The Mission provided Nails with assistance on
numerous occasions from 1995 until 2003. The Mission's
decision to barr Nails had nothing to do with her alleged
disability.

Also, the Mission is a religious organization that is

funded by private sources.  It does not receive any federal, state, or local government funds or grants. Nails lacks any evidence to establish that the Mission does receive public monies.

 Despite the fact that Nails claims the McKinney Act applies to the Mission, her testimony shows she has no information to support this claim.  Nails testifies:

 "Q.  Ms. Nails, I do apologize to you.  I want to make certain that I'm clear on a couple of things.  Do you have any evidence or information that The Dothan Rescue Mission actually receives block grants from a government entity?

 A.  No."

 (Nails Dep. 104 Lines 11-17).

 The discussion above shows that none of the authorities that Nails bases her Complaint and Amended Complaint upon apply to The Mission.

## SUMMARY JUDGMENT STANDARD

 Rule 56(c), Fed. R. Civ. P. reads in pertinent part:

    The judgment sought shall be rendered
 forthwith if the pleadings, depositions, answers

to interrogatories, and admissions on file,
together with the affidavits, if any, show that
there is no genuine issue as to any material fact
and that the moving party is entitled to judgment
as a matter of law.

In pertinent part, Rule 56(e), Fed. R. Civ. P. reads:

When a motion for summary judgment is made and
supported as provided for in this rule, an adverse
party may not rest upon the mere allegations or
denials of the adverse party's pleading, but the
adverse party's response, by affidavits or as
otherwise provided in this rule, must set forth
specific facts showing that there is a genuine
issue for trial.  If the adverse party does not so
respond, summary judgment, if appropriate, shall
be entered against the adverse party.

In *Celotex Corporation v. Catrett*, 477 U.S. 317 (1986),

the United States Supreme Court states clearly the movant's

burden on motion for summary judgment.  In pertinent part,

the Court states:

Of course, a party seeking summary judgment
always bears the initial responsibility of
informing the district court of the basis for its
motion, and [of] identifying those portions of
'the pleadings, depositions, answers to
interrogatories, and admissions on file, together
with the affidavits, if any,' which it believes
demonstrate the absence of a genuine issue of
material fact.

* * *

[T]he burden on the moving party may be
discharged by 'showing' -- that is, pointing out
to the district court -- that there is an absence
of evidence to support the nonmoving party's case.

*Celotex Corporation v. Catrett*, 477 U.S. 317, 323, 325

(1986).

Moreover, in *Celotex*, the Court states clearly that a

nonmovant must establish each element of her case (at least

those elements upon which she bears the burden of

establishing at trial) by sufficient evidence in order to

withstand a motion for summary judgment.    In pertinent part,

the Court states:

> In our view, the plain language of Rule 56(c)
> mandates the entry of summary judgment, after
> adequate time for discovery and upon motion,
> against a party who fails to make a showing
> sufficient to establish the existence of an
> element essential to that party's case, and on
> which that party will bear the burden of proof at
> trial.    In such a situation, there can be "no
> genuine issue of material fact," since a complete
> failure of proof concerning an essential element
> of the nonmoving party's case necessarily renders
> all other facts immaterial.    The moving party is
> "entitled to a judgment as a matter of law"
> because the nonmoving party has failed to make a
> sufficient showing on an essential element of her
> case with respect to which she has the burden of
> proof.

*Celotex*, 477 U.S. at 322-323.

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242

(1986), the United States Supreme Court clearly establishes

that a nonmovant must support each element of her case (upon

which she will bear the burden of proof at trial) by that

quantum and quality of evidence required for success at

trial.  In pertinent part, the Court states:

> As Adickes, supra, [v. S.H. Kress & Co., 398
> U.S. 144 (1970)], and Cities Service, supra,
> [First National Bank of Arizona v. Cities Service
> Co., 391 U.S. 253 (1968)], indicate, there is no
> issue for trial unless there is sufficient
> evidence favoring the nonmoving party for a jury
> to return a verdict for that party.  If the
> evidence is merely colorable, or is not
> significantly probative, summary judgment may be
> granted.

> As the Court long ago said in Improvement Co.
> v. Munson, 14 Wall. 442, 448, 20 L.Ed. 867 (1872),
> and has several times repeated:

>> "Nor are judges any longer required to
>> submit a question to a jury merely because some
>> evidence has been introduced by the party having
>> the burden of proof, unless the evidence be of
>> such a character that it would warrant the jury in
>> finding a verdict in favor of that party.  * * *
>> [B]efore the evidence is left to the jury, there
>> is a preliminary question for the judge, not
>> whether there is literally no evidence, but
>> whether there is any upon which a jury could
>> properly proceed to find a verdict for the party
>> producing it, upon whom the onus of proof is
>> imposed."

> [W]e are convinced that the inquiry involved
> in a ruling on a motion for summary judgment or
> for a directed verdict necessarily implicates the
> substantive evidentiary standard of proof that
> would apply at the trial on the merits.  * * *
> The judge's inquiry, therefore, unavoidably asks
> whether reasonable jurors could find by a
> preponderance of the evidence that the plaintiff
> is entitled to a verdict -- "whether there is
> [evidence] upon which a jury can properly proceed
> to find a verdict for the party producing it, upon

> whom the onus of proof is imposed." Munson,
> supra, 14 Wall., at 448.

Liberty Lobby, 477 U.S. at 249-50, 251, 252 (Citations omitted; emphasis supplied); see also, Rollins v. Techsouth, Inc., 833 F.2d 1525, 1527-28 (11th Cir. 1987), Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988), Earley v. Champion International Corp., 907 F.2d 1077, 1080-81 (11th Cir. 1990).

To succeed, then, against the Mission on this its properly supported motion for summary judgment, Nails must establish each disputed element of her case by a preponderance of the evidence. A preponderance of the evidence has been defined as "as evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it;..." *Black's Law Dictionary* 1064 (5th ed. 1979).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Nails has attended numerous colleges and universities and only lacks approximately 25 hours of college credit to complete her Bachelor's degree in business

management.    (Nails Depo. 31 Lines 13-22).

2.    Nails was awarded Social Security disability with Medicare and Medicaid in November of 2003.  (Nails Depo. 35 Lines 13-15).  Nails was awarded disability because of lower back pain, pain in both knees, and a stye in her left foot. (Nails Depo. 35 Lines 16-21).

3.    After being awarded social security disability in 2003, Nails continued to operate her own cleaning service and work in a warehouse moving boxes of automobile parts from one shelving area to another.  (Nails Depo. 32 Line 1 through 35 Line 11).

4.    After a trial stay at The Mission in May of 2003, Nails was asked to leave because she was not following the rules at The Mission.  (Nails Depo. 42 Line 1 through 43 Line 2).  The trial period in May of 2003 was after Nails had already been barred for life for breaking rules at The Mission.  Nails testified:

"Q.  So, then, the trial period, the three-day period that we've been talking about in May of 2003 was after you're barred for life and they're giving you another chance?

A.    That's correct, yes."

(Nails Depo. 91 Line 22 through 92 Line 1).

5.    The incident in June of 2005 concerns Nails trying to receive meal tickets allowing her to eat in the Mission's cafeteria.  (Nails Depo. 43 Lines 10-19).  Nails was not trying to live as a resident at The Mission in June of 2005. (Nails Depo. 43 Lines 15-17).  Nails' testimony shows that the entire 2005 incident concerned meal tickets:

"Q.  Now, let's talk about the June of 2005 incident just a little bit.  Let me make sure I've got all of it, an understanding of it.  Okay?  The whole thing in June of 2005 had to do with meal tickets?

A.    Uh-huh.

Q.    Correct?

A.    Yes.

Q.    It had nothing to do with you actually residing at the mission?

A.    No."

(Nails Depo. 92 Lines 2-12).

6.    Nail's testimony shows that she has no evidence or information to support that her disability played any role in the May of 2003 or June of 2005 incidents.  Nails testifies:

"Q.  Let's get back to May of 2003.  Do you have any evidence or information to support a claim that you being asked to leave after this trial period in May of 2003, had something to do with a physical disability that you had?

A.  No.

Q.  Do you have any evidence or information that might support a position that your meal tickets being taken away from you in June of 2005, had something to do with a physical disability that you had?

A.  No."

(Nails Depo. 92 Line 24 through 93 Line 10).

7.  Nails has no documents of any kind to support her allegations in this case.  (Nails Depo. 47 Lines 3-5).

8.  Nails does not have any information or proof that The Dothan Rescue Mission is not a religious organization. (Nails Depo. 53 Lines 11-13). During the times she stayed at The Mission, Nails was asked to attend a religious service in the evenings.  (Nails Depo. 53 Lines 14-19).  Nails' testimony shows that she knew if a person stayed at The Mission they were required to attend religious services:

"Q. So, as you sit here today, under oath, you've been sworn to tell the truth by this lady right over here, do you

have any evidence or information to tell me about today,

that supports the position you're taken, that The Dothan

Rescue Mission is not a religious organization?

     A.   I don't have any information or proof for you

today that The Dothan Rescue is not a religious

organization.

     Q.   When you stayed at The Dothan Rescue Mission, were

you aware or were you made to go to religious services?

     A.   Yes.  Was made, asked, told, that everyone would

have to go to a service in the evening.

     Q.   So, Was it your understanding, when you stayed at

The Dothan Rescue Mission, that if you stayed at The Mission

you had to attend religious services?

     A.   Yes.

     Q.   It was a requirement, was it not?

     A.   Yes.

(Nails Depo. 53 Line 4 through 54 Line 1).

  Nails understood that if a person stayed at The Mission

they were required to attend religious services." (Nails

Depo. 53 Line 20 through 54 Line 1).  In fact, guests at The

Mission are required to attend religious services every

night they stay at The Mission.  (Affidavit of Brad Hardy,

Page 12 of 50

Affidavit of Anna Culbreth).

9.   Nails has no information or proof of any kind that
The Mission receives any type of federal funding.  Nails
actually admits that she has received information showing
that The Mission does not receive grants from the federal
government.  (Nails Depo. 55 Line 12 through 56 Line 14).

Nails testified that when researching whether or not
The Mission received government grants she learned:

"Q.  And what if anything, did you learn?

A.   If they were getting any types of grants from the
state.

Q.   And what, if anything, did you learn related to
that?

A.   That they had filed for a grant, but they did not
submit all of the paperwork, so the grant was -  -
information was not completed, and they had not received the
grant."

(Nails Depo. 55 Lines 4-15).

Nails also testified:

"Q.  But, the information you received through this
telephone call was that The Dothan Rescue Mission did not
receive a grant?

A.    From that particular agency, that's correct.

Q.    The agency that we're talking about, was it a government agency or a private agency?

A.    I think that it was the federal government.

Q.    But, again, the information that you received through this telephone call is that The Dothan Rescue Mission did not get that grant?

A.    Right.   Matter of fact it was through the Bush campaign for the homeless shelters.   I went on the internet and found that.

(Nails Depo. 55 Line 22 through 56 Line 14).

Q.    As you sit here today under oath, you can't tell me that The Dothan Rescue Mission is receiving a federal grant, can you?

A.    No."

(Nails Depo. 60 Lines 19-22).

10.  The Dothan Rescue Mission in fact does not receive any federal, state or local government funds of any kind. (Affidavit of Brad Hardy, Affidavit of Anna Culbreth, Affidavit of Angela Palmer).   The Mission is funded solely by private donations from churches, individuals and businesses.   (Affidavit of Brad Hardy).

11. After reviewing the Articles of Incorporation for The Dothan Rescue Mission, Nails testifies that The Mission is a religious organization:

"Q. And what is the title of Defendant's Exhibit 7?

A. Articles of Incorporation of The Dothan Rescue Mission, a non-profit corporation.

Q. And would you please read for me Section A of the objects and purposes of the corporation, that's contained there on the first page of Defendant's Exhibit 7?

A. Objects and purpose of corporation. The objects and purpose of this corporation should be: A. To serve as an arm of the church given to the soul-savings ministry among the rejected and neglected people being found in need of assistance, including, but without limitation those in need of food, clothing, housing and other material necessities and special - - specifically in need of knowing the Good News of the Gospel of Jesus Christ.

Q. And would you agree with me, ma'am, that according to this document, Defendant's Exhibit 7, one of the objects or purposes of The Dothan Rescue Mission is to serve as an arm of the church? That's what it says, doesn't it?

A. That's what the document says, yes.

Q.   Yes ma'am.  And is not an arm of the church a religious organization?

A.   Yes."

(Nails Depo. 57 Line 7 through 58 Line 8).

12.  The Mission is a private organization and is not an arm of the State of Alabama, the City of Dothan, or the federal government.  (Affidavit of Brad Hardy, Affidavit of Angela Palmer).  Nails testified that she did not have any information showing The Mission was a public organization:

"Q. Do you have any evidence or information, to tell me about, today, while you're under oath, that would support a position that The Dothan Rescue Mission is a public organization, an arm of the State of Alabama, an arm of the City of Dothan, an arm of the federal government?

A.   I don't have any information today, no."

(Nails, Depo. 59 Lines 9-17).

13.  The Dothan Rescue Mission does not receive any funding from the State of Alabama.  (Affidavit of Brad Hardy).  In her deposition Nails testified the following:

"Q. As you sit here today under oath, ma'am, can you tell me that The Dothan Rescue Mission is receiving a grant from the State of Alabama?

Page 16 of 50

A.   No. "

(Nails Depo. 60 Line 23 through 61 Line 2).

14.  The Mission does not receive any grant money or funding from the City of Dothan.  (Affidavit of Brad Hardy, Affidavit of Angela Palmer).  The Mission does receive donations through Project Care.  As Dothan's City Finance Director, Angela Palmer, stated in her affidavit: "Project Care is a program whereby Dothan Utility customers may choose to donate funds to help less fortunate citizens with their utility bills.  The money donated by the citizens is in addition to the amount they owe Dothan Utilities.  Dothan Utilities simply gathers the donated money and passes it along to The Dothan Rescue Mission.   No matching funds from the City of Dothan are given to the Mission.  The City does not donate any money from any source of revenue to Project Care.

All money given to The Dothan Rescue Mission through Project Care is by private donations from Dothan utility customers.  The Dothan Rescue Mission has complete control over how the donated funds are disbursed.  Basically the utility office turns over any donated money, and then The Rescue Mission determines the criteria for applicants and

who is eligible to receive these funds.  The Rescue Mission is in charge of distributing these funds.  The City of Dothan nor Dothan Utilities is involved in any way with the distributing of these funds."

Further, no Dothan utility customer is required to donate funds to Project Care and no tax dollars are used to fund this program.  (Affidavit of Brad Hardy).

15.  The Dothan Rescue Mission is not an entity or office of the City of Dothan.  (Affidavit of Angela Palmer, Affidavit of Brad Hardy).  *********NAILS ON PAGE 65 SAYS SOMEONE TOLD HER THE CITY OF DOTHAN RECEIVES GRANT MONEY*****

16.  Nails relies upon Section 28 of the Urban Development and Housing Act as a basis for her claims against The Mission.  (Amended Complaint).  Nails' testimony describes how she found The Urban Development and Housing Act and identifies Defendant's Exhibit 21 as a copy of that act:

"Q.  My question to you, ma'am, is, where do you find the Section 28?

A.  Go to Section 28 UDHA.  Put that in your internet part, it will pull this - - it will pull the section up.

Q.   And I will represent to you that my associate, Mr.
Moody, did precisely that.

A.   Uh-huh.

Q.   And what we came up with is marked as Defendant's
Exhibit 21.

A.   Uh-huh.

Q.   Would you acknowledge that Section One of the
document I have marked as Defendant's Exhibit 21 says, "This
Act shall be known as The Urban Development and Housing Act
of 1992?

A. That's what it says.  That section one.  Yes.
That's what it says.

Q.   So that would be the UDHA?

A.   Yes."

(Nails Depo. 73 Line 24 through 74 Line 17).

Defendant's Exhibit 21 on its face clearly identifies
the Urban Development and Housing Act of 1992 as Republic
Act No. 7279 of the Republic of the Philippines Congress
from their 5th regular session begun and held in Metro
Manila, on Monday, the 22nd day of July, 1991.

During her deposition Nails testifies that Defendant's
Exhibit 21 is the law she is referring to in her Amended

Complaint:

"Q. So, then, what I've marked as Defendant's Exhibit 21 is what you're referring to in your Amended Complaint?

A.    Correct.

(Nails Depo. 76 Lines 10-13).

17.    Every time Nails applied for assistance from The Mission, she signed a registration card containing a release.  In Nail's deposition, she testified that she signed Defendant's Exhibit 12. (A registration card from November of 2002).  The testimony was as follows:

"Q. Would you agree that it's dated November of 2002?

A.    I can't make out the exact date.

Q.    The highlighted portion right there?

A.    Yes.

Q.    Are you able to read the words above your signature on Defendant's Exhibit 12?

A.    It says, "I relieve the Dothan Rescue Mission, Inc., of all liability for any and all losses, injuries, damages, whatever, whether though (sic) intent, negligence, accident, whatever, and whatever situation (sic) - - sustained."  I can't get - - make that last word out.

Q.    But there is writing that's above your signature

on that document, Defendant's 12?

A.   Yes.

Q.   And you were able to read most of it?  Would you agree with that?

A.   Yes."

(Nails Depo. 97 Lines 9 through 23).

18.   The Mission does not receive any funding from any block grants from any government entity.  (Affidavit of Brad Hardy, Affidavit of Angela Palmer).  Nails herself testifies:

"Q.  Ms. Nails, I do apologize to you.  I want to make certain that I'm clear on a couple of things.  Do you have any evidence or information that The Dothan Rescue Mission actually receives block grants from a government entity?

A.   No."

(Nails Depo. 104 Lines 11-17).

19.   Nails filed this lawsuit on August 16, 2006. (Complaint).

20.   Nails refused to follow many of The Mission's rules during her numerous stays. (Affidavit of Anna Culbreth).  On numerous occasions Nails called Anna Culbreth and her husband, Harry Culbreth, at home complaining about

The Mission and the requirements of The Mission's programs. (Affidavit of Anna Culbreth).

Mr. Culbreth and Ms. Culbreth had discussions with the women's lodge manager concerning Nails conduct and her refusal to follow rules while staying at The Mission. (Affidavit of Anna Culbreth).  A combination of the harassing phone calls and the discussions with the women's lodge manager lead the Culbreths to barr Nails from The Mission while they were acting as the executive director and assistant executive director of The Mission.  (Affidavit of Anna Culbreth).

21.  After Nails was barred from The Mission, The Mission continued to occasionally provide her with meal cards and other assistance, but they did not allow her to reside in The Mission.  (Affidavit of Anna Culbreth, Affidavit of Brad Hardy).

22. Defendant's exhibits 1 through 20 are true and correct copies of documents used by The Mission in the ordinary course of business. (Affidavit of Brad Hardy).

**ARGUMENT**

**A.    The Urban Development and Housing Act does
       not apply to The Mission.**

Nails claims that she is entitled to a Judgment against
The Mission because it did not provide her with the
mandatory notices and protections of Section 28 of the Urban
Development and Housing Act (UDHA). (Amended Complaint,
paragraphs 2, 3). Nails' Amended Complaint states:

"Section 28 UDHA states homeless shelters cannot ask
someone to leave the Homeless Shelter for any reason.
Section 28 UDHA in the execution of eviction or demolition
involving underprivileged and homeless citizens, the
following are mandatory:

    30-day notice
    Adequate consultation
    only during office hours and good weather
    presence of LGC
    all those participating in demolitions must have proper
    ID

    UDHA-Urban Development and Housing Act

    Section 28 UDHA comes from the following: The Social
Policy thus, even with American law reform innovations
supplanted into the notice and relocation benefits under
section 28 of UDHA.

    Each count of the Defendant is that the defendant did

not allow the plaintiff to resided at the Dothan Rescue

Mission and failed to follow the guidelines of Section 28

UDHA (Urban Development and Housing Act)."  (Amended

Complaint Paragraphs 2, 3).

During her deposition, Nails identified Defendant's

Exhibit 21 as a true and correct copy of the UDHA.  During

questioning about the UDHA Nails stated:

"Q.  So, then, what I've marked as Defendant's Exhibit

21 is what you're referring to in your Amended Complaint?

A.   Correct."

(Nail's Depo. 76 Lines 10-13).

Defendant's Exhibit 21 is clearly labeled on its face

as a law of the Republic of the Philippines.  This law does

not apply to The Mission, and even if it did, this Court

would lack jurisdiction to hear claims concerning the UDHA.

28 U.S.C.A. Section 1331 grants federal district courts with

federal question jurisdiction.  Section 1331 provides, "The

district courts shall have original jurisdiction of all

civil actions arising under the Constitution, laws, or

treaties of the United States."   The UDHA is not a law of

the United States, not a provision of a treaty to which the

United States is a party, and is in no way related to the

Constitution.  For these reasons the UDHA does not apply to
The Mission.

   **B.    The Stewart B. McKinney Homeless Assistance Act
          does not apply to The Mission.**

   Nails contends that the Stewart B. McKinney Homeless
Assistance Act relates to The Mission through the UDHA.
These claims are not true for two reasons.

   First,  In her deposition Nails testifies:

   "Q.  I want to make sure I am understanding you.  The
Stewart B. McKinney Homeless Act applies to The Dothan
Rescue Mission somehow through this section 28, UDHA and all
these requirements that are contained in it?

   A.   Uh-huh.  Yes.

   Q.   All right.  And you agree with me that we've got a
copy of the UDHA over here as Defendant's Exhibit 21?

   A.   Yes."

   (Nails Depo. 80 Lines 21 through 81 Line 5).

   Nails cites to the Stewart B. McKinney Homeless
Assistance Act in her Amended Complaint.  (Paragraphs 1, 4).
Specifically, Nails claims that Title IV of the McKinney Act
requires The Mission to follow guidelines established by
Congress.  (Amended Complaint, Paragraph 1).

   Title IV of the McKinney Act concerns housing

assistance, the requirement of a comprehensive homeless assistance plan for those receiving funds through the Act, and the emergency shelter grants program that is overseen by the Secretary of Housing and Urban Development. *42 U.S.C. Section 11361.* Metropolitan cities, urban counties, and states may request funds through the McKinney Act to accomplish the goals of their comprehensive homeless assistance plans. These entities can also use funds they have received through Title IV to fund emergency shelters. *42 U.S.C. Section 11371. 42 U.S.C. Section 11373 (c)* describes the procedure for private organizations to receive funds under the McKinney Act. In relevant part *Section 11373 (c)* states:

"Distribution to nonprofit organizations. - - Any local government receiving assistance under this subtitle **may** distribute all or a portion of such assistance to private nonprofit organizations providing assistance to homeless individuals." (emphasis added)

No local government entity distributes any funds from any source to The Mission. (Affidavit of Angela Palmer, Affidavit of Brad Hardy, Nails Depo. 60 Lines 19-22). This clearly shows The Mission received no funding

through the McKinney Act therefore the Act does not apply.

In her deposition, Nails admits she has no information
showing The Mission receives federal funding of any kind:

"Q. As you set here today under oath, you can't tell
me that The Dothan Rescue Mission is receiving a federal
grant, can you?

A.   No."

(Nails Depo. 60 Lines 19-22).

The Second reason Nails cannot claim the protections of
the McKinney Act is that she is not homeless or a homeless
individual as those terms are defined in the Act. 42 U.S.C.
11302 (section 103 of the McKinney Act) provides:

"(a)IN GENERAL. --  For purposes of this Act, the term
"homeless" or "homeless individual" includes --

(1) an individual who lacks a fixed, regular, and adequate
nighttime resident; and

(2) an individual who has a primary nighttime residence that
is - -

(A) a supervised publicly or privately operated shelter
designed to provide temporary living accommodations
(including welfare hotels, congregate shelters, and

transitional housing for the mentally ill);

(B) an institution that provides a temporary residence for

individuals intended to be institutionalized; or

(C) a public or private place not designed for or ordinarily

used as, a regular sleeping accommodation for human beings."

The evidence in this case shows that Nails was never

homeless during the 2003 or 2005 incidents.  Defendant's

Exhibit 15 is a copy of a rental agreement between Angela

Nails and her landlord, Billy Hicks.   This rental agreement

is part of Nails' file at The Mission from when she

registered for assistance in December of 2002.  Defendant's

Exhibit 15 clearly shows a 12 month lease beginning on the

2nd day of December, 2002 with a rent of $250 per month.

This lease would have expired on December 2, 2003.

Defendant's Exhibit 13 is a financial assistance application

for The Dothan Rescue Mission completed by Angela Nails on

December 6, 2002.  This is four days after Nails signed the

lease agreement, Defendant's Exhibit 15.  Defendant's

Exhibit 13 shows that Nails is seeking assistance for her

apartment rent.  This document also shows that on December

11, 2002, The Mission paid $50 to Billy Hicks to assist

Nails in the payment for her apartment rent.  Defendant's

Page 28 of 50

Exhibit 15 would have been in force during May of 2003, when Nails claims she was denied shelter at The Mission.  Since Nails had a rental agreement for an apartment during this time, she is not homeless as that term is defined by the McKinney Act, and therefore even if the McKinney Act applied to The Mission, Nails would not be the type of person the McKinney Act could protect.

With regards to the 2005 incident, Nails was not trying to seek shelter at The Mission, but only meal vouchers. Nails testifies:

"Q.  The whole thing in June of 2005 had to do with meal tickets?

A.   Uh-huh.

Q.   Correct?

A.   Yes.

Q.   It had nothing to do with you actually residing at The Mission?

A.   No."

Nails offers no evidence of any kind that she was homeless during the time of the 2003 or 2005 incidents nor does she have any evidence to show she would meet the definition of a homeless individual during 2003 or 2005.

Page 29 of 50

## C.    The Americans with Disabilities Act (ADA) does not apply to the Mission.

Nails also claims that The Mission violated the Americans with Disabilities Act when she was barred from The Mission.  (Amended Complaint, paragraph 5).  Nails is seeking damages under 42 U.S.C. Section 12182(a) because she claims The Mission treated her in a discriminating way. Section 12182(a) of the ADA states:

> "General rule.
> No individual shall be discriminated against **on the basis of disability** in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodation of any place of public accommodation by any person who owns, leases, (or leases to), or operates a place of public accommodation."  (emphasis added)

While The Rescue Mission is a place of public accommodation within the meaning of that term in 42 U.S.C. Section 12181(7)(K), the prohibition of discrimination contained in Section 12182 does not apply to The Mission for the following two reasons:

First, while The Mission is a homeless shelter, 42 U.S.C. Section 12187 exempts religious organizations from adhering to the ADA.  Section 12187 states, "The provisions of this subchapter shall not apply to private clubs or establishments exempted from coverage under Title II of the

C.R.A. act of 1964 (42 U.S.C. 2000-a(e))[42 U.S.C.A. §
2000(a)(et seq.] **or to religious organizations or entities
controlled by religious organizations, including places of
worship.**" (Emphasis added).

There is no factual dispute that The Mission is a
religious organization.  Guests at the Mission are required
to attend nightly religious services. (Affidavit of Brad
Hardy, Affidavit of Anna Culbreth). Nails testified:
"Q. So, as you sit here today, under oath, you've been
sworn to tell the truth by this lady right over here, do you
have any evidence or information to tell me about today,
that supports the position you're taken, that The Dothan
Rescue Mission is not a religious organization?

A.   I don't have any information or proof for you
today that The Dothan Rescue is not a religious
organization.

Q.   When you stayed at The Dothan Rescue Mission, were
you aware or were you made to go to religious services?

A.   Yes.  Was made, asked, told, that everyone would
have to go to a service in the evening.

Q.   So, Was it your understanding, when you stayed at
The Dothan Rescue Mission, that if you stayed at The Mission

Page 31 of 50

you had to attend religious services?

    A.    Yes.

    Q.    It was a requirement, was it not?

    A.    Yes.

(Nails Depo. 53 Line 4 through 54 Line 1). Nails actually
admits in her deposition that The Rescue Mission is a
religious organization:

"Q. And what is the title of Defendant's Exhibit 7?

    A.    Articles of Incorporation of The Dothan Rescue
Mission, a non-profit corporation.

    Q.    And would you please read for me Section A of the
objects and purposes of the corporation, that's contained
there on the first page of Defendant's Exhibit 7?

    A.    Objects and purpose of corporation.  The objects
and purpose of this corporation should be: A. To serve as
an arm of the church given to the soul-savings ministry
among the rejected and neglected people being found in need
of assistance, including, but without limitation those in
need of food, clothing, housing and other material
necessities and special - - specifically in need of knowing
the Good News of the Gospel of Jesus Christ.

    Q.    And would you agree with me, ma'am, that according

Page 32 of 50

to this document, Defendant's Exhibit 7, one of the objects
or purposes of The Dothan Rescue Mission is to serve as an
arm of the church?  That's what it says, doesn't it?

    A.    That's what the document says, yes.

    Q.    Yes ma'am.  And is not an arm of the church a
religious organization?

    A.    Yes."

(Nails Depo. 57 Line 7 through 58 Line 8).

    The second reason that Section 12182 of the ADA does
not apply to The Mission is because The Mission did not
discriminate against Nails because of her disability. In
order to recover under an ADA claim, Section 12182 requires
Nails to prove that she is disabled within the meaning of
the ADA, that she was discriminated against on the basis of
that disability, and that The Mission is a place of public
accommodation that does not fit within an exception to
receive the ADA's protection.  Nails has no evidence to show
that The Mission is not a religious organization and
therefore exempt from Section 12182 by the provisions of
Section 12187.

    Nails  has no evidence to show she is disabled within
the meaning of the ADA. For a Plaintiff to state a claim

under Title III of the ADA, "A Plaintiff must allege that
(1)He is a disabled individual; (2) He was denied the full
and equal enjoyment of the goods, services, facilities,
privileges, advantages, or accommodations of any place of
public accommodation by any person who owns, leases (or
leases to), or operates a place of public accommodation, and
(3) The discrimination was by reason of such disability.  42
U.S.C. §12182(a)."
*Lucibello v. Collins*, No. 2:05CV268FTM295PC, 2005 U.S.
Dist.,2005 WL 1882761 at *2 (M.D. Fla., 2005).

Nails must prove that she is disabled in order for the
ADA to apply to her.  To qualify as disabled under the ADA,
the Nails must initially prove that she has a physical or
mental impairment.  *Toyota Motor Manufacturing, Inc. v.
Williams*, 534 U.S. 184, 194 (2002).  Nails claims to have a
physical impairment.  Her testimony shows:

"A.  I was awarded Social Security disability with
Medicare and Medicaid, back in 2003, in November.

Q.  And why were you awarded Social Security
Disability back in November of 2003?

A.  Because my left foot has a sty that comes and
goes.  My back, in the lower part, has chronic back pain.

Page 34 of 50

Both my knees, right and left, have pain."

(Nails Depo. 35 Lines 13-21).

Courts have adopted the following definition used by the Department of Health and Human Services, to define a physical impairment, "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: Neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endoctrine." *Toyota Motor,* 534 U.S. at 194-95. A person is not automatically considered disabled for ADA purposes simply because they suffer from an impairment. "Merely having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity." *Id.* Major life activities include "walking, seeing, hearing, and, as relevant here, performing manual tasks." *Id.* "To qualify as disabled, a claimant must further show that the limitation on the major life activity is substantial." *Id.* According to the E.E.O.C. regulations that provide guidance in this area, "substantially limited

means unable to perform a major life activity that the average person in the general population can perform; or significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Id.* at 195-96.

Nails offers no evidence whatsoever that she qualifies as disabled as that term is defined in the ADA. Nails own testimony actually supports the fact that she is not disabled because she is not limited in any major life activity. Nails testifies that she is able to work. Nails's own testimony shows that since being awarded Social Security Disability she has been able to operate her own cleaning business:

"Q. So, you had gainful employment during this year?

A.  I was self-employed, yeah. I was also self-employed for a couple of months in Ft. Walton Beach, Florida, where I had my own cleaning business.

Q.  How long were you self-employed in the cleaning business in Ft. Walton?

Page 36 of 50

A.   I started, I think it was in April, until - -

Q.   April of this year, ma'am?

A.   April or June.

Q.   April, May, June?

A.   Uh-huh.  2006.

Q.   Were you gainfully employed before having your own
cleaning business down in Ft. Walton Beach, Florida, in
June, this year?

A.   I can't think of anything else, this year.

Q.   What about in 2005?

A.   I had my own cleaning business in 2005, and I was
- -

Q.   Ma'am, I am sorry.  I don't mean to - -

A.   I had my own cleaning business in 2005.

Q.   Okay.  And where was that?

A.   Ft. Walton Beach, Florida.

Q.   And I apologize to you, again, but I do have a
little problem hearing you.  So, when you rambled and were
kind of mumbling, then, I can't understand you.  And the
whole purpose of this is for you and I to communicate.
Okay?

A.   (Witness nodding head in affirmative).

Page 37 of 50

Q.   How long did you operate this cleaning business in Ft. Walton?

A.   I think that was May through August, May through August or September of 2005."

(Nails Depo. 33 Line 21 through 35 Line 8).

In addition to the cleaning business, Nails's testimony clearly shows she was able to perform other manual labor. When asked about her work for Kelly Services, Nails testified:

"Q.  And that's a temporary employment agency of some kind?

A.   It's temporary employment, yes.

Q.   Did they assign you to specific places?

A.   Just one Tri State, in Marianna, Florida.

Q.   What is Tri State, in Marianna, Florida?

A.   It's a auto part warehouse.

Q.   And what did you do for them?

A.   I was just there for two days - - a day and a half.  Myself and a couple of other individuals moved boxes from one shelving area to another shelving area."

(Nails Depo. 32 Line 12 through 33 Line 1).

Nails's testimony discussed above clearly shows that

she was not suffering from any impairment that limited one
of her major life activities. "It is insufficient for
individuals attempting to prove disability status under this
test to merely submit evidence of a medical diagnosis of an
impairment. Instead, the ADA requires those "claiming the
Act's protection... to prove a disability by offering
evidence that the extent of the limitation [caused by their
impairment] in terms of their own experience ... is
substantial." *Toyota Motor*, 534 U.S. at 198. Nails has
presented no evidence to meet this burden. Therefore Nails
is not disabled under the ADA's definition of that term and
cannot recover under the provisions of the ADA.

Nails' only evidence of any type of disability is her
Social Security Disability status. Nails was not even
awarded Social Security Disability until November of 2003.
(Nails Depo. 35 Lines 13-15). This was 6 months after the
alleged incident at The Mission in May of 2003. (Amended
Complaint).

Nails alleged disability did not play a part in The
Mission's decision to refuse Nails service. Nails refused
to follow many of the rules established by The Mission.
Nails called The Mission's Executive Director, Harry

Page 39 of 50

Culbreth, and his wife, Anna Culbreth, Assistant Executive
Director, at home on numerous occasions complaining about
The Mission's program requirements. (Affidavit of Anna
Culbreth). A combination of the harassing phone calls, the
reports about Nails conduct from employees at The Mission,
and her refusal to follow the rules established for a guest
at The Mission were the reasons The Mission asked Nails to
leave and never attempt to stay at The Mission again.
(Affidavit of Anna Culbreth).

With regards to the 2005 incident, Brad Hardy stated:

"Part of my job as Executive Director is reviewing the
files of people who apply for assistance from the Mission.
In January of 2005, I reviewed the Mission's file on Nails
when she applied for assistance. I also interviewed Nails to
determine her financial needs. Her file showed that she had
broken rules at the Mission in the past, and that the
previous Director had barred her from the Mission. Nails
indicated to me that she had shelter, but she wanted to stay
at the Mission to save rent money. After learning these
facts, I denied Nails any financial assistance or shelter."
(Affidavit of Brad Hardy). Part of Hardy's job is to review
the files of people seeking assistance from The Mission.

Hardy reviewed Nails file when she applied for assistance, and he also interviewed her to determine her financial needs. (Affidavit of Brad Hardy). A review of Nails' file showed that she had broken numerous rules at The Mission in the past, and that the previous director had barred her from The Mission. (Affidavit of Brad Hardy).

Hardy assisted Nails with meal vouchers until Nails began to harm morale at the Mission. Hardy states: "I did provide Nails with meal vouchers for the cafeteria on quite a few occasions. These vouchers were revoked, however, after I learned that Nails was speaking negatively of the Mission while she was using our cafeteria." (Affidavit of Brad Hardy).

Nails has presented no evidence of any kind that the 2003 or 2005 incidents at The Mission had anything at all to do with a disability or any activity protected by the ADA. Her testimony on this issue is clear:

"Q. Let's get back to May of 2003. Do you have any evidence or information to support a claim that you being asked to leave after this trial period in May of 2003, had something to do with a physical disability that you had?

A.  No.

Page 41 of 50

Q.    Do you have any evidence or information that might support a position that your meal tickets being taken away from you in June of 2005, had something to do with a physical disability that you had?

A.    No."

(Nails Depo. 92 Line 24 through 93 Line 10).

The discussion above clearly shows that The Mission's decision to barr Nails was not based on her disability, but upon Nails' conduct and her refusal to follow the rules and procedures of The Mission. Nails' claim that her alleged disability played any role in her relationship with The Mission is completely unfounded.

**D.    Nails' Complaint was not timely filed with regards to the May 2003 incident.**

The ADA does not contain a limitations period for filing claims.  Where a federal statute does not contain a limitations period, Courts should look to the most analogous state statute of limitations.  *Everett v. Cobb County School District,* 138 F.3d 1407, 1409 (11th Cir. 1998).  Since the ADA does not contain a limitations period, the 11th Circuit has followed the guidance of the Supreme Court and adopted the forum state's limitation period for personal injury

actions as the limitation period for the ADA.  Everett, 138 F.3d at 1409-10.  As the Supreme Court of Alabama has noted, "The statute of limitations for personal injury actions is two years. §6-2638(1), Ala. Code 1975).  A cause of action accrues when a party suffers an injury or a loss or damage entitling him or her to maintain an action." *Nelson v. Estate of Frederick*, 855 So.2d 1043, 1047 (2003).

Nails claims that one of the incidents she is suing for occurred in May of 2003.  (Amended Complaint, Nails Depo. 41 Lines 11-15).  Nails did not file this lawsuit until <u>August 16, 2006,</u> well beyond the applicable two year statute of limitations. (Complaint).

**E.    The First Amendment does not apply to the Mission because The Mission is not a state actor.**

Nails also claims that The Mission violated her First Amendment rights.  (Complaint, Amended Complaint).  Nails has no evidence of any kind to show that The Mission is a state actor or that The Mission participates in "state action."

"The Fourteenth Amendment, and, through it, the First and Fifth Amendments, do not apply to private parties unless those parties are engaged in activity deemed to be "state

action." *National Broadcasting Co., Inc., The*
*Communications Workers of America*, 860F.2d 1022, 1024, (11th
Cir. 1988). As the Supreme Court clearly stated in *Edmonson*
*v. Leesville Concrete Co., Inc.:* "with a few exceptions,
such as the provisions of the Thirteenth Amendment,
constitutional guarantees of individual liberty and equal
protection do not apply to the actions of private entities.
500 U.S. 614, 619 (1991). The *Edmonson* Court pointed out,
"one great object of the Constitution is to permit citizens
to structure their private relations as they choose subject
only to the constraints of statutory or decisional law."
500 U.S. at 619. To determine if a private party is
participating in "state action" courts must look to (1)
whether the claimed constitutional deprivation resulted from
the exercise of right or privilege having its source in
state authority, and (2) whether the private party charged
with the deprivation could be described in all fairness as a
"state actor." *Edmonson*, 500 U.S. at 620.

When we apply the two-part state action test to The
Mission, it is clear that The Mission is not involved in
state action nor is it a state actor. The Mission receives
no state, local of government funding of any kind in the

operation of its homeless shelter and cafeteria. (Affidavit
of Brad Hardy, Affidavit of Anna Culbreth). The Mission is
not a branch of the City of Dothan. (Affidavit of Brad
Hardy, Affidavit of Angela Palmer). The Mission does not
derive its ability to help the needy people of Houston
County and the surrounding areas from any governmental
authority, nor does The Mission rely upon any governmental
assistance in accomplishing its purpose. Therefore, any
constitutional deprivation Nails claims does not arise from
The Mission exercising any right or privilege originating
from state authority.

With regards to the second prong of the test in
*Edmonson,* The Mission cannot be described in all fairness as
a state actor. The Mission does not receive any state,
local or federal government funding. (Affidavit of Brad
Hardy). Nails's testimony also supports this claim. (Nails
Depo. 104 Lines 11-17, Nails Depo. 60 Line 23 through 61
Line 2). The Mission's purpose of spreading the Gospel of
Christ to the less fortunate citizens of the Wiregrass area
is not a function that is traditionally carried out by the
government. Every aspect of The Mission's business leads to
the conclusion that it is a private religious organization,

and it is not operating as a branch of any governmental entity.

Since the two-parts of the *Edmonson* test have shown that The Mission is **not** a state actor, The Mission cannot be liable for violating any of Nails's constitutional claims.

**F. Nails voluntarily, knowingly, and intelligently waived her rights to sue The Mission.**

Nails waived her right to file suit against The Mission because each time she applied for assistance at The Mission she signed registration cards containing a Release, waiving her rights to sue The Mission. As Defendant's Exhibits 12 and 18 clearly show, above Nails's signature on her registration cards, the following language is present, "I relieve The Dothan Rescue Mission, Inc. of all liability for any and all losses, injuries, damages, whatever, whether through intent, negligence, accident, whatever, and whenever sustained." Nails's Deposition testimony shows that she could read this language on the registration cards. The following testimony concerns the Release:

"Q.  Are you able to read the words above your signature on Defendant's Exhibit 12?

A.  It says, "I relieve The Dothan Rescue Mission,

Page 46 of 50

Inc., of all liability for any and all losses, injuries, damages, whatever, whether though (sic) intent, negligence, accident, whatever, and whatever situation (sic)-- sustained."  I can't make that last word out.

    Q.  But, there is writing that's above your signature on that document, Defendant's Exhibit 12?

    A.  Yes.

    Q.  And you were able to read most of it?  Would you agree with that?

    A.  Yes.

(Nails Depo. 97 Lines 23).

    To be enforceable, "waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of irrelevant circumstances and likely consequences."  *Brady v. United States*, 397 U.S. 742, 748 (1970).  The deposition testimony above shows that Nails could read the wording of the Release on the registration card.  Nails also voluntarily signed the registration cards when she sought assistance from The Mission.

    Nails has attended numerous colleges and universities and only lacks approximately 25 hours for completing her

bachelor's degree in Business Management.    (Nails Depo. 31 Lines 13-22).    Nails graduated from Leavenworth High School, in Leavenworth, Kansas in 1980.    (Nails Depo. 20 Lines 7-14).    After high school, Nails entered The United States Army and served for a year and a half before being honorably discharged.    (Nails Depo. 20 Lines 15-19).    After her stint in the military, Nails took a position working for the Federal Government.    Nails testified:

"Q.  Where did you work?

A.    I was, like, in a supervisor's position for non-appropriated funds.    I was over all the systems for the Air Force and the Army for the Herbert Field, at Ft. Stewart, Georgia,..." (Nails Depo. 24 Lines 18-22).

Nails testimony above shows that she has received her high school diploma, successfully served in the military, worked in a supervisory position for the Federal Government, and she is very close to completing her bachelor's degree in Business Management.    These facts show that Nails is capable of understanding the language of the Release on the registration cards she signed.    Since Nails voluntarily signed the cards, knowing what she was signing, and she possessed sufficient intelligence to understand the meaning

of the words and the consequences of signing the Release, she has waived her ability to sue The Mission for any of the claims stated in her Complaint and Amended Complaint.

## CONCLUSION AND PRAYER FOR RELIEF

The Dothan Rescue Mission is clearly entitled to summary judgment in this matter. No ADA claim was filed timely as to the may 2003 incident. Nails' ADA claim does not meet the clear requirements of the act.

The Mission is not a state actor, it does not receive federal, state, or local government funding, and the Urban Development and Housing Act is a law of a foreign nation. These facts show that none of Nails' claims in her Complaint and Amended Complaint apply to The Mission. Nails has no evidence of any kind to support any allegation she makes the basis of this suit.

BASED ON THE FOREGOING arguments, evidence, and authorities, this Court should GRANT SUMMARY JUDGMENT. Wherefore, The Mission, moves the Court to grant it a full, final, and appealable summary judgment against the Plaintiff in this matter as to all counts, or alternatively, as to such counts as the evidence and law entitle it.

HARDWICK, HAUSE, SEGREST & WALDING

BY: _____
     Kevin Walding (WAL036)
     ASB 8121-I-69J

BY: _____
     Patrick B. Moody (MOO110)
     ASB 0902-T-73M
     Post Office Box 1469
     Dothan, Alabama 36302
     (334) 794-4144
     (334) 671-9330 (FAX)
ATTORNEYS FOR DEFENDANT

### CERTIFICATE OF SERVICE

    I hereby certify that, this date, I have served a copy of this document on the following attorney (s) of record by placing a copy in the United States Mail in a properly addressed envelope with prepaid postage.

Angela Denise Nails
342 South Saint Andrews Street
Apartment 808
Dothan, Alabama 36301

    This the 26th day of January, 2007.

_____
Of Counsel